# Synapsis

Queensbury Union Free School District is permitting an atmosphere of discrimination to permeate the educational program. This deprivation of civil rights resulted from the school district's custom and widespread practice of discouraging Title IX investigations and failing to adequately address sexual harassment. This is a well-settled district-wide practice that constitutes a standard operating procedure of Queensbury Union Free School District. As the final decision maker, Superintendent Kyle Gannon turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights and further harm to students. He made a subsequent deliberate choice to deny a new district-level investigation with an investigator not employed by the school district offered at the appeal level. A deliberate choice by an individual government official constitutes government policy if the official has been granted final decision-making authority concerning the relevant area or issue. This decision has caused the deprivation of rights at issue by school board policies which affirmatively command that it occur, and by acquiescence in a longstanding practice which constitutes the standard operating procedure of discouraging Title IX complaints.

As you look through this information, I think you will see clear indications of negligence on behalf of the Queensbury Union Free School District. The bus driver, Ken Bee, demonstrated a lack of ordinary care by failing to adequately supervise the children on the district school bus from September 2020 through February 2021. As shown on the video, the bus driver heard sexual harassment taking place but did nothing to address it, nor properly reported it as outlined in school board policies. Ken Bee had a reasonable opportunity to intervene and simply refused to do so. This negligence also includes inadequate training and inadequate supervision of the district hired school bus driver and Title IX appointed staff. The school district is aware that bullying and harassment are a highly predictable consequence of inadequate training & supervision and that adequate interactive bullying and harassment training is necessary to protect children and conduct an unbiased investigation. Policymakers' decision not to train the Title IX investigators or hire a properly trained investigator, led directly to sex stereotyping and additional discriminatory practices.

The grievance process prescribed in the final regulations is consistent with constitutional due process guarantees and conceptions of fundamental fairness, in a manner designed to accomplish the critical goals of ensuring that recipients resolve sexual harassment while lessing the risk that sex-based bias will improperly affect outcomes. My daughter was subjected to further sexual discrimination during the interviews due to sexual stereotyping and a lack of objectivity by the Title IX coordinator. My son was asked to disclose what happened to him, while my daughter was told "you don't have to talk about it, if you don't want to". This specific treatment caused additional emotional injury and increased vulnerability to my daughter. After a lot of push and advocacy the district ended up investigating the original complaint and found that ▮▮▮▮▮▮▮▮▮ were both victims of sexual harassment; however, my daughter was never offered any type of supportive services. The school also rationalized the harassing behavior as an impulsive act (although intent is shown on video) and has minimized the harm stating "there was no touching", and "he was remorseful."

▮▮▮▮▮▮ was diagnosed with depression, anxiety, and tic disorder during the 2020-2021

school year. He was medicated and received help from an outside counselor and psychiatrist. The district refused separate transportation for the perpetrators or ██████████ and denied an IEP to adequately meet the emotional and social needs of ██████ Although I explained the constant stress and anger ██████ was enduring this school year, school staff denied they were aware of anything further happening to her. She requested to move her bed away from the window, was expressing fear that someone was going to come and take her, and was violent on multiple occasions when she was asked to take a shower. ██████ also received help from an outside psychologist this past school year who thought she had either repressed additional information related to the harassment or was just not being truthful. On August 20, 2021 as a condition of a due process settlement, and under the written agreement of non-disclosure, I was allowed to watch additional video evidence from the January 29th incident. On this video I observed many unsafe behaviors as well as physical bullying occurring amongst other students. I observed and heard students having many inappropriate conversations, taking pictures of students secretly, and watching and sharing inappropriate material on personal devices while on the school bus. Most shockingly, I heard a student threaten my daughter by saying "I will rape you and your mom." I also heard this boy say to my son "You should let your sister suck your penis when you get home, it will feel good." School staff was aware of this threatening rape comment on February 1, 2021, yet never informed me or the parents of the perpetrator.

Administrators were aware of bullying conduct in the past, but failed to take precautions against future incidents. When incidents arose this year, they failed to appropriately respond. In the K-12 arena, the immediate response of the district is integral for allowing students to feel safe and continue their education. Due to the lack of concerted response, ██████ and ██████ have been left feeling unsupported and have disengaged from their education. Neither wanted to continue in the music program, enroll in summer activities associated with the school, or join after-school clubs. ██████ also no longer wants to play baseball; something he previously enjoyed and excelled at. The supportive measures you will see included in the board decision, which are not actually supportive measures at all, were not tailored to meet the needs of ██████ or ██████, and were not directly related to restoring what has been lost. They also fail to mention that they are not paying for the counseling mentioned, and do not provide transportation for the clubs or mentoring. School meetings that were held at my request were filled with smoke and mirrors, and there was little to no follow-through or further communication. I have also received a lot of promised actions that fall short, or just never happen.

The final regulation also expressly protects information protected by legally recognized privileges, ensuring that a party's treatment records are not used in a grievance process without the party's voluntary, written consent. No one from the district had voluntary written consent to access ██████'s mental health records during this investigation. I also never requested them to contact Parsons and ask for expedited services. Although I inquired about the district's relationship with Parsons at one point, I have never signed a release for them to be able to communicate. ██████'s treatment provider information was shared district-wide with administrators, school board members, teachers, the school attorney, secretaries, and could continue to be accessed by anyone capable of obtaining the board appeal letter; all without any consent to do so. Administrators have also shared details of the sexual harassment with other parents from the district without consent, and failed to inform me of my rights to confidentiality

during the investigation. The board hearing that was held under NYS DASA regulations, was attorney led and I was never informed of my rights to equal representation. Our families' directory information was also shared with the respondents family without my consent.

This Title IX regulation also requires that both parties receive copies of evidence gathered during the investigation that is "directly related to the allegations" in the formal complaint. Neither party received actual copies of evidence. The regulation also requires that both parties be sent a copy of the recipient's investigative report that summarizes all relevant evidence including inculpatory and exculpatory evidence. A summary of information used was sent, but not a summary of the actual evidence. Statements made by witnesses were never provided to either party and the school district has denied my continual requests to view all of the evidence used for the investigation. They also refused to allow the State Police to view the bus video, stating to them it is protected by FERPA. If this is contained in my childrens' educational record protected by FERPA, then I have the right to view it. The refusal is a denial of my rights as a parent. Records requests have not been fulfilled to date under IDEA nor FERPA.

The school board's sexual harassment & bullying policies have little value because they fail to monitor them. Parents who complain of Bullying and Harassment conduct are routinely retaliated against or ignored and no meaningful investigations ever take place. Other standards of care compromised include the duty to inform parents of harm to their children and duty to warn of dangerous conditions on school property. The school district was aware there were more victims during the investigation but did not inform parents. They did not add victims to the investigative report nor launch new investigations. In fact, an additional written complaint was received by the district, with an additional victim in this situation, but the school district did not investigate it. Despite notice of multiple victims and incidents, the district did not take appropriate action, and in some circumstances took no action, to prevent the harassment from recurring. In addition, the district before and after the sexual harassment of the students, failed to monitor the effectiveness of sexual harassment policies and procedures as required by federal law. Had the district adopted and implemented such policies and procedures, the district could have prevented the continued harm. Title IX of the Education Amendment, 20 U.S.C. 1681, states "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. ███████ and ████████████, 5th grade students of the Queensbury Union Free School district, were subjected to discrimination on the basis of sex, which denied them the equal access to educational programing and district transportation. ████████ and ██████'s safety and educational needs remain unsupported by school district staff, and the effects and harm associated is affecting their education and overall quality of life. The district's grievance procedure has been exhausted, and progress is illusive at best due to a counteractive agenda by the school district. ███████ and ███████ are currently not attending Queensbury Schools, nor any school for that matter.

**Leading up to..**

October 15, 2020, ▮▮▮▮ came to me upset and crying right when she got off the bus. She said she couldn't hold it in anymore.She told me that kids had been really mean to ▮▮▮▮ on the bus for the past few days. She said it had been happening "for a while" and she felt guilty for not protecting him. She told me older boys in the back were offering her cheetos to sit with them and not sit next to her brother because "he was ugly" they told her. She told me about a specific boy named ▮▮▮▮ taunting ▮▮▮▮ and making him upset on a daily basis. (▮▮▮▮ was experiencing anxiety-induced hives)

**10/15/20-Reported Bullying incident from bus**

▮▮▮▮▮▮▮▮  <▮▮▮▮▮▮▮▮▮▮▮▮>          Thu, Oct 15, 2020 at 4:45 PM

To: "Cosh, Gwynne" <▮▮▮▮▮▮▮▮▮▮▮▮>

*"Hi Mrs. Cosh, I was hoping you can help with a bus incident. A boy named ▮▮▮▮ has been picking on ▮▮▮▮. Yesterday he told him he had a big head and that his hives make him look like he has eczema. ▮▮▮▮ always struggles with self esteem but this is affecting him a lot. He has an appointment to see a physiatrist next week. I know kids can be mean but if you could at least seperate the boys on the bus that would be helpful I guess. I appreciate any help." ▮▮▮▮▮▮▮▮*

Mrs. Cosh followed up that she would be out tomorrow, but would have the assistant principal look into the situation tomorrow. I talked with ▮▮▮▮ and ▮▮▮▮ a little more and found out that kids were approaching him to be mean, and did not even sit near him so I sent a follow-up email.

*"Thank you! Apparently he doesn't even sit near them but the middle schoolers walk up and down the aisles and switch seats after other kids get off. ▮▮▮▮ said they also take their masks off on the bus to eat. She said this ▮▮▮▮ kid told her today that she was cooler than ▮▮▮▮ and that he would bring her cheetos tomorrow. I'm quite shocked to hear all of this honestly."*

The next day assistant principal Amanda Denno sent a follow-up email: ==**The bus driver had notice here that bullying was going on**==.

Denno, Amanda ‹adenno@queensburyschool.org›                                        Fri, Oct 16, 2020, 11:16 AM   ☆  ↰  ⋮
to me ▼

Hi ▮▮
I hope you're doing well. I called you, but was unable to leave a message because your mailbox is full. I spoke with ▮▮ and ▮▮ this morning and they gave me some information about the bus. I called and spoke with the driver on the bus. I also talked to the Middle School Assistant Principal about ▮▮. She is taking care of that with him right now. I let ▮▮ and ▮▮ know that I wanted to know about how the bus went this afternoon and if there are any more issues. Hopefully, we have this resolved and the bus will be a more peaceful place!

Feel free to give me a call if you have any questions,
Amanda
▮▮▮

Hi ▮▮▮,
*I hope you're doing well. I called you, but was unable to leave a message because your mailbox is full. I spoke with ▮▮▮and ▮▮▮ this morning and they gave me some information about the bus. ==I called and spoke with the driver on the bus==. I also talked to the Middle School Assistant Principal about ▮▮▮. She is taking care of that with him*

***right now. I let █████ and █████ know that I wanted to know about how the bus went this afternoon and if there are any more issues. Hopefully, we have this resolved and the bus will be a more peaceful place!***

***Feel free to give me a call if you have any questions,***
***Amanda***

That afternoon █████ and █████ confirmed they had spoken to Mrs. Denno, but were picked up from school. The next day they reported █████ was moved to an assigned seat at the front of the bus and reported things were "better" but asked what a "lesbian" was, stating they heard it on the bus. I praised them for coming to me with questions and how proud I was of █████ for speaking up. We started talking about the importance of telling vs. tattling at this time and when to speak up for yourself or others. The following week of school █████ was not acting himself again. He started having trouble sleeping and was complaining of stomach aches.

**10/24/21-Intake appointment with a Psychiatrist.** █████ told her other kids were very mean to him and that he did not have any friends at school. He did not elaborate on specifics or bring up the bus incident. █████ was put on anxiety medication.

Over the course of the next month, I kept in contact with █████'s psychiatrist and pediatrician, as well as continued to try to find outside counseling. We followed suggestions of starting a positive mindset journal, using a weighted blanket to help with sleep, and even bought him a puppy to give him responsibility after school to prevent him from running to his room.

# A Cry For Help

These papers were sent home in a folder prior to parent/teacher conferences by the classroom teacher. According to the date of email, these were completed on or about Nov 9, 2020.

 

Pencil marks were ▮▮▮▮ or ▮▮▮▮'s self-assessment. ▮▮▮▮ identified "I need help" for being a problem solver but then changed her mind to the middle column. The blue marker marks were made by the classroom teacher during a discussion following the student's self-assessment.

When these papers were discussed at the P/T conference, the teacher indicated the ▮▮▮ would get off the bus upset (blue marker was her marks she wrote when she discussed the assessments with the ▮▮▮). She said she thought maybe they were arguing on the bus. I followed up with the ▮▮▮ about this. They said they are good on the bus, but told me the other kids on the bus are "really bad."

In December, mornings became very difficult to get ▮▮▮ to school. He was often hiding and crying saying he hated school and did not want to go. ▮▮▮ started wearing makeup and expressing she wanted to wear belly shirts. Due to the ▮▮▮ "non-spoken" indicators that something more was going on, I called Anntoinette Donohue, school counselor, at the WHBI mid-December to explain my concerns and expressed I am getting worried that something is happening to them at school, especially to ▮▮▮ who was having school avoidance and resistance, and had been bullied in the past. Mrs. Donohue stated she would touch base after the holiday because her schedule was tight. She did not remember talking with me in the fall time.



Following the school break, ████ told me Mrs. Donohue met with him one time. He said they talked about how he does not like school. I was not contacted about this meeting, not the other ones. The following Wednesday ████ said he met with her again. He said they talked about the importance of smiling because he was upset. Due to meeting twice, I contacted Mr. Donohue on January 15, 2021 to ask her if there was a meeting set up to meet with ████. She told me she does not provide therapy and that I should be trying to find him counseling outside of school. I told her his complaints were school-related so I thought she could help, but that I was also seeking outside counseling and was on a waiting list for Parsons. She told me "if you want something above and beyond what a regular student gets, you will need to request a 504". She told me ████ started crying when she asked how school was going, and that it is obvious to her he has anxiety. (I was under the impression that she was not going to be seeing him again) ████ stated she did see him on another Wednesday after the January 29, 2021 incident and she taught him how to breathe. ████ told me they met and he told her he was scared of ████. "Mrs. Donohue can't help me" ████ said. (It was obvious this was not a trusting relationship.)

**On Tuesday January 19, 2021**, I emailed Mrs. Denno (504 Coordinator) The email reads as follows:

*Hi Amanda, I just called but you were in a meeting. Unfortunately my day is busier than anticipated so in case I don't catch you later-I thought I would just send an email. I am looking for a way to help ████ right now socially and emotionally. Although we are on a few waiting lists for outside counseling, my hope is that some support can be provided at school. I know you are aware of some of ████ 's obstacles but unfortunately things have not gotten better. It is becoming increasingly difficult (anxiety and sadness) in the mornings before school because he does not want to go. To him-school is the issue. (no friends, academics are too easy or too hard, no fun...ect...) I know this not to be the case, but it is very hard to help him change his mindset without being in school with him or knowing more about his day. I certainly do not want to ask for anything I am not entitled to, but felt very frustrated after talking to Mrs. Donohue on Friday. It is very apparent that he will not receive any sort of counseling at school with her without a 504 plan (which is not appropriate). Her words also made it clear that it was not necessary because the teacher is not reporting any behaviors. It was upsetting to hear that kids who handle their*

*emotions internally may not get needed help. Anyway, I am wondering if there are any tier 2 programs that would help █████ I am not aware of? Is there a mentor program of some sort at school? Is there an SEL program the school uses that I can look up and connect with him about? Does the school have direct contact with the parsons program? He has been on a waiting list since August. █████ is coming home from school with hives again, and although we have made some gains at home, every time he has to go back to school it feels like starting all over again.  At this point, I would love any advice you may have. I appreciate the help and support so much!* ██████████

Amanda Denno called me later that day. She said that Mrs. Donohue's schedule is "tight", and due to covid they are not doing clubs or mentoring right now. No tier 2 programs, no social emotional curriculum. I asked for anything to help █████ even some sort of notification to know what is going on at school to try to connect with him about positive things. She told me about the morning announcements on YouTube and asked Kelly Doerings from Parsons (School-based counseling) to reach out to me.  I also asked Amanda to give the specials' teachers a heads-up about ██████ 's needs right now because I felt the awareness in all areas of his school day would be beneficial right now to support him getting through this tough time. She said she would.

# You Can't Fix What You Refuse to See



The final regulations within Title IX, obligate school districts to respond promptly and supportively to persons alleged to be victimized by sexual harassment, resolve allegations of sexual harassment promptly and accurately under a predictable, fair grievance process that provides due process protections to alleged victims and alleged perpetrators of sexual harassment, and effectively implement remedies for victims. The Queensbury Union Free School District spent more time trying to talk me out of filing a Title IX complaint, then they did trying to help the victims. They told me this was the first Title IX investigation they had in at least 30 years. It is very clear to me now why this is. Queensbury operates under a policy and practice of discouraging such complaints and offers a DASA investigation instead because the report is easier to hide. When I was persistent in my rights to the Title IX process, it was clear this upset the school, and in turn my children's needs were not met as a retaliatory act. Queensbury Union Free School district also interfered with the right and privilege secured by Title IX when they failed to enter additional complaints and evidence into the investigation when they had actual knowledge of additional sexual harassment. The school district explains Title IX investigations as unnecessary and only intended for college level institutions.

**The following DASA guidelines for schools also helped me realize my children were not only sexually harassed, but victims of a hostile bullying environment as well.**

*Respond: When bullying is reported to you or witnessed by you, you must respond and intervene immediately, making sure that everyone is safe. Model respectful behavior when you intervene and reassure the student who has been bullied that what has happened is not his or her fault. Ask the student, "What do you need from me?" This may help you determine some of your next steps, including what kind of follow-up is needed. Immediately address the impact the student's behaviors had on the individual(s) who was physically injured and/or emotionally harmed. School officials should offer ongoing counseling for both parties, although separately, and survey all involved students on their perception of school being a safe learning environment with a culture of respect for all students.*

▆▆▆▆▆ started counseling through Parsons on 3/12/21, but we had been on a waiting list for many months. The intake was completed in November. This initiation had nothing to do with the school. Mrs. Denno told me Mrs. Donahue's schedule was "tight" and Mrs. Donohue herself told me she does not provide therapy. Some sort of "check-in" was started February 22nd, 2021 but there was no communication between Mrs. Donohue and I. There were no goals or progress monitoring. ▆▆▆▆ told me "Mrs. Donohue can't help him". ▆▆▆▆ started outside counseling on 3/25/21, but never offered any kind of school support ever. My children were never offered counseling from the school. Matter of fact, not one mental health provider from the school ever contacted me to see how they were doing, still to this day. Mr. Gannon's recommendation was to set up a restorative meeting between the kids without even meeting them or knowing the full story. Restorative Practices can be useful, in fact this is how I parent, but when there is an imbalance of power, however, bringing together the target of the bullying and the student exhibiting bullying behavior can cause the targeted student to re-experience the pain, fear, and feeling of helplessness. This practice should not be used as an automatic go-to remedy.

It is my educated guess that the investigation took so long because they were overwhelmed with what they recovered during the investigation. Instead of addressing the environmental issue appropriately-they decided to take the "duck and cover" approach.

**Research**: *Following a complaint or observation of inappropriate harassing or intimidating behavior, school officials must conduct an "environmental scan" to determine what occurred, who was involved in what occurred, when and where it occurred, and what could have been done differently to avoid the behavior. It is important to document what the allegations are and to try to capture information from as many sources as possible, including bystanders, about what happened, other incidents, and the harm that was done. Using their exact language, write down exactly what students say happened. It may also be helpful to try to find out whether anything happened that might have led to the incident. You may also uncover other victims, witnesses, and even additional perpetrators that will need to be interviewed.*

- ▆▆▆▆▆▆▆ (additional victims I am aware of)
- ▆▆▆▆ & Brother (name unknown) & ▆▆▆▆'s families were never contacted about watching inappropriate videos on the bus.
- Bus driver Ken Bee was removed from the bus route March 19, 2021 but parents were never informed this was happening or why.  (He still remains employed by the district as a bus

driver. I know this for certain because Mr. Gannon offered for him to be ████ and
████ bus driver during our April 12th conversation)

**Record**: The report must be thorough, accurate, and helpful. Collect and save everything in a folder.
In some cases, there may be things like text messages, pictures, <mark>videos,</mark> or e-mails that should be
copied and saved. Just like responding to the incident itself, writing and filing a formal report of a
bullying incident should always be guided by your school's policies, Student Code of Conduct and
the commissioner's regulations. Your school will probably have its own forms for writing and filing a
report. After thorough research and while reviewing your school's Student Code of Conduct, this
report is where you would make a determination as to whether an incident is bullying or some other
form of behavior.

- School Policies included below. Highlights indicate mistruths that policies are being followed.

**Revisit**: Once an investigation is completed, the school should continue to monitor the situation,
respond to harassment, and take reasonable steps when crafting remedies in order to prevent a
hostile school environment. The remedies should include responses intended to minimize burdens
on students who were targets of the harassment. After a plan has been developed for both the
student who was bullied, and the student engaged in bullying behavior, it will be important for you to
follow-up with each student to check and see how things are going. You want to find out if anything
has changed, if the plans put into place are working (or not), and if anything else needs to be done.
Follow-up gives you a chance to gather more information, and it lets all the students involved know
that there is continued adult support for them.

- Although a bus plan was created at my request, it was not successful for many reasons as
  outlined in the appeal.
- A safety plan was requested many times and has yet to be made.
- All initiations of contact are made by me. All conversations result in smoke and mirror
  conversations to distract from the problem and/or focus on a solution. Every contact I am
  "offered" something and then that offer is documented as either something great they did or
  something I "refused".
- On June 2, 2021 I met with district staff who still did not know what the climate of the bus
  was currently. (Superintendent Gannon, and building principals Cosh & Brannigan)

# Timeline



- **Date of initial complaint: 1/29/21** Sexual Harassment complaint emailed to WHBI principal and Queensbury UFSD Superintendent.

- **Acknowledgement of complaint: 1/30/21** by principal through email and phone conversation. Request for a Title IX investigation made.

**FEBRUARY 2021**

| SUN | MON | TUE | WED | THU | FRI | SAT |
|-----|-----|-----|-----|-----|-----|-----|
| | 1 Incident confirmed on video by admin ▮ Ryan rode AM bus | ② Meeting at School | ③ ▮s parents told of incident | 4 Title IX complaint accepted | 5 Interviews with ▮ & ▮ | 6 |
| 7 | 8 | 9 | 10 "Title IX not necessary-Issue has been dealt with" (Denise) | 11 Mrs. Cosh- ▮ is going back on the bus 2/22 | 12 Phone call with Mr. Gannon expressing concerns | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 Meeting with Mrs. Dunham | 23 | 24 Proposed final report received | 25 | 26 Viewed Video | 27 |
| 28 ▮ & ▮ did not ride the bus | | | | | | |

○ ▮ ISS?
○ ▮ OSS?

2/2/21-During Meeting at School I was informed ▮s parents had not been told about the incident yet "until they know what type if investigation they are going to do." (Pressured to consider DASA instead of Title IX)

- **2/1/21 Sexual Harassment confirmed and viewed on bus video** by WHBI principal Cosh and Middle School Principal Brannigan. Google Meet held-Principal Brannigan recommended a police report instead of Title IX investigation. (Landon would have been viewed in the video as a witness and victim as well)

- **2/2/21 Meeting at School** with myself, Middle School principal Brannigan, WHBI Principal Cosh, and Assistant Superintendent/Title IX Coordinator Denise Troelstra  (I was informed ▮'s parents had not been told yet, grievance process discussed, informal restorative resolution recommended and denied) According to Title IX Final Rule, "Schools may not offer an informal resolution process unless a formal report is filed"

- 2/3/21 Telephone call from Denise Troelstra asking if I still wanted a title IX investigation. DASA report recommended instead. (Requested both Title IX and DASA) According to Mrs. Dunhum, ▮'s parents were informed of the sexual harassment on this day. Before this day she was told she had to transport ▮ to school right now because he said the word "rape" on the bus.

- **2/4/21-Complaint accepted and received by email**. ▮ told me this night that a boy on the bus had been talking to her about her private parts for a while on the bus. I asked her if he said the word Vagina or was talking about her specific private part. She said she didn't understand what he was saying about it but she felt sick. She was yelling and very upset. I focused on calming her down knowing the interview was taking place tomorrow and more information would

probably come out then.

- **2/5/21-Interviews with** ████ **and** ████ ████ <mark>identified as a witness by both</mark> ████ <mark>and</mark> ████ (interviewed separately) The interviews conducted by Mrs. Troelstra were beyond ill-informed. She intended to pull the twins from class and interview them in the principal's office, and then return them to class. Due to refusing this type of insensitive practice-the interviews were scheduled the next day in my presence. Mrs. Troestra did not spend any time engaging with or getting to know the twins. ████ **was asked to tell what happened on the bus, while** ████ **was told she did not have to talk about it. This silencing of her voice has had a tremendous impact on her healing**. Both of the twins were asked "What would you like to happen?" ████ said "I want people to be nice." ████ said "I never want to see ████ again". Why ask the statements if these feelings are not taken into consideration? Both of the ████ were masked, yet sitting 6ft apart from all other people, including myself. They were in a strange empty room with plastic covering the floor. Both of them were crying, and their feelings were never acknowledged or reflected upon at all. ████ eyes and legs were fluttering. I asked him if he needed to take a break or wanted to sit next to me, even though I was asked not to say anything. He nodded his head to indicate yes so I moved his chair closer to mine. He leaned onto my shoulder and grabbed my hand tight. He squeezed it hard for the rest of the interview. The ████ were never asked about any other incidents or concerns so after ████ interview was finished (still in the presence of both Denise and Mrs. Cosh) I asked her "You know how you told me a boy on the bus was talking to you about your vagina many times?" "Yes" she said. I said "What that ████ or someone else?" "That was ████" she said. ████ **has never talked about what happened to her again! She said "I don't have to talk about it" when I told her about meeting a counselor. She has since redacted the bus incident and says nothing was ever said to her (although on video). She remains in outside counseling with a psychologist.**

- **2/10/21-Phone call from Denise Troelstra.** "Title IX not necessary, issue has been dealt with." I expressed my right to the investigation and asked her to continue. Summary of information received by email later that day.

**According to QUFSD Policy: 0110-R Sexual Harassment Regulation:**

9. Parent/Student/Employee/"Non-employee" Involvement and Notification

a. Parents of student targets and accused students shall be notified within one school day of allegations that are serious or involve repeated conduct.

b. The parents of students who file complaints or are accused students will be allowed to participate at each stage of investigation and resolution procedures involving the student.

████'s parents were not informed of the allegations for 4 days. ████'s parents were never told he was identified as a witness, interviewed as a witness, nor notified that he too was a victim as seen on video.



**Phone conversation with Cheri Martindale (Director of Transportation) on March 3rd, 2021**
I introduced myself and asked for an update on bus situation following the sexual harassment complain. Cheri said a few of the boys on the bus have been a major concern in the past but that she likes to give everyone a fresh start. She said the previous bus driver handled these kids pretty well so it didn't get too out of control but that this bus driver was new to this role and needs training. She said he used to be an activities driver but because of covid-they needed him for regular bus runs. He is receiving training as of "yesterday" (3/2) when Ken and her watched the bus video together. (The first known incident happened on 1/29 and he didn't receive training until 3/2) She further told me she didn't know what happened until a week ago. Admin didn't tell her anything. She wished she knew sooner so she could have helped, she said. I asked her about the bus since September this school year. She never checked on the driver or watched prior videos because she did not receive any complaints. She said the driver's just "too nice". She apologized for what happened and sounded deeply sorry but reiterated she just didn't know. I asked her if she knew about the bullying incident from October and no...admin never told her. She then told me how disturbing the back of the bus video was and wanted me to know that the driver can't hear back there. She told me there are 3 bus cameras on the bus...one in the middle (right over the twins pretty much), one in the back, one in the front. I told her I was only shown a small clip from the front one and the bus driver would have been able to hear the kid in seat 1 yelling about two kids raping eachother. (Admin never told me about these other cameras. Why wouldn't they show me the video with my kids in it the most?) She told me the admin has only put the bus monitor on for two weeks and that she doesn't have monitors to put on the bus after that. So the plan is for [REDACTED] to come back on the bus Wednesday 3/10 and the monitor is off Friday 3/12.

**I discussed this plan with [REDACTED] & [REDACTED] pediatrician and he was very concerned. Advised me not to let the twins face him. He ended up sending me a reasonable accommodation letter to transport them because he has concerns for their safety with the school being so irresponsible.**

March 5, 2021

RE:  ███████████████
     DOB: ██████████

To Whom It May Concern:

███████████████ is a patient in our practice. ██████ has a Medical Disability due to the Diagnosis of Anxiety and Depression.  Due to his Disability, ██████ requires his Father, ██████████ (DOB: ████████) to pick him up at school in the afternoon.  ████████████ will need 40minutes per afternoon to be able to pick ██████ up at school and bring him home.  This will allow ████████████ to perform his job without having to worry about his son's safety during transportation from school to home.

Sincerely,

Electronically signed by Wright, Stuart B, M.D. on 03/05/2021 at  1:32 pm
**Stuart B. Wright, MD, F.A.A.P.**

---

## April

Thursday April 1st-Appeal Denial Letter Received

Monday April 12th-First scheduled Executive Session(rescheduled). Phone discussion with Mr. Gannon.

Kyle was initially nice and apologized...he didn't say for what..but did say "I am sorry." but then when I mentioned the board meeting, his tone changed. Mr. Gannon informed me that the board of education has been debriefed and at the executive session I would have 20 minutes to speak. I asked to see a copy of the information they have so I know what to refer to. He said "they have everything you have." He stated in his career a parent has never gone before the board so he does not know what the procedures are. He said the board members have been instructed not to talk to me and that I cannot talk to them without him and his attorney present. I asked what the follow-up will be after the conversation. He did not answer and then asked my intent for doing this. I told him it was a right outlined in the board policies and that I am very concerned about the way this has been handled. He then asked what I wanted. I explained to him that the twins still do not have access to the bus which makes it hard for them to face their fears with support. I also explained no supportive services have been provided for them by the district at all. He told me he would make a call about transportation and call me right back. He offered Ken Bee as a driver for the ██████ or to ride with Saint Mary's kids up near Lake George before getting taken home, which would be pm transportation only. I was shocked that he would suggest putting them back with the bus driver that did not protect them in the past. I asked if the transportation dept could call me tomorrow because he did not have details about how the Saint



Mary's bus works, what time they leave the school, where the ████ would board the bus ect… I explained ████████ fear of school and my advocacy for support thus far. Mr. Gannon said he would look into getting ██████ a mentor with a lego robotics interest as well. I explained my request for this in the past many times has been ignored. I did thank him for his time and consideration to support the kids at this time but explained by concern that this conversation should have happened 3 months ago and just maybe with the support provided at an earlier time the harm my children are enduring might not have gotten so bad. We tentatively set-up a meeting for Friday 4/16 with building principals and himself to discuss a plan going forward. When I asked about the board meeting again stating I still didn't understand what to expect….He tried to intimate me by saying I sent emails to building principals that were aggressive and that was why they stopped trying to help. I asked him to explain these emails and he said he did not have specifics. I suggested he look into this allegation because it couldn't be further from the truth. I explained my willingness to partner has never waivered and all I have ever wanted was for the ████ to be protected and supported in their healing, and for their educational benefit and access to be restored.

Friday April 16th-First day of the ████ riding the new PM bus. Meeting at the WHBI with Mrs. Denno, Mrs. Cosh, and Mr. Gannon. Mentoring requested for both ██████ and ██████ to help them connect a positive experience to school. I explained the lack of communication with the counselor and classroom teacher was affecting ████████ education, so I moved counseling to after school. I also requested a lego-robotics mentor (high-school student) for ██████ due to the Lego robotics club not currently running and increased school avoidance and physical symptoms related to school anxiety. They agreed to look into mentors for the ████

Monday April 18th-Email request for Board Level review of case and IEP evaluation for ██████

Wednesday April 21st-Request made again to Mrs. Cosh to get ██████ a mentor. (email)

Friday April 23rd-Met with Mrs Cosh, Mrs. Denno, and Mrs. Agans. Signed consent to evaluate. Mrs. Cosh is looking for a Mentor for ████████

Tuesday April 27th-████████ first meeting with Mentor after school.


**May**

Monday May 3rd-Met with Mrs. Cosh and Mrs. Denno. Asked about SEL curriculum (there isn't one), Asked about bullying awareness. October bullying month. (see classroom post), Mrs. Denno is looking for a mentor for ████████

Friday May 7th-"Kidnapping" Text, suicidal student, playground fight and supervision concern

Monday May 10th-Board Review in Executive Session

Friday May 21st-Received board appeal letter

Queensbury became a new Target District in 2019-2020, based on 2018-2019 data. ESSA provided $25,000 in support. (Improvement plan developed and was set to be implemented first day of school 2020) Goal #1: "Establish and incorporate Social Emotional Learning Curriculum (SEL) and practices to improve student wellness"

## 2020-21 DISTRICT COMPREHENSIVE IMPROVEMENT PLAN (DCIP)

### 2020-21 summary of priorities

In the space below, input the five district priorities for 2020-21 identified in this plan.

1. Establish and Incorporate Social Emotional Learning Curriculum (SEL) and Practices to Improve Student Wellness
2. Increase Student Attendance at QMS
3. Increase Math Achievement for subgroups: SWD & ED
4. Economically Disadvantaged Subgroup: Increase Graduate Rate
5. Literacy Interventions: Increasing ELA progress and growth for subgroups: ED and SWD

https://www.queensburyschool.org/academics/2020-21-district-comprehensive-improvement-plan-dcip/

Although ▮▮▮▮ and ▮▮▮▮ never indicated any kind of program in class where kids talk about how they are feeling or how to handle problems, I asked principal Gwynne Cosh on May 3, 2021, what their social emotional curriculum was and she explained they do not have one. She stated character education discusses some of these things. I asked if these are topics that are continued into the classroom and she said she did not know if teachers continue them into the classroom, but that they say them on the announcements. I explained my experience as an educator with the social emotional program "Open Circle" and shared my positive experiences. I then asked about bullying prevention. Gwynne stated October is bullying month and they post things in their Google Classroom. I asked if students were asked to go there and complete activities and she was unsure. I asked about the rest of the year. Assistant principal Amanda Denno stated they used to partner with the prevention council to push into classrooms and could bring that back. I expressed concern that these topics are not part of the classroom curriculum. That evening (5/3/21) I asked ▮▮▮▮ and ▮▮▮▮ about any bullying classroom discussions and neither one identified any. I found the one post on the building Google Classroom re: bullying on their chromebooks and showed them the article and quiz. These things did not look familiar to them and they stated they do not go into the building Google Classroom during school.



**Amanda Denno**
Oct 5, 2020 (Edited Oct 20, 2020)

Good Morning. As we mentioned on Morning Announcements this morning this week kicks off Bullying Prevention Month. Please see the links below to explore more about what you can do to prevent bullying.
What is bullying: Do you know? https://pacerkidsagainstbullying.org/what-is-bullying/did-you-know/
https://www.pacer.org/bullying/video/player.asp?video=96
https://pacerkidsagainstbullying.org/wp-content/uploads/2014/07/bullying101.pdf

May 10, 2021-I provided the school board with bullying information and resources and offered to pay for as many copies of the book that they needed. They did not get back to me about this.



As you can tell from the board letter received on May 21, 2021, the district does not correlate social emotional education and bullying prevention to the DASA complaint.

> Please be further advised that at the Board's direction, the District reviewed the information and documentation that you submitted to the Board on May 10, 2021 regarding your concerns on issues that went beyond the Tucker/Dunham DASA complaint and your appeal. The Board appreciates and shares your desire for the social and emotional well being of all students, along with the importance of anti-bullying training both in and out of the classroom. The District is complying with all DASA requirements, including annual trainings. Please be assured that the District will continue to evaluate and enhance social and emotional learning programs and initiatives, as well as bullying awareness.
>
> Sincerely,
>
> Timothy Weaver
> Vice President, Board of Education
>
> C: Kyle Gannon, Superintendent
>   QUFSD Board members

**Policy Located in the Code of Conduct:**

https://boardpolicyonline.com/?b=queensbury&s=24034

## 5300.15 IV. ESSENTIAL PARTNERS

All members of our learning community -- including students, staff, parents, and engaged service providers -- must assume a responsible role in promoting behavior that enhances academic and social success.  Courteous, respectful, and responsible behavior fosters a positive climate in the learning community.

Those responsibilities include but are not limited to the following:

### A. Parents

The Code of Conduct is a guide for understanding the personal, social, and academic behaviors which are expected from your child while at school and school functions.  This Code also guides how school staff will work with you and your child to help demonstrate positive behaviors and enjoy academic success.

To achieve this goal, parents will be encouraged to promote participation in restorative practices to resolve incidents and conflict and to support their child in receiving the maximum benefit from a restorative practice approach.

To achieve this goal, a parents are expected to:

1.   Recognize that the education of their child(ren) is a joint responsibility of the parents and the school community.

2.   Send their children to school ready to participate and learn.

3.   Ensure their children attend school regularly and on time.

4.   Ensure absences are excused.

5.   Ensure their children be dressed and groomed in a manner consistent with the student dress code.

6.   Help their children understand that in a democratic society appropriate rules are required to maintain a safe, orderly environment.

7.   Know school rules and help their children understand them so that their children can help create a safe, respectful, supportive school environment.

8.   Convey to their children a supportive attitude toward education and the district.

9. **Build good relationships with teachers, other parents and their children's friends.**

10. **Tell school officials about any concerns in a respectful and timely manner.**

11. **Help their children deal effectively with peer pressure.**

12. **Inform school officials of changes in the home situation that may affect student conduct or performance.**

13. **Provide a place for study and ensure homework assignments are completed.**

14. **Be respectful and courteous to staff, other parents/guardians and students while on school premises.**

**B. Staff**

The Code of Conduct is a guide for supporting positive student behavior at school. It is intended to help staff prevent student misconduct through the use of effective strategies and systems. It will provide guidance for intervening effectively and appropriately if students don't meet expected standards of behavior or violate the school rules and policies. Concerns about safety and school climate should be brought to the school principal so staff can work together to maintain a safe and orderly learning and work environment.

All staff are expected to understand that students may come to school having experienced trauma in their lives, which can impact their behavior in school (e.g. anger, outbursts, withdrawal, self-injury).

**C. Teachers**

To achieve this goal, all district teachers are expected to:

1. **Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex, which will strengthen students' self-concept and promote confidence to learn.**

2. **Be prepared to teach.**

3. **Demonstrate interest in teaching and concern for student achievement.**

4. **Know school policies and rules, and enforce them in a fair and consistent manner.**

5. **Maintain confidentiality in conformity with federal and state law.**

6.  **Communicate to students, parents and other staff:**

   1.  **Course objectives and requirements**

   2.  **Marking/grading procedures**

   3.  **Assignment deadlines**

   4.  **Expectations for students**

   5.  **Classroom behavior plan**

7.  **Communicate regularly with students, parents, administrators, guidance, and other teachers concerning growth and achievement.**

8.  **Participate in school-wide efforts to provide adequate supervision in all school spaces.**

9.  **Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee or any person who is lawfully on school property or at a school function.**

10. **Address personal biases that may prevent equal treatment of all students in the school or classroom setting.**

11. **Be open to active participation in resolving conflicts through a restorative process.**

**D. School Counselors**

**All district School Counselors are expected to:**

1.  **Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.**

2.  **Assist students in coping with peer pressure and emerging personal, social and emotional problems.**

3.  **Initiate teacher/student/counselor conferences and parent/teacher/ student/counselor conferences, as necessary, as a way to resolve problems.**

4.  **Regularly review with students their educational progress and career plans.**

5.  **Maintain confidentiality in accordance with federal and state law.**

6.  Provide information to assist students with career planning.

7.  Encourage students to benefit from the curriculum and extracurricular programs.

8.  Make known to students and families the resources in the community that are available to meet their needs.

9.  Participate in school-wide efforts to provide adequate supervision in all school spaces.

10. ==Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function==.

11. Address personal biases that may prevent equal treatment of all students.

12. ==Promote a trauma-responsive approach to addressing student behavior by supporting professional development, providing safe work environments, forming trusting relationships with students, allowing for student choice and autonomy, and encouraging student skill-building and competence==.

13. Be open to active participation in resolving conflicts through a restorative process.

E. Other School Personnel

All district Other School Personnel are expected to:

1.  Maintain a climate of mutual respect and dignity for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.

2.  Maintain confidentiality in accordance with federal and state law.

3.  Be familiar with the code of conduct.

4.  ==Help children understand the district's expectations for maintaining a safe, orderly environment==.

5.  Participate in school-wide efforts to provide adequate supervision in all school spaces.

6.  ==Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function==.

7.  **Address personal biases that may prevent equal treatment of all students.**

8.  **Be open to active participation in resolving conflicts through restorative practices.**

**F. Principals/Administrators**

**All district Principals/Administrators are expected to:**

1.  **Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.**

2.  **Ensure that students and staff have the opportunity to communicate regularly with the principal/administrators and have access to the principal/administrators for redress of grievances.**

3.  **Maintain confidentiality in accordance with federal and state law.**

4.  **Evaluate on a regular basis all instructional programs to ensure infusion of civility education in the curriculum.**

5.  **Support the development of and student participation in appropriate extracurricular activities.**

6.  **Provide support in the development of the code of conduct, when called upon. Disseminate the code of conduct and anti-harassment policies.**

7.  **Be responsible for enforcing the code of conduct and ensuring that all cases are resolved promptly and fairly.**

8.  **Participate in school-wide efforts to provide adequate supervision in all school spaces.**

9.  **Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.**

10. **Address personal biases that may prevent equal treatment of all students and staff.**

11. **Promote trauma-responsive approach to addressing student behavior by supporting professional development, providing safe work environments, forming trusting relationships with students, allowing for student choice and autonomy, and encouraging student skill-building and competence.**

12. **Be open to active participation in resolving conflicts through a restorative process.**

**G. Dignity Act Coordinators**

The Dignity Act Coordinators will be annually appointed at the reorganizational meeting each school year. The Dignity Act Coordinator responsibilities for each building are assigned to an Assistant Principal in each of the respective building. The District Compliance Officer duties will be assigned to the Assistant Superintendent for Personnel and Recruitment. Contact information for these individuals is posted on the District website.

**All district Dignity Act Coordinators are expected to:**

1. **Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.**

2. **Oversee and coordinate the work of the district-wide and building-level bullying prevention committees.**

3. **Identify curricular resources that support infusing civility in classroom instruction and provide guidance to staff as to how to access and implement those resources.**

4. **Coordinate, with the Professional Development Committee, training in support of the bullying prevention committee.**

5. **Be responsible for monitoring and reporting on the effectiveness of the district's bullying prevention policy.**

6. **Address and investigate issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.**

7. **Address personal biases that may prevent equal treatment of all students and staff.**

**H. Superintendent**

The district's Superintendent of Schools is expected to:

1. **Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color,**

weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.

2.  Inform the Board about educational trends relating to student discipline.

3.  Review with district administrators the policies of the Board of education and state and federal laws relating to school operations and management.

4.  Maintain confidentiality in accordance with federal and state law.

5.  Work to create instructional programs that minimize incidence of inappropriate behavior and are sensitive to student and teacher needs.

6.  Work with district administrators in encouraging a positive school climate, enforcing the code of conduct and ensuring that all cases are resolved promptly and equitably.

7.  Participate in school-wide efforts to provide adequate supervision in all school spaces.

8.  Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function.

9.  Address personal biases that may prevent equal treatment of all students and staff.

10. Promote a trauma-responsive approach to addressing student behavior by supporting professional development and appropriate staffing.

I. Board of Education

The district Board of Education members are expected to:

1.  Promote a safe, orderly and stimulating school environment, supporting active teaching and learning for all students regardless of actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression) or sex.

2.  Maintain confidentiality in accordance with federal and state law.

3.  Develop and recommend a budget that provides programs and activities that support achievement of the goals of the code of conduct.

4.  Collaborate with student, teacher, administrator, and parent organizations, school safety personnel and other school personnel to develop a code of conduct

<mark>that clearly defines expectations for the conduct of students, district personnel and visitors on school property and at school functions</mark>.

5. Adopt and review at least annually the district's code of conduct to evaluate the code's effectiveness and the fairness and consistency of its implementation.

6. Lead by example by conducting Board meetings in a professional, respectful, courteous manner.

7. <mark>Address issues of harassment or any situation that threatens the emotional or physical health or safety of any student, school employee, or any person who is lawfully on school property or at a school function</mark>.

8. Address personal biases that may prevent equal treatment of all students and staff.

9. <mark>The Board will promote a trauma-informed approach to addressing student behavior by supporting professional development, providing a safe school environment, encouraging the forming of trusting relationships with students, allowing for student choice and autonomy, and encouraging student skill-building and competence</mark>.

10. Be open to active participation in resolving conflicts through a restorative process.

**Other Board Policies:**

1. https://boardpolicyonline.com/?b=queensbury&s=1019421

## 0110.1 SEXUAL HARASSMENT OF STUDENTS

The Board of Education recognizes that harassment of students on the basis of actual or perceived sex, sexual orientation, and/or gender identity and expression is abusive and illegal behavior that harms targets and negatively impacts the school culture by creating an environment of fear, distrust, intimidation and intolerance. The Board further recognizes that preventing and remedying such harassment in schools is essential to ensure a healthy, nondiscriminatory environment in which students can learn.

Sexual harassment is a form of sex discrimination and is unlawful under federal and state law. For the purposes of this policy, sexual harassment includes harassment on the basis of actual or perceived sex, sexual orientation, and/or gender identity and expression.  Sexual harassment of a student can deny or limit the student's ability to participate in or to receive benefits, services, or opportunities from the school's program.

Sexual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's actual or perceived sex, sexual orientation, and/or gender identity and expression, when:

   1. submission to that conduct is made either explicitly or implicitly a term or condition of a student's education;

   2. submission to or rejection of such conduct is used as the basis for decisions affecting a student's education; or

   3. the conduct has the purpose or effect of unreasonably interfering with a student's school performance or creating an intimidating, hostile or offensive educational environment, even if the complaining individual is not the intended target of the sexual harassment.

Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, or verbal, nonverbal or physical aggression, intimidation or hostility that is based on actual or perceived gender and sexual stereotypes.  Examples of sexual harassment can be found in the accompanying regulation (0110.1-R).

The Board is committed to providing an educational environment that promotes respect, dignity and equality and that is free from all forms of sexual harassment. To this end, the Board condemns and strictly prohibits all forms of sexual harassment on school grounds, school buses and at all school-sponsored activities, programs and events, including those that take place at locations outside the district, or outside the school setting if the harassment impacts the individual's education in a way that violates their legal rights, including when harassment is done

by electronic means (including on social media).  <mark>Sanctions will be enforced against all those who engage in sexual harassment or retaliation, and against district personnel who knowingly allow such behavior to continue</mark>.

Sexual harassment may subject the district to liability for harm done to targets.  Harassers may also be individually subject to civil liability if sued in a court of law or criminal liability if prosecuted.

Under various state and federal laws, students have legal protections against sexual harassment in the school environment as described above.  Those laws are listed in the reference section.  The district's Code of Conduct also addresses appropriate behavior in the school environment.  Sexual harassment can occur between persons of all ages and genders.

In order for the Board to effectively enforce this policy and to take prompt corrective measures, it is essential that all targets of sexual harassment and persons with knowledge of sexual harassment report the harassment immediately. The district will promptly investigate all complaints of sexual harassment, either formal or informal, verbal or written. To the extent possible, all complaints will be treated in a confidential manner. Limited disclosure may be necessary to complete a thorough investigation. If the complainant reports that they feel unsafe at school due to the nature of the complaint, the district will determine if accommodations need to be made until the issue is resolved.

If, after appropriate investigation, the district finds that a person has violated this policy, prompt corrective action will be taken in accordance with the applicable collective bargaining agreement, contract, district policy and state law.

All complainants and those who participate in sexual harassment complaints or the investigation of a complaint of sexual harassment have the right to be free from retaliation of any kind, when they do so with a good faith belief that sexual harassment has occurred.  Such prohibited retaliation can include, but is not limited to, discipline, discrimination, demotion, denial of privileges, or any action that would keep a person from coming forward to make or support a sexual harassment claim.  Such actions need not be job- or education-related, or occur in the workplace or educational environment, to constitute unlawful retaliation.

The Superintendent of Schools is directed to develop and implement regulations for reporting, investigating and remedying allegations of sexual harassment. These regulations are to be attached to this policy. <mark>In addition, the Board directs that training programs shall be established for students and annually for employees to raise awareness of the issues surrounding sexual harassment and to implement preventative measures to help reduce incidents of sexual harassment.</mark> Age-appropriate instructional materials will be incorporated into the curriculum to educate students so that they can recognize and reduce the incidence of sexual harassment.

This policy, or a simplified version, will be posted in a prominent place in each district facility, on the district's website, and will be published in student registration materials, student, parent and employee handbooks, and other appropriate school publications.

2. https://boardpolicyonline.com/?b=queensbury&s=1019423

## 0110.1-R SEXUAL HARASSMENT OF STUDENTS REGULATION

This regulation is intended to create and preserve an educational environment free from unlawful harassment on the basis of actual or perceived sex, sexual orientation, and/or gender identity and expression, in furtherance of the district's commitment to provide a healthy and productive environment for all students that promotes respect, dignity and equality.

**Sexual Harassment Defined**

Sexual harassment is a form of sex discrimination and is unlawful under federal and state law. Sexual harassment includes harassment on the basis of actual or perceived sex, sexual orientation, and/or gender identity and gender expression.

Sexual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's actual or perceived sex, gender, or sexual orientation, when:

1. submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of an a student's education (including any aspect of the student's participation in school-sponsored activities, or any other aspect of the student's education); or

2. submission to or rejection of that conduct or communication by an individual is used as the basis for decisions affecting a student's education; or

3. the conduct or communication has the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in school-sponsored activities, or creating an intimidating, hostile or offensive working or educational environment, even if the complaining individual is not the intended target of the sexual harassment.

Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, or verbal, nonverbal or physical aggression, intimidation or hostility that is based on sex, gender and sexual stereotypes.

**Unacceptable Conduct**

School-related conduct that the district considers unacceptable and which may constitute sexual harassment includes, but is not limited to, the following:

1. rape, attempted rape, sexual assault, attempted sexual assault, forcible sexual abuse, hazing, and other sexual and gender-based activity of a criminal nature as defined under the State Penal Law;

2.  unwelcome sexual advances or invitations or requests for sexual activity, including but not limited to those in exchange for grades, promotions, preferences, favors, selection for extracurricular activities or job assignments, homework, etc., or when accompanied by implied or overt threats concerning the target's work or school evaluations, other benefits or detriments;

3.  unwelcome or offensive public sexual display of affection, including kissing, hugging, making out, groping, fondling, petting, inappropriate touching of one's self or others (e.g. pinching, patting, grabbing, poking), sexually suggestive dancing, and massages;

4.  any unwelcome communication that is sexually suggestive, sexually degrading or derogatory or implies sexual motives or intentions, such as sexual remarks or innuendoes about an individual's clothing, appearance or activities; sexual jokes; sexual gestures; public conversations about sexual activities or exploits; sexual rumors and "ratings lists;" howling, catcalls, and whistles; sexually graphic computer files, messages or games, etc.;

5.  unwelcome and offensive name calling or profanity that is sexually suggestive or explicit,, sexually degrading or derogatory, implies sexual intentions, or that is based on sexual stereotypes or sexual  orientation, gender identity or expression;

6.  unwelcome physical contact or closeness that is sexually suggestive, sexually degrading or derogatory, or sexually intimidating such as the unwelcome touching of another's body parts, cornering or blocking an individual, standing too close, spanking, pinching, following, stalking, frontal body hugs, etc.;

7.  unwelcome and sexually offensive physical pranks or touching of an individual's clothing, such as hazing and initiation, "streaking" (running naked in public), "mooning" (exposing one's buttock), "snuggies" or "wedgies" (pulling underwear up at the waist so it goes in between the buttocks), bra-snapping, skirt "flip-ups," or "spiking" (pulling down someone's pants or swimming suit); pinching; placing hands inside an individual's pants, shirt, blouse, or dress, etc.;

8.  unwelcome leers, stares, gestures, or slang that are sexually suggestive; sexually degrading or derogatory or imply sexual motives or intentions;

9.  clothing with sexually obscene or sexually explicit slogans or messages;

10. unwelcome and offensive skits, assemblies, and productions that are sexually suggestive, sexually degrading or derogatory, or that imply sexual motives or intentions, or that are based on sexual stereotypes;

11. unwelcome written or pictorial display or distribution (including via electronic devices) of pornographic or other sexually explicit materials such as  signs, graffiti, calendars, objects,  magazines, videos, films, Internet material, etc.;

12. other hostile actions taken against an individual because of that person's sex, sexual orientation, gender identity or transgender status, such as interfering with, destroying or damaging a person's school area or equipment; sabotaging that person's school activities; bullying, yelling, or name calling; ==or otherwise interfering with that person's ability to participate in school functions and activities==; and

13. any unwelcome behavior based on sexual stereotypes and attitudes that is offensive, degrading, derogatory, intimidating, or demeaning, including but not limited to:

   1.   disparaging remarks, slurs, jokes about or aggression toward an individual because the person displays mannerisms or a style of dress inconsistent with stereotypical characteristics of the person's sex;

   2.   ostracizing or refusing to participate in group activities with an individual during class projects, physical education classes or field trips because of the individual's sex, sexual orientation, and/or gender identity or expression;

   3.   taunting or teasing an individual because they are participating in an activity not typically associated with the individual's actual or perceived sex, sexual orientation, or gender.

==For purposes of this regulation, action or conduct shall be considered "unwelcome" if the student did not request or invite it and regarded the conduct as undesirable or offensive.==

==Sexual harassment may occur on school grounds, school buses== and at all school-sponsored activities, programs and events, including those that take place at locations outside the district, or outside the school setting if the harassment impacts the individual's education in a way that violates their legal rights, including when the harassment is done by electronic means (including on social media).

**Determining if Prohibited Conduct is Sexual Harassment**

Complaints of sexual harassment will be thoroughly investigated to determine whether the totality of the behavior and circumstances meet any of the elements of the above definition of sexual harassment and should therefore be treated as sexual harassment. Not all unacceptable conduct with sexual connotations may constitute sexual harassment. In many cases (other than quid pro quo situations where the alleged harasser offers academic rewards or threatens punishment as an inducement for sexual favors), unacceptable behavior must be sufficiently severe, pervasive and objectively offensive to be considered sexual harassment.  If the behavior doesn't rise to the level of sexual harassment, but is found to be objectionable behavior, the individual will be educated and counseled in order to prevent the behavior from continuing.

In evaluating the totality of the circumstances and making a determination of whether conduct constitutes sexual harassment, the individual investigating the complaint should consider:

1.  the degree to which the conduct affected the ability of the student to participate in or benefit from his or her education or altered the conditions of the student's learning environment;

2.  the type, frequency and duration of the conduct;

3.  the identity of and relationship between the alleged harasser and the subject of the harassment (e.g., sexually based conduct by an authority figure is more likely to create a hostile environment than similar conduct by a peer);

4.  the number of individuals involved;

5.  the age and sex of the alleged harasser and the target of the harassment;

6.  the location of the incidents and context in which they occurred;

7.  other incidents at the school; and

8.  incidents of gender-based, but non-sexual harassment.

## Reporting Complaints

Students who believes they have been the target of sexual harassment related to the school setting are encouraged to report complaints as soon as possible after the incident in order to enable the district to promptly and effectively investigate and resolve the complaint. Any person who witnesses or is aware of sexual harassment of a student is also encouraged to report the incident or behavior to the district. Targets are encouraged to submit the complaint in writing; however, complaints may be filed verbally.

Complaints should be filed with the Building Principal or the Title IX officer; however, students may go to any district employee with sexual harassment complaints.

Any school employee who receives a complaint of sexual harassment from a student must inform the student of the employee's obligation to report the complaint to the school administration, and must then immediately notify the Building Principal and/or the Title IX officer.

In order to assist investigators, targets should document the harassment as soon as it occurs and with as much detail as possible including: the nature of the harassment; dates, times, places it has occurred; name of harasser(s); witnesses to the harassment; and the target's response to the harassment.

## Confidentiality

It is district policy to respect the privacy of all parties and witnesses to complaints of sexual harassment. To the extent possible, the district will not release the details of a complaint or the identity of the complainant or the individual(s) against whom the complaint is filed to any third parties who do not need to know such information. However, because an individual's need for

confidentiality must be balanced with the district's legal obligation to provide due process to the accused, to conduct a thorough investigation, or to take necessary action to resolve the complaint, the district retains the right to disclose the identity of parties and witnesses to complaints in appropriate circumstances to individuals with a need to know. The staff member responsible for investigating complaints will discuss confidentiality standards and concerns with all complainants.

If a complainant requests that their name not be revealed to the individual(s) against whom a complaint is filed, the staff member responsible for conducting the investigation shall inform the complainant that:

1. the request may limit the district's ability to respond the their complaint;

2. district policy and federal law prohibit retaliation against complainants and witnesses;

3. the district will attempt to prevent any retaliation; and

4. the district will take strong responsive action if retaliation occurs.

If the complainant still requests confidentiality after being given the notice above, the investigator will take all reasonable steps to investigate and respond to the complaint consistent with the request as long as doing so does not preclude that district from responding effectively to the harassment and preventing the harassment of others.

**Investigation and Resolution Procedure**

1. *Investigation*

The Building Principal (or designee) or the Title IX officer will conduct a preliminary review when they receive a verbal or written complaint of sexual harassment, or if they observe sexual harassment. Except in the case of severe or criminal conduct, the Building Principal (or designee) or the Title IX officer should make all reasonable efforts to resolve complaints informally at the school level. The goal of informal investigation and resolution procedures is to end the harassment and obtain a prompt and equitable resolution to a complaint. All persons involved in an investigation (complainants, witnesses and alleged harassers) will be accorded due process to protect their rights to a fair and impartial investigation. This investigation shall be prompt and thorough, and shall be completed as soon as possible.

Immediately, but generally no later than three working days following receipt of a complaint, the Building Principal (or designee) or the Title IX officer shall begin an investigation of the complaint according to the following steps:

1. Interview the target and document the conversation. Instruct the target to have no contact or communication regarding the complaint with the alleged harasser. Ask

the target specifically what action they want taken in order to resolve the complaint. Refer the target, as appropriate, to school social workers, school psychologists, crisis team employees, other school staff, or appropriate outside agencies for counseling services.

2. Review any written documentation of the harassment prepared by the target. If the target has not prepared written documentation, ask the target to do so, providing alternative formats for individuals with disabilities and young children, who have difficulty writing and need accommodation. If the complainant refuses to complete a complaint form or written documentation, the Building Principal (or designee) or Title IX officer shall complete a complaint form (see exhibit 0110-E.1, Student Harassment and Nondiscrimination Incident Form) based on the verbal report.

3. Request, review, obtain and preserve relevant evidence of harassment (e.g. documents, emails, phone records, etc.), if any exist.

4. Interview any witnesses to the complaint. Where appropriate, obtain a written statement from each witness. Caution each witness to keep the complaint and their statement confidential.  Employees may be required to cooperate as needed in investigations of suspected sexual harassment.

5. Interview the alleged harasser regarding the complaint and inform the alleged harasser that if the objectionable conduct has occurred, it must cease immediately. Document the conversation. Provide the alleged harasser an opportunity to respond to the charges in writing.

6. Instruct the alleged harasser to have no contact or communication regarding the complaint with the target and to not retaliate against the target. Warn the alleged harasser that if they make contact with or retaliates against the target, they will be subject to immediate disciplinary action.

7. Review all documentation and information relevant to the complaint.

8. Where appropriate, suggest mediation as a potential means of resolving the complaint. In addition to mediation, use appropriate informal methods to resolve the complaint, including but not limited to:

   a. discussion with the accused, informing them of the district's policies and indicating that the behavior must stop;

   b. suggesting counseling and/or sensitivity training;

   c. conducting training for the department or school in which the behavior occurred, calling attention to the consequences of engaging in such behavior;

d. requesting a letter of apology to the complainant;

e. writing letters of caution or reprimand; and/or

f. ==separating the parties==.

9. Involvement and Notification

a. ==Parents/guardians of student targets and accused students shall be notified within one school day of allegations that are serious or involve repeated conduct==.

b. ==The parents/guardians of students who file complaints are welcome to participate at each stage of investigation and resolution procedures involving the student.==

c. If either the target or the accused is a student receiving special education services under an IEP or Section 504/Americans with Disabilities Act accommodations, the Committee on Special Education will be consulted to determine the degree to which the student's disability either caused or is affected by the discrimination or policy violation. In addition, due process procedures required for persons with disabilities under state and federal law shall be followed.

d. The investigator shall submit a copy of all investigation and interview documentation to the Superintendent.

e. The investigator shall report back to both the target and the accused, notifying them in writing, and also in person as appropriate, regarding the outcome of the investigation and the action taken to resolve the complaint and steps that may be taken to prevent further occurrences. The investigator shall instruct the target to report immediately if the objectionable behavior occurs again or if the alleged harasser retaliates against them.

f. The investigator will notify the target that if they desire further investigation and action, they may request a district level investigation by contacting the Superintendent of Schools.  The investigator will also notify the target of their right to contact the New York State Division of Human Rights, the U.S. Department of Education's Office for Civil Rights, and/or a private attorney.

10.  Create a written documentation of the investigation, kept in a secure and confidential location containing:

a. A list of all documentation and other evidence reviewed, along with a detailed summary;

b. A list of names of those interviewed along with a detailed summary of their statements;

c. A timeline of events;

d. A summary of prior relevant incidents, reported or unreported; and

e. The final resolution of the complaint, together with any corrective action(s).

If the initial investigation results in a determination that sexual harassment did occur, the investigator will promptly notify the Superintendent, who shall then take prompt disciplinary action in accordance with district policy, the applicable collective bargaining agreement or state law.

If a complaint received by the Building Principal or the Title IX officer contains evidence or allegations of serious or extreme harassment, such as employee to student harassment, criminal touching, quid pro quo (e.g., offering an academic reward or punishment as an inducement for sexual favors), or acts which shock the conscience of a reasonable person, the complaint shall be referred promptly to the Superintendent. In addition, where the Building Principal or the Title IX officer has a reasonable suspicion that the alleged harassment involves criminal activity, they must immediately notify the Superintendent, who shall then contact appropriate child protection and law enforcement authorities. Where criminal activity is alleged or suspected by a district employee, the accused employee shall be suspended pending the outcome of the investigation, consistent with all contractual or statutory requirements.

Any party who is not satisfied with the outcome of the initial investigation by the Building Principal or the Title IX officer may request a district-level investigation by submitting a written complaint to the Superintendent within 30 days.

**District-level Procedure**

The Superintendent or designee shall promptly investigate and resolve all sexual harassment complaints that are referred to them by a Building Principal or Title IX officer, as well as those appealed to the Superintendent following an initial investigation by a Building Principal or the Title IX officer. In the event the complaint of sexual harassment involves the Superintendent, the complaint shall be filed with or referred to the Board President, who shall refer the complaint to a trained investigator not employed by the district for investigation.

The district level investigation should begin as soon as possible but not later than three working days following receipt of the complaint by the Superintendent or Board President.

In conducting the formal district level investigation, the district will use investigators who have received formal training in sexual harassment investigation or that have previous experience investigating sexual harassment complaints.

If the investigation results in a determination that sexual harassment did occur, prompt corrective action will be taken to end the harassment.  Where appropriate, district investigators may suggest mediation as a means of exploring options of corrective action and informally resolving the complaint.

No later than 30 days following receipt of the complaint, the Superintendent (or in cases involving the Superintendent, the Board-appointed investigator) will notify the target and alleged harasser, in writing, of the outcome of the investigation.  If additional time is needed to complete the investigation or take appropriate action, the Superintendent or Board-appointed investigator will provide all parties with a written status report within 30 days following receipt of complaint.

The target and the alleged harasser have the right to be represented by a person of their choice, at their own expense, during sexual harassment investigations and hearings.

**External Remedies**

In addition, targets also have the right to register sexual harassment complaints with the U.S. Department of Education's Office for Civil Rights (OCR) and the New York State Division of Human Rights (DHR).  The OCR can be contacted at (800)421-3481, 400 Maryland Avenue SW, Washington DC 20202-1100 or at **https://www2.ed.gov/about/offices/list/ocr./docs/howto.html**. The DHR can be contacted at (888)392-3644, www.dhr.ny.gov/complaint, or at 1 Fordham Plaza, Fourth Floor Bronx, NY 10458.

Nothing in these regulations limits the right of the complainant to file a lawsuit in either state or federal court, or to contact law enforcement officials if the sexual harassment involves unwanted physical touching, coerced physical confinement, or coerced sex acts, or other acts which may constitute a crime.

**Retaliation Prohibited**

Any act of retaliation against any person who opposes sexually harassing behavior, or who has filed a complaint in good faith, is prohibited and illegal, and therefore subject to disciplinary action. Likewise, retaliation against any person who has, in good faith, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing of a sexual harassment complaint is prohibited. For purposes of this policy, retaliation includes but is not limited to: verbal or physical threats, intimidation, ridicule, bribes, destruction of property, spreading rumors, stalking, harassing phone calls, discipline, discrimination, demotion, denial of privileges, any action that would keep a person from coming forward to make or support a sexual harassment claim, and any other form of harassment. Such actions need not be job- or education-related, or occur in the workplace or educational environment to constitute unlawful retaliation.  Any person who retaliates is subject to immediate disciplinary action, up to and including suspension or termination.

**Discipline/Penalties**

Any individual who violates the sexual harassment policy by engaging in prohibited sexual harassment will be subject to appropriate disciplinary and/or remedial action, including sensitivity training where appropriate. Measures available to school authorities include, but are not limited to the following:

> **Students:** Discipline may range from a reprimand up to and including suspension from school, to be imposed consistent with the student conduct and discipline policy and applicable law.

> **Employees:** Discipline may range from a warning up to and including termination, to be imposed consistent with all applicable contractual and statutory rights.

> **Volunteers:** Penalties may range from a warning up to and including loss of volunteer assignment.

> **"Non-employees"** (i.e., contractors, subcontractors, vendors, consultants and other persons providing services pursuant to a contract, or their employees): Penalties may range from a warning up to and including loss of district business.

> **Other individuals:** Penalties may range from a warning up to and including denial of future access to school property.

**False Complaints**

False or malicious complaints of sexual harassment may result in corrective or disciplinary action taken against the complainant.

**Training**

All students and employees shall be informed of this policy in student and employee handbooks, on the district website and student registration materials. A poster summarizing the policy shall also be posted in a prominent location at each school.  All secondary school student body officers will receive district training about the policy at the beginning of each school year.

In addition, age-appropriate curricular materials will be made available so that it can be incorporated in instruction K-12 to ensure that all students are educated to recognize and report sexual harassment.

Principals in each school and instructional administrators shall be responsible for informing students and staff on a yearly basis of the terms of this policy, including the procedures established for investigation and resolution of complaints, general issues surrounding sexual harassment, the rights and responsibilities of students and employees, and the impact of sexual harassment on the target.

3. https://boardpolicyonline.com/?b=queensbury&s=1019423

# 0115.1 STUDENT HARASSMENT AND BULLYING PREVENTION AND INTERVENTION

The Board of Education is committed to providing an educational and working environment that promotes respect, dignity and equality. The Board recognizes that discrimination, such as harassment, hazing and bullying, are detrimental to student learning and achievement. These behaviors interfere with the mission of the district to educate its students and disrupt the operation of the schools. Such behavior affects not only the students who are its targets but also those individuals who participate and witness such acts.

To this end, the Board condemns and strictly prohibits all forms of discrimination, such as harassment, hazing and bullying on school grounds, school buses and at all school-sponsored activities, programs and events. Discrimination, harassment, hazing or bullying that takes place at locations outside of school grounds, such as cyberbullying, which can be reasonably expected to materially and substantially interfere with the requirements of appropriate discipline in the operation of the school or impinge on the rights of other students are prohibited, and may be subject to disciplinary consequences.

**Definitions**

Bullying

Bullying, under the amended Dignity for All Students Act, has the same meaning as harassment (see below). The accompanying regulation provides more guidance regarding the definition and characteristics of bullying.

Cyberbullying

Cyberbullying is defined as harassment (see below) through any form of electronic communication.

Discrimination

Discrimination is the act of denying rights, benefits, justice, equitable treatment or access to facilities available to all others, to an individual or group of people because of the group, class or category to which that person belongs (as enumerated in the *Definitions* section, under Harassment, below).

Hazing

Hazing is an induction, initiation or membership process involving harassment which produces public humiliation, physical or emotional discomfort, bodily injury or public ridicule or creates a

situation where public humiliation, physical or emotional discomfort, bodily injury or public ridicule is likely to occur.

<u>Harassment</u>

Harassment has been defined in various ways in federal and state law and regulation. The Board recognizes that these definitions are important standards, but the Board's goal is to prevent misbehavior from escalating in order to promote a positive school environment and to limit liability. <mark><u>The Dignity for All Students Act</u></mark> (<u>§§10-18 of Education Law</u>) <mark>defines harassment as the creation of a hostile environment by conduct or by verbal threats, intimidation or abuse, including cyberbullying, that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; (b) reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; (c) reasonably causes or would reasonably be expected to cause physical injury or emotional h arm to a student;</mark> (d) occurs off school property and creates or would foreseeably create a risk of substantial disruption within the school environment, where it is foreseeable that the conduct, threats, intimidation or abuse might reach school property. The harassing behavior may be based on any characteristic, including but not limited to a person's actual or perceived:

• race,

• color,

• weight,

• national origin,

• ethnic group,

• religion,

• religious practice,

• disability,

• <mark>sex</mark>,

• sexual orientation, or

• <mark>gender</mark> (including gender identity and expression).

For the purposes of this definition the term "threat, intimidation or abuse" shall include verbal and non-verbal actions.

In some instances, bullying or harassment may constitute a violation of an individual's civil rights. The district is mindful of its responsibilities under the law and in accordance with district policy regarding civil rights protections

**Prevention**

The school setting provides an opportunity to teach children, and emphasize among staff, that cooperation with and respect for others is a key district value. A program geared to prevention is designed to not only decrease incidents of bullying but to help students build more supportive relationships with one another by integrating the bullying prevention program into classroom instruction. Staff members and students will be sensitized, through district-wide professional development and instruction, to the warning signs of bullying, as well as to their responsibility to become actively involved in the prevention of bullying before overt acts occur.

Curricular material that raises awareness to the sensitivity to discrimination or harassment and civility in the relationships of people of different races, weights, national origin, ethnic groups, religions, religious practices, mental or physical abilities, sexual orientation, sexes or gender expression or identities will be included in the instructional program k-12.

In order to implement this program the Board will designate at its annual organizational meeting a Dignity Act Coordinator (*DAC*) for each building. The role of the DAC is to coordinate and enforce this policy. One of the DACs will be designated as the district-wide coordinator whose responsibilities are described in the accompanying regulation.  The role of each DAC is to oversee and enforce the policy in the school to which they are assigned.

In addition, the Superintendent will establish a district-wide Task Force by way of the District Safety Committee to deal with bullying prevention topics, as well as Dignity Act Coordinating Committees in each school that will be overseen by the DACs.  Committees will include representation from staff, administration, students and parents. The district-wide task force and the school-level committee will assist the administration in developing and implementing specific prevention initiatives, including early identification of bullying and other strategies. The accompanying regulation provides more detail on the specific programs and strategies implemented by the district.

**Intervention**

Intervention by adults and bystanders is an important step in preventing escalation and resolving issues at the earliest stages. Intervention will emphasize education and skill-building.

Successful intervention may involve remediation.  Remedial responses to bullying and harassment include measures designed to correct the problem behavior, prevent another occurrence of the behavior and protect the target. Remediation may be targeted to the individual(s) involved in the bullying behavior or environmental approaches which are targeted to the school or district as a whole.

In addition, intervention will focus upon the safety of the target. Staff is expected, when aware of bullying, to either refer the student to designated resources for assistance, or to intervene in accordance with this policy and regulation.

**Provisions for students who don't feel safe at school**

The Board acknowledges that, notwithstanding actions taken by district staff, intervention may require a specific coordinated approach if the child does not feel safe at school. Students who do not feel safe at school are limited in their capacity to learn and reach their academic potential. Staff, when aware of bullying, should determine if accommodations are needed in order to help ensure the safety of the student and bring this to the attention of the building principal. The building principal, other appropriate staff, the student and the student's parent will work together to define and implement any needed accommodations.

The district recognizes that there is a need to balance accommodations which enhance student safety against the potential to further stigmatize the targeted student. Therefore, each case will be handled individually, and the student, parent/guardian, and school administration will collaborate to establish safety provisions that best meet the needs of the targeted student. Follow-up discussion and/or meetings will be scheduled, as needed, to ensure that safety concerns have been adequately addressed and to determine when and if accommodations need to be changed or discontinued.

**Training**

The Board recognizes that in order to implement an effective bullying prevention and intervention program, professional development is needed. The Superintendent, the DACs and the District Administrative Team will incorporate training to support this program in new teacher orientation and the annual professional development plan, as needed. Training opportunities will be provided for all staff, including but not limited to bus drivers, cafeteria and hall monitors and all staff who have contact with students. The DACs will be trained in accordance with state requirements and will continue their professional development so as to successfully support this policy and program.

**Reporting and Investigation**

Although it can be difficult to step forward, the district can't effectively address bullying if incidents aren't reported. Students who have been bullied, parents whose children have been bullied or other students or staff who observe bullying behavior are encouraged and expected to make a verbal and/or written complaint to any school personnel in accordance with the training and guidelines provided. Staff who observe or learn of incident(s) of bullying are required, in accordance with State law, to make an oral report to the building principal or their building's DAC within one school day and to fill out the district reporting form within two school days. If a staff person is unsure of the reporting procedure, he/she is expected to inquire about how to proceed by speaking with their supervisor. A district employee may be deemed to have

==permitted unlawful discrimination or harassment if he/she fails to report an observed incident, whether or not the target complains.==

At all times, complaints will be documented, tracked and handled in accordance with the regulations and procedures accompanying this policy, or, if applicable, [0100, Equal Opportunity and Nondiscrimination, or 0110, Sexual Harassment] and the district's Code of Conduct. The DACs will prepare a quarterly report for the Superintendent based on complaints filed.

There shall be a duty for all school personnel to report any incidents of student-to-student and staff-to-student bullying that they observe to their building principal or other administrator who supervises their employment.  In addition, there shall be a further duty for all school personnel to report any incidents of student-to-student and staff-to-student bullying of which they are made aware by students to their building principals or other administrator who supervises their employment. Supervisors will refer the information to appropriate district staff for investigation as designated in regulation.

An equitable and thorough investigation will be carried out by the Building Principal or DAC in accordance in accordance with the accompanying regulation.   The results of the investigation shall be reported back to both the target and the accused in accordance with the accompanying regulation.  If either of the parties disagrees with the results of the investigation, they can appeal the findings in accordance with the regulations that accompany this policy.  Verified bullying incidents that meet the criteria established by the state will be included in the statewide reporting system when applicable, in accordance with law and regulation.

The Board will receive the annual VADIR report, as well as any other state-required report relevant to bullying and/or school climate, for each building and for the district as a whole. Based on the review of the data, the Board may consider further action, including but not limited to modification of this policy and additional training.

**Disciplinary Consequences/Remediation**

While the focus of this policy is on prevention, bullying acts may still occur. In these cases, offenders will be given the clear message that their actions are wrong and the behavior must improve. Student offenders will receive in-school guidance in making positive choices in their relationships with others. If appropriate, disciplinary action will be taken by the administration in accordance with the district's Code of Conduct, as applicable.  If the behavior rises to the level of criminal activity, law enforcement will be contacted.

Consequences for a student who commits an act of bullying shall be unique to the individual incident and will vary in method and severity according to the nature of the behavior, the developmental age of the student, and the student's history of problem behaviors, and must be consistent with the district's Code of Conduct.

**Non-Retaliation**

All complainants and those who participate in the investigation of a complaint in conformity with state law and district policies, who have acted reasonably and in good faith, have the right to be free from retaliation of any kind.

**Dissemination, Monitoring, Review, and Reporting**

This policy, or a plain language summary, shall be published in student registration materials, student, parent and employee handbooks, and posted on the district's website.  A bullying complaint form will be available on the district's website. The district will ensure that the process of reporting bullying is clearly explained.

Each year, as part of the periodic review of the Code of Conduct, this policy will be reviewed to assess its effectiveness and compliance with state and federal law. If changes are needed, revisions will be recommended to the Board for its consideration.

The district will ensure that reporting of information to the public will be in a manner that complies with student privacy rights under the Family Educational Rights and Privacy Act (FERPA).

4. https://boardpolicyonline.com/?b=queensbury&s=23880

# 0115.1-R STUDENT HARASSMENT AND BULLYING PREVENTION AND INTERVENTION REGULATION

The Board condemns and strictly prohibits all forms of discrimination, such as harassment, hazing, intimidation and bullying on school grounds, school buses and at all school-sponsored activities, programs and events.  Discrimination, harassment, hazing or bullying that takes place at locations outside of school grounds, such as cyberbullying, which can be reasonably expected to materially and substantially interfere with the requirements of appropriate discipline in the operation of the school or impinge on the rights of other students are prohibited, and may be subject to disciplinary consequences.

**Definitions**

Bullying

Under the amended Dignity for All Students Act, bullying and harassment are equivalent and used interchangeably.   In order to facilitate implementation, provide meaningful guidance and prevent behaviors from rising to a violation of law, bullying is further understood to be a hostile activity which harms or induces fear through the threat of further aggression and/or creates terror. Bullying may be premeditated or a sudden activity. It may be subtle or easy to identify, done by one person or a group.   Bullying often includes the following characteristics :

1. Power imbalance - occurs when a bully uses his/her physical or social power over a target.

2. Intent to harm - the bully seeks to inflict physical or emotional harm and/or takes pleasure in this activity.

3. Threat of further aggression - the bully and the target believe the bullying will continue.

4. Terror - when any bullying increases, it becomes a "systematic violence or harassment used to intimidate and maintain dominance."

(Barbara Coloroso, *The Bully, The Bullied & The Bystander*, 2003)

There are at least three kinds of bullying: verbal, physical and social/relational.

• Verbal bullying (which can be delivered orally, electronically or in writing) includes name calling, insulting remarks, verbal teasing, frightening phone calls, violent threats, extortion, taunting, gossip, spreading rumors, racist slurs, threatening electronic communications ("cyberbullying"), anonymous notes, etc.

• Physical bullying includes poking, slapping, hitting, tripping or causing a fall, choking, kicking, punching, biting, pinching, scratching, spitting, twisting arms or legs, damaging clothes and personal property, or threatening gestures.

• Social or relational bullying includes excluding someone from a group, isolating, shunning, spreading rumors or gossiping, arranging public humiliation, undermining relationships, teasing about clothing, looks, giving dirty looks, aggressive stares, etc.

The New York State Education Department provides further guidance on bullying and cyberbullying prevention on the following website:

http://www.p12.nysed.gov/technology/internet_safety/documents/cyberbullying.html

Discrimination

Discrimination is the act of denying rights, benefits, justice, equitable treatment or access to facilities available to all others, to an individual or group of people because of the group, class or category to which that person belongs (as enumerated under *Harassment* as defined above).

Harassment

Harassment has been defined in various ways in federal and state law (including the penal law) and regulation. The Board recognizes that these definitions are important standards, but the Board's goal is to prevent behaviors from escalating to violations of law and, instead, to promote a positive school environment and limit liability. The Dignity for All Students Act (§§10-18 of Education Law) defines harassment  as the creation of a hostile environment by conduct or by threats, intimidation or abuse, including cyberbullying, that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; (b) reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; (c) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student; or (d) occurs off school property and creates or would foreseeably create a risk of substantial disruption within the school environment, where it is foreseeable that the conduct, threats, intimidation or abuse might reach school property.  The harassing behavior may be based on any characteristic, including but not limited to a person's actual or perceived:

• race,

• color,

• weight,

• national origin,

• ethnic group,

• religion,

• religious practice,

• disability,

• sex,

• sexual orientation, or

• gender (including gender identity and expression).

<u>Gender identity</u> is one's self-conception as being male or female, as distinguished from actual biological sex or sex assigned at birth.

<u>Gender expression</u> is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice or mannerisms.

For the purposes of this definition, the term "threats, intimidation or abuse" shall include verbal and non-verbal action.

<u>Hazing</u>

Hazing is an induction, initiation or membership process involving harassment which produces public humiliation, physical or emotional discomfort, bodily injury or public ridicule or creates a situation where public humiliation, physical or emotional discomfort, bodily injury or public ridicule is likely to occur.

**Prevention**

Prevention is the cornerstone of the district's effort to address bullying and harassment. The components of such an effort involve the following:

• Following the principles and practices of "*Educating the Whole Child Engaging the Whole School: Guidelines and Resources for Social and Emotional Development and Learning (SEDL) in New York State* - Adopted by the Board of Regents July 18, 2011." District curriculum will emphasize developing empathy, tolerance and respect for others.

• Learning about and identifying the early warning signs and precursor behaviors that may lead to bullying.

• Gathering information about bullying at school directly from students (through surveys and other mechanisms); analyzing and using the data gathered to assist in decision-making about programming and resource allocation.

• Establishing clear school wide and classroom rules about bullying consistent with the district's code of conduct.

• Training adults in the school community to respond sensitively and consistently to bullying.

• Raising awareness among adults, through training, of the school experiences of marginalized student populations (as enumerated in the *Definitions* section above), social stigma in the

school environment, gender norms in the school environment, and strategies for disrupting bullying, intimidation, harassment or other forms of violence.

• Providing adequate supervision, particularly in less structured areas such as in the hallways, cafeteria, school bus and playground.

• Raising parental awareness and involvement in the prevention program and in addressing problems.

• Using educational opportunities or curriculum, including, if applicable, the Individual Educational Program (IEP), to address the underlying causes and impact of bullying.

The  Superintendent will establish a district-wide Task Force by way of the District Safety Committee to deal with bullying prevention topics, as well as Dignity Act Coordinating Committees in each school that will be overseen by the DACs. Committees will include representation from staff, administration, students and parents.  The district-wide task force and the school-level committee will assist the administration in developing and implementing specific prevention initiatives, including early identification of bullying and other strategies.

**Role of the Dignity Act Coordinators (DAC)**

The Board of Education will annually designate a staff member, who has been thoroughly trained in human relations in the areas of race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender (including gender identity and expression), and sex, as the Dignity Act Coordinator (DAC) in each school building, accountable for implementation of this policy.   In addition, one will be designated as the district-wide coordinator who will be responsible for ensuring equivalency in programming across buildings. The DACs will be responsible for coordinating and enforcing this policy and regulation in their respective school buildings, including but not limited to coordination of:

• the work of the building-level committees;

• professional development for staff members and,

• the complaint process, and

• management of the Dignity Act's civility curriculum components.

**Reporting and Investigation**

In order for the Board to effectively enforce this policy and to take prompt corrective measures, it is essential that all targets and persons with knowledge of bullying report such behavior immediately to the principal, the principal's designee or the DAC as soon as possible after the incident so that it may be effectively investigated and resolved. The district will also make a bullying complaint form available on its website to facilitate reporting. The district will collect

relevant data from written and verbal complaints to allow reporting to the Board on an annual basis.

Staff who observe or learn of incident(s) of bullying are required, in accordance with State law, to orally report to the building principal or their building's DAC within one school day and to fill out the district reporting form within two school days. If a staff person is unsure of the reporting procedure, he/she is expected to inquire about how to proceed by speaking with their supervisor. A district employee may be deemed to have permitted unlawful discrimination or harassment if he/she fails to report an observed incident, whether or not the target complains.

The district will promptly and equitably investigate all complaints, formal or informal, verbal or written. To the extent possible, all complaints will be treated in a confidential manner, although limited disclosure may be necessary to complete a thorough investigation

In order to assist investigators, individuals should document the bullying as soon as it occurs and with as much detail as possible including: the nature of the incident(s); dates, times, places it has occurred; name of perpetrator(s); witnesses to the incident(s); and the target's response to the incident.

If, after appropriate investigation, the district finds that a student, an employee or a third party has violated this policy, prompt corrective and possibly disciplinary action will be taken in accordance with the code of conduct, applicable collective bargaining agreement, district policy and state law. If the reported behavior constitutes a civil rights violation, the complaint procedure associated with that policy will be followed, as applicable.  If either of the parties disagrees with the findings of the initial investigation, an appeal may be made to the Superintendent in accordance with the process described below.

**Confidentiality**

It is district policy to respect the privacy of all parties and witnesses to bullying. To the extent possible, the district will not release the details of a complaint or the identity of the complainant or the individual(s) against whom the complaint is filed to any third parties who do not need to know such information. However, because an individual's desire for confidentiality must be balanced with the district's legal obligation to provide due process to the accused, to conduct a prompt and thorough investigation, and/or to take necessary action to resolve the complaint, the district retains the right to disclose the identity of parties and witnesses to complaints in appropriate circumstances to individuals with a need to know. The staff member responsible for investigating complaints will discuss confidentiality standards and concerns with all complainants.

If a complainant requests that his/her name not be revealed to the individual(s) against whom a complaint is filed, the staff member responsible for conducting the investigation shall inform the complainant that:

1. the request may limit the district's ability to respond to his/her complaint;

2. district policy and federal law prohibit retaliation against complainants and witnesses;

3. the district will attempt to prevent any retaliation; and

4. the district will take strong responsive action if retaliation occurs.

If the complainant still requests confidentiality after being given the notice above, the investigator will take all reasonable steps to investigate and respond to the complaint consistent with the request as long as doing so does not preclude the district from responding effectively to the bullying and preventing the bullying of other students.

**Investigation and Resolution Procedure**

**A. Initial (Building-level) Procedure**

Whenever a complaint of bullying is received whether verbal or written, it will be subject to a preliminary review and investigation. Except in the case of severe or criminal conduct, the principal, the principal's designee or the DAC shall make all reasonable efforts to resolve complaints informally at the school level. The goal of informal procedures is to end the bullying, prevent future incidents, ensure the safety of the target and obtain a prompt and equitable resolution to a complaint.

As soon as possible, but no later than five working days following receipt of a complaint, the principal, the principal's designee or the DAC should begin an investigation of the complaint by:

• Reviewing any written documentation provided by the target(s).

• Conducting separate interviews of the target(s), alleged perpetrator(s), and witnesses, if any, and documenting the conversations.

• Providing the alleged perpetrator(s) a chance to respond and notify him/her that if objectionable behavior has occurred, it must cease immediately.   The individual will be made aware of remediation opportunities as well as potential disciplinary consequences.

• Determining whether the complainant needs any accommodations to ensure his/her safety, and following up periodically until the complaint has been resolved.  Accommodations may include, but are not limited to:

o A "permanent" hall pass that allows the student to visit a designated adult at any time;

o Access to private bathroom facilities;

o Access to private locker room facilities;

o An escort during passing periods;

o  If the student feels unsafe in a specific class, an opportunity for individual tutoring or independent study until the case is resolved;

o  An opportunity for independent study at home with district-provided tutor until the case is resolved;

o  Permission to use personal cell phone in the event that the student feels threatened and needs immediate access to parent or guardian;

o  Assignment of a bus monitor.

The district recognizes that there is a need to balance accommodations which enhance student safety against the potential to further stigmatize the targeted student.  Therefore, each case will be handled individually, and the student, parent/guardian, and school administration will collaborate to establish safety provisions that best meet the needs of the targeted student. Follow-up discussion and/or meetings will be scheduled, as needed, to ensure that safety concerns have been adequately addressed and to determine when and if accommodations need to be changed or discontinued.

Parents of student targets and accused students should be notified within one school day of allegations that are serious or involve repeated conduct.

Where appropriate, informal methods may be used to resolve the complaint, including but not limited to:

a. discussion with the accused, informing him or her of the district's policies and indicating that the behavior must stop;

b. suggesting counseling, skill building activities and/or sensitivity training;

c. conducting training for the department or school in which the behavior occurred, calling attention to the consequences of engaging in such behavior;

d. requesting a letter of apology to the target;

e. writing letters of caution or reprimand; and/or

f. separating the parties.

Appropriate disciplinary action shall be recommended and imposed in accordance with district policy, the applicable collective bargaining agreement or state law. School districts should make every effort to attempt to first resolve the misconduct through non-punitive measures.

The investigator shall report back to both the target and the accused, within 30 days following the receipt of the complaint notifying them in writing, and also in person, as appropriate, regarding the outcome of the investigation and the action taken to resolve the complaint. The actions taken will be in conformance with the *Remediation/Discipline/Penalties* section of this

regulation. The target shall report immediately if the objectionable behavior occurs again or if the alleged perpetrator retaliates against him/her.

If a complaint contains evidence or allegations of serious or extreme bullying, or a civil rights violation, the complaint shall be referred promptly to the Superintendent. The complainant will also be advised of other avenues to pursue their complaint, including contact information for state and federal authorities.

In addition, where the principal, the principal's designee or the DAC has a reasonable suspicion that the alleged bullying incident involves criminal activity, he/she should immediately notify the Superintendent, who shall then contact the school attorney, appropriate child protection and, if appropriate, law enforcement authorities.

Any party who is not satisfied with the outcome of the initial investigation may request a district-level investigation by submitting a written complaint to the Superintendent within 30 days.

## B. District-level Procedure

The Assistant Superintendent for Personnel and Recruitment/Compliance Officer shall promptly investigate and equitably resolve all bullying complaints that are referred to him/her, as well as those appealed to the Superintendent following an initial investigation.  In the event the complaint involves the Superintendent, the complaint shall be filed with or referred to the Board President, who shall refer the complaint to an appropriate independent individual for investigation.

The district level investigation should begin as soon as possible but not later than five working days following receipt of the complaint by the Assistant Superintendent for Personnel and Recruitment/Compliance Officer, Superintendent or Board President.

In conducting the formal district level investigation, the district will endeavor to use individuals who have received formal training regarding such investigations or that have previous experience investigating such complaints.

If a district level investigation results in a determination that bullying did occur, prompt corrective action will be taken to end the misbehavior in accordance with the *Remediation/Discipline/Penalties* section of this regulation.

No later than 30 days following receipt of the complaint, the Superintendent or designee (or in cases involving the Superintendent, the Board-appointed investigator) will notify the target and alleged perpetrator, in writing, of the outcome of the investigation. If additional time is needed to complete the investigation or take appropriate action, the Superintendent or Board-appointed investigator will provide all parties with a written status report within 30 days following receipt of the complaint.

Any party who is not satisfied with the outcome of the district-level investigation may appeal to the Board of Education by submitting a written request to the Board President within 30 days.

## C. Board-level Procedure

When a request for review by the Board has been made, the Superintendent or designee shall submit all written statements and other materials concerning the case to the President of the Board.

The Board shall notify all parties concerned of the time and place when a hearing will be held. Such hearing will be held within 15 school days of the receipt of the request of the complainant.

The Board shall render a decision in writing within 15 days after the hearing has been concluded.

The district shall retain documentation associated with complaints and investigations in accordance with Schedule ED-1.

### Retaliation Prohibited

Any act of retaliation against any person who opposes bullying behavior, or who has filed a complaint, is prohibited and illegal, and therefore subject to disciplinary action. Likewise, retaliation against any person who has testified assisted, or participated in any manner in an investigation, proceeding, or hearing of a bullying complaint is prohibited. For purposes of this policy, retaliation includes but is not limited to: verbal or physical threats, intimidation, ridicule, bribes, destruction of property, spreading rumors, stalking, harassing phone calls, and any other form of harassment. Any person who retaliates is subject to immediate disciplinary action up to and including suspension or termination.

### Remediation/Discipline/Penalties

Any individual who violates this policy by engaging in bullying will be subject to appropriate action, which may include disciplinary action. Remedial responses to bullying include measures designed to correct the problem behavior, prevent another occurrence of the behavior, and protect the target of the act. Appropriate remedial measures may include, but are not limited to:

• Restitution and restoration;

• Peer support group;

• Corrective instruction or other relevant learning or service experience;

• Changes in class schedule

• Supportive intervention;

• Behavioral assessment or evaluation;

• Behavioral management plan, with benchmarks that are closely monitored;

• Student counseling;

• Parent conferences; or

• Student treatment or therapy.

Environmental remediation may include, but is not limited to:

• School and community surveys or other strategies for determining the conditions contributing to the relevant behavior;

• Modification of schedules;

• Adjustment in hallway traffic and other student routes of travel;

• Targeted use of monitors;

• Parent education seminars/workshops;

• Peer support groups.

Disciplinary measures available to school authorities include, but are not limited to the following:

<u>Students</u>: Discipline may range from a reprimand up to and including suspension from school, to be imposed consistent with the Code of Conduct and applicable law.

<u>Employees</u>: Discipline may range from a warning up to and including termination, to be imposed consistent with all applicable contractual and statutory rights.

<u>Volunteers</u>: Penalties may range from a warning up to and including loss of volunteer assignment.

<u>Vendors</u>: Penalties may range from a warning up to and including loss of district business.

<u>Other individuals</u>: Penalties may range from a warning up to and including denial of future access to school property.

**Policy Dissemination**

All students and employees shall be informed of this policy in student and employee handbooks, on the district website and student registration materials.

All employees shall receive information about this policy and regulation at least once a year.

Principals in each school shall be responsible for informing students and staff on a yearly basis of the terms of this policy, including the procedures for filing a complaint and information about the impact of bullying on the target and bystanders.

**Training**

Training needs in support of this bullying prevention and intervention program will be reflected in the district's annual professional development plan, new teacher orientation, in curriculum and will be considered in the budget process. The DAC, administrative employees and other staff, such as counselors or social workers who have specific responsibilities for investigating and/or resolving complaints of bullying shall receive yearly training to support implementation of this policy, regulation and on related legal developments.

5. https://boardpolicyonline.com/?b=queensbury&s=24133

## 8130 SCHOOL SAFETY PLANS AND TEAMS

Emergencies and violent incidents in schools are critical issues that must be addressed in an expeditious and effective manner. The Board of Education recognizes its responsibility to adopt and keep current a comprehensive district wide school safety plan and building-level emergency response plan(s) regarding violence prevention, crisis intervention, emergency response and management.

Taken together, the district-wide and building plans shall provide a comprehensive approach to addressing school safety and violence prevention, and provide the structure where all individuals can fully understand their roles and responsibilities for promoting the safety of the entire school community. The plans will be designed to prevent or minimize the effects of serious violent incidents and emergencies and to facilitate the district's coordination with local and county resources. The plans will also address risk reduction/prevention, response and recovery with respect to a variety of types of emergencies and violent incidents in district schools, and will address school closures and continuity of operations in the context of epidemics/pandemics, in either the plans themselves or in addenda to the plans.

In accordance with state law and regulation, the district will have the following school safety teams and plans to deal with violence prevention, crisis intervention and emergency response and management:

Comprehensive district-wide school safety team and plan

The Board will annually appoint a district-wide school safety team that includes, but is not limited to the following constituencies: a representative from the Board, teachers, administrators, and parent organizations, school safety personnel and other school personnel (including bus drivers and bus aides). This team is responsible for the development and review of a comprehensive district-wide school safety plan. The plan will cover all district school buildings and will address violence prevention (taking into consideration a range of programs and approaches that are designated to create a positive school climate and culture), crisis intervention, emergency response and management at the district level. It will include all those elements required by law and regulation.

The district-wide safety plan will include contracts or memoranda of understanding that define the relationship between the district, personnel, students, visitors,  law enforcement, and School Resource Officers. These contracts or memoranda will be consistent with the Code of Conduct, and will define the roles, responsibilities, and involvement in the schools of law enforcement or School Resource Officers. The role of school discipline will be clearly delegated to school administration.

The Superintendent of Schools or designee will be the district's chief emergency officer, and will coordinate communication between school staff and law enforcement and first responders. The chief emergency officer will ensure that all staff understand the district-wide school safety plan and receive training on the building-level emergency responses plan, violence prevention and mental health, and will also ensure that district-wide and building-level plans are completed, reviewed annually, and updated as needed by the designated dates. The chief emergency officer will ensure that the district-wide plan is coordinated with the building-level plans, and will ensure that required evacuation and lockdown drills are conducted.

Building-level emergency response teams and plans

Each Building Principal is responsible for annually appointing a building-level emergency response team that includes representatives from teachers, administrators, parent organizations, school safety personnel (including bus drivers and bus aides), other school personnel, law enforcement officials, fire officials and other emergency response agencies. The building-level emergency response team is responsible for the development and review of a building-level emergency response plan for each district building. The plan(s) will address response to emergency situations, such as those requiring evacuation, sheltering and lock-down at the building level and will include all components required by law and regulation. These confidential plans will include evacuation routes, shelter sites, medical needs, transportation and emergency notification of parents and guardians.

Building-level emergency response plans will include protocols in response to carbon monoxide alarms or detection. Alarm or detection of carbon monoxide will result in the appropriate actions as described by the emergency response plan.

Building-level emergency response plans must designate:

·    an emergency response team for incidents that includes appropriate school personnel, law enforcement officials, fire officials, and representatives from local, regional and/or state emergency response agencies to assist the school community in responding to a violent incident or emergency; and

·    a post-incident response team that includes appropriate school personnel, medical personnel, mental health counselors and other related personnel to assist the community in coping with the aftermath of a serious violent incident or emergency.

During emergencies, staff are authorized to temporarily cover classroom door vision panels when it is likely to protect staff and students.  For example, covering vision panels may prevent an intruder from determining if a classroom is occupied, thereby discouraging attempts to gain access.  During emergencies, staff are also authorized to temporarily block doors to slow the access of intruders.  Building-level emergency

response plans must address the temporary covering of door vision panels and the temporary blocking of doors during emergencies.

**Threat Assessment Teams**

The Building Principal, in consultation with the Superintendent, will annually designate a threat assessment team to provide ongoing support and information in order to identify, and assess individuals who may be potential threats to safety, with the intent of minimizing acts of violence in the school community. The threat assessment team will be composed of, but not limited to, the following personnel from both within the school and the larger community, as appropriate: building administrators, legal counsel, the school physician and/or lead nurse, the safety compliance/asset control coordinator, school counselors, local mental health and social service providers, law enforcement, security personnel, and facilities and maintenance personnel. The team will meet regularly. The team will be mindful of the need for discretion and observance of confidentiality requirements.

Students will be encouraged to bring their concerns to any district employee. If a district employee becomes aware of a threat to the school community, they must inform the Building Principal, who will convene the threat assessment team. The Building Principal may request the participation of the following individuals who may have specific knowledge of the potential perpetrator: supervisors, teachers, students, and parents. The Building Principal is responsible for keeping the Superintendent informed about the activities of the threat assessment team. Threat assessment team members will receive appropriate training.

The Building Principal is responsible for conducting at least one test every school year of the emergency response procedures under this plan including procedures for sheltering and early dismissal.

To maintain security and in accordance with the law, the building-level emergency response plan(s) are confidential and not be subject to disclosure under the Freedom of Information Law or any other law.

Annual Review and Report

All plans will be reviewed and updated, if necessary, by the appropriate safety team by September 1 every year. In conducting the review, the teams will consider any changes in organization, local conditions and other factors including an evaluation of the results of the annual test of the emergency response procedures which may necessitate updating of plans. If the plan requires no changes, then it will remain in effect. If the district-wide plan requires change, then the updated plan will  be submitted to the Board of Education in time to allow 30-days of public comment and to hold a public hearing which provides for the participation of school personnel, students and other interested parties prior to Board adoption. All plans must be adopted by the Board of Education by September 1.

<mark>The Superintendent of Schools is responsible for submitting the district-level school safety plan and any amendments to the plan to the Commissioner within 30 days after its adoption, no later than October 1 of each year</mark>. The district-wide plan will be posted on the district's website. The district is responsible for submitting the building-level safety plan for each building and any amendments to the plan with the appropriate local law enforcement agency and the state police within 30 days after its adoption, but no later than October 1~~5~~ of each year.

**Queensbury Union Free School District District-Level Safety Plan:**

https://www.queensburyschool.org/departments-and-services/health-wellness/school-safety/#section3

Section II: States "Anti-bullying presentations" is a prevention/intervention strategy

Section II: Risk reduction/prevention and intervention

**Prevention/intervention strategies**

PROGRAM INITIATIVES

The district has developed a number of programs and activities to aid in risk reduction. These initiatives are run at different age groups within the district.

- Anti-Bullying Presentations.
- Character Education programs.
- The District Code of Conduct.
- The district has developed comprehensive threat assessment and risk intervention procedures and training.
- The district has a growing SADD chapter in the school.
- Encouraging open discussion in health education classes on topics that affect all students, such as bullying, respect, and mental health.
- The district's School Resource Officers have been involved in school curriculum to help foster a positive relationship between students, faculty, and law enforcement personnel.
- Certain employees have attended Conflict Resolution training.
- Student council.
- Athletic Code of Conduct

Supporting Documentation:

Determination:

This certainly is not a prompt and equitable resolution as required by Title IX. Although the investigation went beyond the 30 day time frame in the school board policy, the reason for a prompt investigation is to determine the need for immediate safety intervention and necessary supportive services. Although not noted on the determination, Gwynne Cosh and Michael Brannigan viewed the bus video on February 1, 2021, meaning sexual harassment was visible and evident.

As seen on the written determination dated March 11, 2021 you can see the Title IX investigation was not launched until February 5, 2021. ████ was also not interviewed by the title IX coordinator until February 5th, the same day as ██████ and ██████

interview. Why was ▮▮▮▮ suspended in and out of school, before the investigation even began? The determination also states ▮▮▮▮ was suspended from the bus February 1-March 9th. This is not accurate information.

The Title IX Final Rule requires schools to provide "supportive measures" to students, with or without a formal complaint. You will notice under section E of the determination, there are no remedies noted supporting ▮▮▮▮▮▮ or ▮▮▮▮▮▮ Such measures are designed to be individualized and restore or preserve equal access to the educational program, or activity without unreasonably burdening the other family, including measures designed to protect the safety of all parties and deter sexual harassment.

In order for appropriate protections to be put into place, and for services to be individualized, staff would need to understand the impact and safety concerns surrounding the incident. Once the specific impact is identified, a safety plan should include specific actions to restore equal access to education.

# Impact on ▓▓▓▓▓

▓▓▓▓▓ struggled with responsibility, following rules, and making good choices in school. During a phone conversation with Mrs. Bailey on 2/8 these behaviors were recent changes for her. Mrs. Bailey, ▓▓▓▓▓ teacher, informed me she is going on YouTube when she should be using the chromebook for an assignment provided by the teacher. She also informed me that she is delaying the start of her work and needs many reminders to get back to work. During a meeting on May 10, 2021 with the classroom teacher I was informed this is still happening. When I asked ▓▓▓▓▓ why she was doing that-she just got angry. I asked her how she knew about YouTube, because we do not allow it at home. She said ▓▓▓ used to show her things on YouTube. ▓▓▓▓▓ has a current fear of being taken and we do not know why. She is afraid of loud noises out of the blue, is experiencing heachaches, loss of sleep, and fears of being alone.

| COMMENTS: |
| --- |
| **Marking Period 1** |
| Comments by: BAILEY |
| Looking forward to meeting with you for our Parent Teacher conference on Google Meet. Watch for an email from me with the link. |
| Comments by: CIRILLO |
| Pleasure to have in class. |
| **Marking Period 2** |
| Comments by: BAILEY |
| ▓▓▓▓ s doing well in 5th grade. |
| She needs to be more responsible when asked to follow classroom rules and procedures. |

▓▓▓▓▓ originally expressed fear of ▓▓▓ , but the lack of support within the school environment now include the following concerns:

- Fear of being alone in school and at home (ex: walking alone in the hallway to get breakfast)
- Insubordination during the school day (delay in work completion & not going on the appropriate educational websites as directed)
- Deception (Ex: telling the teacher she ate when she did not)
- Not seeking help appropriately (Examples: other students following her in school, not informing staff re: bullying, sexual harassment, peer expressing suicidal thoughts, student alone in the classroom.)
- Excessive Anger (although not observed in school to my knowledge)
- Seeking attention through peers in negative ways.

School staff and administration have been informed of the trauma associated here and have yet to still address it. On the determination of the board appeal letter you will see ▓▓▓▓▓ has been "provided counseling" but this is a blatant lie. I hope someone asks to see proof of this. At my persistent request and relentless attempts to help ▓▓▓▓▓

and ███ face their fears of ███, I asked to speak with a counselor to get advice to help them do this. Denise set up a meeting with Antoinette Donohue, Amanda Denno, myself, and ███ and ███ on March 2nd to have the opportunity to ask questions, however my request to receive help to support the ███ has not happened at all. In an email to set up a time, Amanda put "counseling" in the subject line. I noticed this and figured they were trying to find a way for them to document they were providing "counseling" but this is furthest from what actually happened. ███ shut down during the meeting when Mrs. Donohue made him feel stupid after asking one question. I now understood why ███ reported to me "Mrs. Donohue can't help me". There was no counsel happening at all. In fact, I specifically asked Mrs. Donohue during this meeting to help ███ make friends and this has never happened. Mrs. Donohue and I have not spoken at all regarding this incident, the trauma the ███ are enduring, or to provide suggestions or strategies to help them. NOT one mental health provider from the school has ever reached out to me regarding this situation.

3/17/21-███ started seeing a psychologist outside of school for therapy. They were working on anger, fear, and making good choices. There was little to no progress made. Dr. Millis believes she is trying to regain lost power.

On the Board appeal letter you will see "check-ins" and "clubs" listed as supportive services. The check-ins were suggested by the district when they denied my request for counseling stating that Mrs. Donohue's schedule was "tight". These check-in's, designed by the district stated Mrs. Donohue would meet the ███ at the front door of the school as they got off the bus to ask them if they felt safe for two weeks. Although I disagreed this was an effective plan to see how they were feeling, I kept this feeling to myself and pre-set the ███ for this to begin on Monday February 22, 2021. Mrs. Donohue was not waiting for them this morning. According to the school she had a personal emergency but I was not informed that the plan had changed that morning to be able to let the ███ know. That day on the bus did not go well. The ███ did not feel safe due to the bus monitor not being informed of his responsibilities but they had to get back on that bus again in the afternoon before being able to let me know. ███ went back on the bus the following week so the "check-ins" could not happen anymore because they were no longer riding the bus. <u>The clubs mentioned are not individualized.</u> <u>They are open to anyone in the school and transportation is not provided-so this is not a</u> <u>supportive service designed not to burden the family. In addition, the board hearing was</u> <u>on May 10, 2021. Why was new information/evidence entered into the review past this</u> <u>date (see May 17th email below) and without my knowledge. This is the reason an</u> <u>unbiased hearing officer is necessary, as outlined in the school board policy</u>. An unbiased hearing officer was not utilized. In fact, the only person that talked to me that night was the school district attorney. The board decision was made by one board

member, which is against governmental policy, and they did not explain or justify any of the decisions made. Mr. Gannon told me the board was told not to speak to me.

**Email Sent to Amanda Denno: February 18, 2021**



*Hi Amanda, Tony and I just talked with the ▮▮ for quite a while. After describing the plan ▮▮▮ thought the bus monitor would keep her safe. ▮▮▮ however did not feel the same way. He stated "putting ▮▮ back on the bus was a terrible idea." When asked "why?" he said "he didn't just say things to us". He said he feels "unsafe" and he thought ▮▮▮ would probably also be scared because he talked to him about his "penis" too. This whole conversation was very upsetting like everything just flooding back. He expressed fear that ▮▮ would just say things over the seat to him regardless of the monitor. I told him the monitor would ensure he wouldn't say anything to him and he just does not believe that. He thinks ▮▮ will say things to him getting on or off the bus then. He also asked if ▮▮ could talk to other people and I said I was not sure, but that he probably could. He said he would feel "sick" listening to him speak badly to other people. Because he seemed to have another scenario to offer for every explanation, it is obvious that he has so much anxiety about seeing him again. When telling them about the seating arrangements of everyone ▮▮▮ told me they sit in seat 5 in the morning. They were moved to seat 1 only in the afternoon "because of what happened." Again they should not have been punished for this..but we can't change it now. I'm also wondering if other bus videos were watched and if ▮▮▮ was interviewed? There may be reasons ▮▮ shouldn't be going back on the bus. I was hopeful this conversation would go better. I was hopeful the twins would feel safe..but they don't. Even though ▮▮▮ said she was okay with the plan....her behavior showed differently. She was making fists during the conversation. When I asked her why she was doing this, she teared up. I dropped it to let everyone have a break from a heavy conversation but then when asked to get in the shower she threw a tantrum hitting walls, screaming, and slamming doors. This is what happened the day of the interview at the school as well. It has not happened in the time period between. I wish the district would have offered support before planning to reunite them to allow everyone to prepare for this. This reunion is irresponsible. We must address their needs. Please let me know if the plan remains the same for Monday.... ▮▮▮ ▮▮*

Email sent to Amanda later that same day as I was trying to brainstorm ways to help the twins face their fears.

**Kristina Tucker** <ktuck003@gmail.com>
to Amanda ▾

Feb 18, 2021, 9:20 PM   ☆   ↩   ⋮

Can we talk about this tomorrow? I have an idea. I think even a couple days on the bus with the monitor to build some confidence that they will be okay before Ryan returns would be helpful. It gives the monitor a chance to meet the twins and reassure them they will be okay without the fear associated. Right now the monitor is a stranger to them. Maybe Mrs. Donahue can give me some strategies to discuss with them how to face their fears and recognize their feelings. We certainly want them to get through this and don't expect Ryan will be off the bus forever.

...

*Can we talk about this tomorrow? I have an idea. I think even a couple days on the bus with the monitor to build some confidence that they will be okay before ▓▓▓ returns would be helpful. It gives the monitor a chance to meet the ▓▓▓ and reassure them they will be okay without the fear associated. Right now the monitor is a stranger to them. Maybe Mrs. Donahue can give me some strategies to discuss with them how to face their fears and recognize their feelings. We certainly want them to get through this and don't expect ▓▓▓ will be off the bus forever.*

Email sent to Gwynne asking about mentoring for ▓▓▓▓▓ AGAIN: May 15,2021

**Kristina Tucker** <ktuck003@gmail.com>
to Gwynne ▾

May 15, 2021, 8:12 PM (12 days ago)   ☆   ↩   ⋮

Hi Gwynne, I wanted to email you while I was thinking about it but no need to respond over the weekend. Brooklyn has been asking me about mentoring. I assume it is not going to work out but I wanted to confirm that before I told her that. Also I talked to Bentley about Jackson and Kyle. I think he could build a friendship with Jackson if they had an opportunity. Im not sure how the outside lunch works but is there a place they could go together and eat to get to know eachother more? I'll let Mrs. Bailey know she can pass on my contact info to his family to see if we can connect them outside of school. Also can we set up a meeting to start talking more about next year for both of them? I'd like to create a safety plan that could be shared with all of their teachers so they have an awareness upfront. I know Mr. Gannon said he wanted to join a meeting so maybe that would be a good conversation to have him involved as well. Let me know what you think. Hope you are having a nice weekend. Kristina

*Hi Gwynne, I wanted to email you while I was thinking about it but no need to respond over the weekend. ▓▓▓▓▓ has been asking me about mentoring. I assume it is not going to work out but I wanted to confirm that before I told her that. Also I talked to ▓▓▓▓▓ about Jackson and Kyle. I think he could build a friendship with Jackson if they had an opportunity. Im not sure how the outside lunch works but is there a place they could go together and eat to get to know eachother more? I'll let Mrs. Bailey know she can pass on my contact info to his family to see if we can connect them outside of school. Also can we set up a meeting to start talking more about next year for both of them? I'd like to create a safety plan that could get shared with all of their teachers so they have an awareness upfront. I know Mr. Gannon said he wanted to join a meeting so maybe that would be a good conversation to have him involved as well. Let me know what you think.  Hope you are having a nice weekend. ▓▓▓▓▓*

Her response: ==Sent on May 17, 2021==

**Cosh, Gwynne**
to me ▾

May 17, 2021, 10:26 AM (10 days ago)   ☆   ↩   ⋮

Hi Kristina,

I hope you had a nice weekend.

Unfortunately we are having a difficult time finding someone for Brooklyn as QHS is winding down and the mentors we would want to set her up with are busy with sports, studying for exams etc. However we will be offering three more clubs this school year: Running Club, Hiking Club, and Book Buddies Club. If Brooklyn is interested in any of those we can make sure she gets into one of those clubs.

I think Jaxon is a great choice for connecting with Bentley outside of school. I would be happy to set a meeting up with us and Mr. Gannon to discuss the transition for Brooklyn and Bentley. Would Thursday morning  at 8:30 or Friday afternoon at 12 work?

Let me know what might work best for you.

Gwynne
...

*Hi ▓▓▓▓▓*
*I hope you had a nice weekend. Unfortunately we are having a difficult time finding someone for ▓▓▓▓▓ as QHS is winding down and the mentors we would want to set*

*her up with are busy with sports, studying for exams etc. However we will be offering three more clubs this school year: Running Club, Hiking Club, and Book Buddies Club, if Brooklyn is interested in any of those we can make sure she gets into one of those clubs. I think Jaxon is a great choice for connecting with Bentley outside of school.  I would be happy to set a meeting up with us and Mr. Gannon to discuss the transition for Brooklyn and Bentley. Would Thursday morning  at 8:30 or Friday afternoon at 12 work? Let me know what might work best for you. Gwynne*

My response back May 17, 2021



*Okay I appreciate you trying. I sense her nerves of clubs and I'm not sure why but I will mention them to her. Unfortunately those two times won't work for me this week. I do have prepping days Tuesday and Wednesday this week so I could adjust my schedule if you had any availability these two days. Also Friday I'm free in the morning until 10:30. If these times don't work I can look at the next couple of weeks. Thanks! Kristina*



**Brooklyn is no longer eating breakfast at school.**

# Impact on ████

████ has been diagnosed with major depressive disorder, generalized anxiety, and tic disorder this school year. He has lost the trust of adults and does not want to attend school. He also no longer wants to attend school related activities or even be near the campus. The incidents related here have affected him academically as shown in his report card below. He also had an evaluation for an IEP.

| MATH | M1 | M2 | M3 | M4 |
|---|---|---|---|---|
| **MATHEMATICAL REASONING** | | | | |
| G5M-01. Solves one-step word problems | 3 | 3 | | |
| G5M-02. Solves multi-step word problems | 2 | 2 | | |
| **OPERATIONS AND ALGEBRAIC THINKING** | | | | |
| G5M-03.Writes and interprets numerical expressions | 3 | 3 | | |
| **NUMBER SENSE AND OPERATIONS IN BASE TEN** | | | | |
| G5M-04.Understands place value to the thousandths place | 3 | 2 | | |
| G5M-05.Adds and subtracts multi-digit whole numbers and decimals | 4 | 2 | | |
| G5M-06.Multiplies and divides multi-digit whole numbers and decimals | 3 | 3 | | |
| **NUMBER SENSE AND OPERATIONS - FRACTIONS** | | | | |
| G5M-07.Adds and subtracts fractions with unlike denominators | NA | 3 | | |
| G5M-08.Multiplies and divides fractions | NA | 3 | | |
| **MEASUREMENT AND DATA** | | | | |
| G5M-09.Converts units within a given measurement system | 3 | 2 | | |
| G5M-10. Understands and calculates volume | NA | NA | | |
| **GEOMETRY** | | | | |
| G5M-11. Classifies two dimensional figures based on properties | NA | NA | | |
| G5M-12. Graphs points on a coordinate plane to solve problems | NA | NA | | |

| ENGLISH LANGUAGE ARTS - READING | M1 | M2 | M3 | M4 |
|---|---|---|---|---|
| **FOUNDATIONAL SKILLS** | | | | |
| Current Reading Level: Grade Level Expectations: Fall S/T, Winter U, Spring V | T | U | | |
| **LITERATURE AND INFORMATIONAL TEXTS** | | | | |
| G5R-01. Accurately quotes from a text when explaining what the text says explicitly and when drawing inferences | 4 | 3 | | |
| G5R-02. Explains how a part of a story is important to the whole: chapters, scenes, or stanzas fit together to provide the overall structure of a particular story, drama, or poem | 3 | 3 | | |
| G5R-03. Analyzes perspective/ point of view of a text | NA | NA | | |
| G5R-04. Determines the meaning of words and phrases as they are used in a text, including figurative language such as metaphors and similes | 4 | 4 | | |
| G5R-05. Summarizes a text to determine a theme in a story, drama or poem | 4 | NA | | |
| G5R-06. Determines two or more main ideas of an informational text and explains how they are supported by key details | NA | 3 | | |
| G5R-07. Explains the relationships or interactions between two or more individuals, events, ideas, or concepts based on specific information in the text | NA | 2 | | |
| **LANGUAGE** | | | | |
| Applies correct grade-level grammar and punctuation | 4 | 3 | | |
| Applies correct spelling of grade-level words in written work | 4 | 4 | | |
| Applies correct spelling of words on weekly tests | 4 | 4 | | |

Although ████ was meeting all grade-level expectations in the first marking period, you can see a significant change to the second marking period.

Letter sent to School Superintendent Kyle Gannon on 2/5/21
To Whom it may concern:
February 5, 2021

Please attach the following information to my initial Sexual Harassment complaint and document as additional information/evidence for the Title IX investigation.

● On January 29, 2021 my children ( ████ and ████ reported 6th grade student Ryan encouraged them to engage in a sexual act. The specific language spoken to ████ was "You should let your sister suck your penis." ████ was also present. ████ needs to be added as a victim, not just ████
● ████ has since reported that this was not the first incident that Ryan has stated to her regarding her genitals. She specifically stated that Ryan would talk to her about her "vagina". She is unable, fearful, or unwilling to explain specific details regarding this.
● ████ has reported that Ryan told him he was "Gay".
● ████ and ████ both identify a student by the name of "Landon" to have overheard the initial reported comment. (Landon to be added as potential witness)
● ████ has expressed fear of being near Ryan.

As a parent, I am beyond saddened that my children are having to go through this. Although I am hopeful this situation will have minimal long-term effects on their lives, I want you to be aware of the immediate effects and stress they are currently enduring and expressing: confusion, anger, sadness, and even neurological distress (tics). In my professional capacity, I want you to understand the neurobiology of trauma and how it may affect the accuser's actions and feelings. It is expected that victims can have fragmented memories and/or varying emotions and functionality. Children who are harassed or bullied may also have serious and/or lasting effects from this experience. Conduct of such a pervasive nature interferes with a student's educational performance and opportunities, as well as mental, emotional and/or physical well-being. It is reasonable to suspect that victims will need emotional support, even if not initially apparent.I am hopeful that The Queensbury Union Free School District will conduct a thorough investigation (regardless of Title ix requirements) to ensure the safety of all students,minimize risk, and provide rehabilitative services as needed. This should not be identified and investigated as an isolated incident.

Sincerely, ████ ████

**Email sent to Amanda Denno: 2/18/21**

Kristina Tucker <tituck002@gmail.com>                                          Thu, Feb 18, 7:11 PM   ☆  ↰  ⋮
to Amanda, tuck002 ▾

Hi Amanda, Tony and I just talked with the twins for quite a while. After describing the plan Brooklyn thought the bus monitor would keep her safe. Bentley however did not feel the same way. He stated "putting Ryan back on the bus was a terrible idea." When asked "why?" he said "he didn't just say things to us". He said he feels "unsafe" and he thought Landon would probably also be scared because he talked to him about his "penis" too. This whole conversation was very upsetting like everything just flooding back. He expressed fear that Ryan would just say things over the seat to him regardless of the monitor. I told him the monitor would ensure he wouldn't say anything to him and he just does not believe that. He thinks Ryan will say things to him getting on or off the bus then. He also asked if Ryan could talk to other people and I said I was not sure, but that he probably could. He said he would feel "sick" listening to him speak badly to other people. Because he seemed to have another scenario to offer for every explanation, it is obvious that he has so much anxiety about seeing him again. When talking them about the seating arrangements of everyone-Brooklyn told me they sit in seat 5 in the afternoon "because of what happened." Again they should not have been punished for this. but we can't change it now  I'm also wondering if other bus videos were watched and if Landon was interviewed? There may be reasons Ryan shouldn't be going back on the bus. I was hopeful this conversation would go better. I was hopeful the twins would feel safe. but they don't. Even though Brooklyn said she was okay with the plan...her behavior showed differently. She was making fists during the conversation. When I asked her why she was doing this, she teared up. I dropped it to let everyone have a break from a heavy conversation but then when asked to get in the shower she threw a tantrum hitting walls, screaming, and slamming doors. This is what happened the day of the interview at the school as well. It has not happened in this time period between. I wish the district would have offered support before planning to reunite them to allow everyone to prepare for this. This reunion is irresponsible. We must address their needs. Please let me know if the plan remains the same for Monday...  Kristina Tucker

Hi Amanda, Tony and I just talked with the twins for quite a while. After describing the plan ████ thought the bus monitor would keep her safe. ████ however did not feel the same way. He stated "putting Ryan back on the bus was a terrible idea." When asked "why?" he said "he didn't just say things to us". He said he feels "unsafe" and he thought Landon would probably also be scared because he talked to him about his "penis" too. This whole

conversation was very upsetting like everything just flooding back. He expressed fear that ▮▮▮ would just say things over the seat to him regardless of the monitor. I told him the monitor would ensure he wouldn't say anything to him and he just does not believe that. He thinks ▮▮▮ will say things to him getting on or off the bus then. He also asked if ▮▮▮ could talk to other people and I said I was not sure, but that he probably could. He said he would feel "sick" listening to him speak badly to other people. Because he seemed to have another scenario to offer for every explanation, it is obvious that he has so much anxiety about seeing him again. When telling them about the seating arrangements of everyone-▮▮▮ told me they sit in seat 5 in the morning. They were moved to seat 1 only in the afternoon "because of what happened." Again they should not have been punished for this..but we can't change it now. I'm also wondering if other bus videos were watched and if ▮▮▮ was interviewed? There may be reasons ▮▮▮ shouldn't be going back on the bus. I was hopeful this conversation would go better. I was hopeful the ▮▮▮ would feel safe..but they don't. Even though ▮▮▮ said she was okay with the plan....her behavior showed differently. She was making fists during the conversation. When I asked her why she was doing this, she teared up. I dropped it to let everyone have a break from a heavy conversation but then when asked to get in the shower she threw a tantrum hitting walls, screaming, and slamming doors. This is what happened the day of the interview at the school as well. It has not happened in the time period between. I wish the district would have offered support before planning to reunite them to allow everyone to prepare for this. This reunion is irresponsible. We must address their needs. Please let me know if the plan remains the same for Monday....  ▮▮▮ ▮▮▮

## Email sent o Gwynne Cosh and Denise Troelstra 2/27/21



"Please don't feel the need to read or respond to this over the weekend. I just wanted to share something with you ▮▮▮ told me last night. He was very sad last night.. and while trying to find out why,  he said "mom you know the peardeck thing that asks you how you are feeling, do teachers see the answers?" I told him yes and just to always be honest when answering. He said he is. I could tell there was something bothering him about that. He told me he has indicated he was sad many times and noone has ever talked to him about it. I asked him if he would like me to talk to Mrs. Bailey but he said the surveys are given in specials. Can you tell me more about this? I definitely think he spends a lot of time thinking about things like this and internalizes it as noone cares about him."

Mrs. Cosh called me on March 2nd to tell me she looked into this as she was not aware teachers were using these surveys that identify student's feelings. She said ▮▮▮ has taken them in specials and the last one was on Friday Feb 26th. She thanked me for bringing this to her attention because she found out teachers were not always checking responses or if they were...it was sometimes after the class and students were not being checked on. Denise did not respond to this email nor follow-up at a later time.

Email sent March 9, 2021 to Denise Troelstra following the board of education public comment.



"I am very disappointed that the board did not want further information. Im also very disappointed that the school district staff aware of this issue thinks its reasonable to further traumatize my children by asking them to face ▬▬ tomorrow. ▬▬ asked me tonight if I would go to the store and get him a device for the bus to be able to listen to music. He said he thought he could face ▬▬ tomorrow if he could have headphones on and just keep his eyes closed. So I want you to picture that and think of the courage he has. Although he is showing great insight to problem solving, this is not a problem he should have to solve. This ultimately broke my heart. ▬▬ starts counseling tomorrow so he does not need to see Mrs. Donahue tomorrow or anymore at all. The right thing to do here was to provide ▬▬ separate transportation for the remainder of the school year. This would allow the ▬▬ to have the healing time that they deserve and perhaps the positive experience on the bus that they also deserve. This would also minimize the risk to others and the liability of the school district. All students would still be given the same opportunities at the cost of a suburban or small bus run. I will never understand putting this cost before the health and safety of everyone involved and I never expected this to be our experience at Queensbury. I was really thinking about what you said regarding the necessary evidence needed (multiple incidents) before separate transportation is provided. So I'm wondering how this justification works after the next kid gets sexually harassed or sexually abused? Well my kids won't be the guinea pigs."

Email sent to Gwynne Cosh requesting IEP evaluation for ▬▬ 4/18/21

April 18, 2021

Dear Mrs. Cosh,
I am writing to request my son ▬▬ be evaluated for special education services. I am worried that ▬▬ academic decline and loss of interest in school is due to social/emotional concerns. Specifically, ▬▬ struggles to make friends, identify bullying and harassment, develop coping mechanisms to address fears, and create trusting relationships with staff. The bullying and harassment ▬▬ has endured this school year has affected his ability to receive meaningful educational benefit and he may need special services in order to learn. These issues have increasingly gotten worse over the past six months. ▬▬ has a diagnosis of anxiety and depression.

Some goals and objectives I would like considered are:
● Ability to read/recognize social cues.
● Ability to strategize and respond effectively to harm or potential harm

● Ability to self-advocate

Some considerations to help ▇▇▇▇▇ achieve these goals may be:
● A buddy system set-up for School-Wide activities. (Mentor, friend ▇▇▇▇▇)
● Classroom lessons to raise awareness of Bullying and Harassment.
● Continued individual counseling with progress monitoring.

As added safety precautions, I would like the following considered and included in the IEP:
● ▇▇▇▇▇ will be able to Identify an adult in the school that he can trust for help. ▇▇▇▇▇
will be able to describe how he will access this adult and when it is appropriate to do so.
● How school staff will document and report incidents.
● How ▇▇▇▇▇ will be provided safe and fearless transportation to school.
● Increased supervision in unstructured environments..ie, on the playground, bus,
cafeteria, hallways ect..

This letter serves as my request and consent for an evaluation of my child, but before the
evaluation begins, I have some questions I would like answered. Please provide me with the
name and telephone number of the person who will be forwarded this letter and coordinate this
evaluation. Thank you for your prompt attention to my request. I look forward to your response.


▇▇▇▇▇ Psychologist took him off all anxiety medication over the summer due to the
environmental factors ▇▇▇▇▇ was experiencing at school. She says "We do not
medicate kids for environmental issues. He needs environmental support." Her advice
was to get him out of Queensbury Schools.


**"Bus drivers don't protect kids"** ▇▇▇▇▇ said after making the scribble through the bus driver's
face.



**Situation on the newly started PM transportation: (text from** ▮▮▮**)**



**Additional document with further texts from the beginning of the school year included in seperate link.

**Email sent to Mrs. Cosh. Mrs. Denno, Mrs. Bailey. And Mrs. Bureau (ELA teacher) 5/18/21**



"Hi, I wanted to follow-up with everyone after our last conversation. To share some good news-when I picked up ▮▮▮ from mentoring today he was very positive. He couldn't wait to tell me about mentoring, but also about the robot him and ▮▮▮ finished today. He had a feeling of accomplishment and that was music to my ears. I know everyday can't be rainbows and robots but being able to connect to something in school in a positive manner for him is just really great! I talked to him about friends and he does seem to connect with ▮▮▮ so if you could pass on my contact information to his family, that would be really great! My cell is ▮▮▮ and feel free to share my email as well. ▮▮▮ has messenger kids as well if they want to find me on Facebook. Tonight we had a long chat when he was Journal writing and the lonely feeling came up. I asked him to tell me more about this. The recent partner situation I mentioned was during ELA. He said they were working on themes from Charlotte's web and the class was

asked to find a partner for discussion. He said he did not seek out a partner and no one came to him. He said  waved him over to her group but by that point he was "feeling bad" so essentially learning was lost there. He said he gets spoken to a lot in ELA about not sitting the right way. He said it's hard to sit all day and he doesn't realize he starts to sit on his feet. He said he feels embarrassed when he is called out across the room about this. He said Mrs. Bureau is strict (this is not a negative quality in my book whatsoever) but says he is "afraid" to ask for help. I explained to him as I have done many times before that he has to verbalize a need for help. This is a struggle this year and something he could benefit from more support around. He said he is currently having a hard time with the literary essay assignment and has no idea if he is doing it correctly. I have no intentions of trying to make anyone feel bad here because I know how hard teachers work and I know how much you can have on your plate at any given time. I imagine this year has been harder than ever. I also know how much teachers care to make a difference, so I'm hoping this awareness is just a helpful insight into           world right now. On a side note,          might be in a funk tomorrow. Her friend          hasn't been the best role model for her and I had to put an end to their communication. I know having to step in on their friendship is probably embarrassing for her but I don't allow my kids to talk like her. She is definitely going through some normal pre-teen peer pressure culminating with a desire to find her connection in school. To end this email on a positive note          was very excited about her chorus recording today and there was a sense of normalcy this morning getting her ready so I wanted to thank you for allowing this celebration of accomplishment in the music program this year under these circumstances. I can't wait to view the video with them! Please stay in contact about anything we can do to help support the          have a successful end of the school year.

## Email sent to school psychologist Monique Agans 5/19/21



Hi Monique, I expect this lack of awareness to be a hurdle in the eval process so I wanted to share the portion about the classroom example from this email with you. His anxiety is perceived as shyness and his academic decline is perceived as an overall weakness when in fact his anxiety and depression correlates to this academic decline. His inability to seek friends/partners leads to lost learning. He has to be able to work with others to benefit from his education. His struggle with math is not due to cognitive abilities as outlined in his past academic records and first quarter grades at Queensbury. His learning is directly impeded by his social and emotional needs not being met. His needs are not even appropriately recognized as neither teacher identifies these types of concerns, but his          in his class told me about it. He needs at the least indirect support of a special educator to recognize his needs. Can you update me where we are in the evaluation process? Thank you,



Email sent Monday April 12, 2021 by Mrs. ▮▮▮ (▮▮ mother) to Denise Troelstra, Kyle Gannon, and Michael Brannigan.

Hello Mr. Gannon,

I have been quiet thru the latter half of this investigation as I had no idea what to say, what to ask or how to respond. I was embarrassed and felt it was my role to be cooperative. I was thankful that the school seemed understanding of the extenuating circumstances that led to my child's behavior. However, I have recently developed some concerns. My neighbors have shared that there have been several instances of bullying and unsafe behavior on the bus since earlier in the school year. Children bullying others, standing up and yelling "rape" in the isle (not just my child) , watching sexually explicit videos, discussing pornography, older children telling younger children they are ugly and worthless. ▮▮▮ just admitted this was happening to him. An older young lady was telling him he was ugly and stupid. Because he believes this true, he just agreed with the bully. He believed this was true, so he never told me.

It was also brought to my attention that another boy had made allegations that my son had bullied him on the bus. It was reported to me that ▮▮▮ called another boy fat and made other inappropriate comments. This was apparently brought to the school's attention by his parents. Why was I not informed of this? Was my son questioned about this? Did that other boy get support? ▮▮▮ does not remember saying this but as I have no idea when this happened, I cannot address this with him. I would have wanted to know about this immediately!

My next question is WHEN was the school informed of ▮▮▮ statement to the ▮▮▮ kids? I feel as though it was days until I was informed. This put ▮▮▮ and others at risk. How many times could ▮▮▮ have made these comments to other children on the bus until I was informed and could address this with him? This policy of delayed information should be looked at in the DACA and Title IX procedures moving forward. Also, being a care coordinator for traumatized children I must ask, if everyone was properly trained to question students? Especially questions relating to sexual abuse or harassment. This is a specialized skill.

This brings me to my third question. If I was not informed of my child's behavior on at least one occasion, were the parents of the children who were discussing pornography with my child informed of their children's behavior? Where these parents informed and the children educated? If they were not, I will file a complaint to ensure they are. Are they supervised so this behavior doesn't continue? ▮▮▮

has since reported that these kids also told him to solicit others for sexual activity online. My son followed thru in desperation to impress and make friends.

Fourth, I was never offered the opportunity to watch the bus video. From reading Mrs. ████ letter it is clear that she was allowed to watch this video. I understand there is a camera at the front and back of the bus. I would like to see what the children are doing in the back of the bus prior to ████ making his horrible statement to the ████ Children. He stated children were watching inappropriate things on their devices and discussing things of a sexual nature. I would also like to see ████ behavior from the front of the bus.

Fifth, there is a new bus driver. Why and why was I not informed? My child has been directly impacted in significant ways by the environment on the bus and I have been given very limited information of what happened. I have only been told what HE has done but clearly the school was well informed of an environment that would encourage this behavior and that he in fact was also a victim. There needs to be an anti-bullying campaign in school, children and parents need to be engaged. This has gotten too big! My high school student is also experiencing bullying online by peers. Tic Toc, snap chat and other apps are the new weapons. And our children are paying the price.

I wish the school had been more transparent about the bigger picture. My son has been emotionally harmed by this bus environment. Other children like the ████ have been harmed. The boy I did not hear about may have been harmed. And little to no information has been given about a solution. How many children were subjected to talk about pornography like ████ How many then made poor choices or said things that hurt others? How many other children are there? And without parental support how can we expect different. If we do not know what is happening how can we help our children? To say there is an aide is only a minimal protection if that aide is not also specifically looking for the behaviors that have been happening on the bus, watching particular children, supporting those who feel at risk and communicating back to parents of these children. There has been little follow up by the school. No updates, no communication. No inquiry about ████ progress or wellbeing. I write this only to bring awareness. That we need to partner. There needs to be communication with parents. I look forward to answers to my questions, an opportunity to view the video and a discussion regarding what is being done to prevent these issues in the future and help those who have been affected. Thank you for your time.

Sincerely,

████████

On May 10, 2021 this is the relief I was seeking. This was spoken and a copy was left for them.

Possible Remedies/Prevention

The bottom line here is students cannot effectively learn in an environment that is not safe or is perceived by students as unsafe. Responsible school administrators will take every opportunity to determine risks of harm to students present at their school and change the condition to eliminate or reduce the risks. As a parent, I have to look at the risks of bullying and harassment here and it's terrifying. Here are some suggestions.

1. **Have the New York State Center for School Safety or another outside agency conduct a climate and safety review of the school district and implement recommendations.**
**OR**
2. **Complete School Administrative Tasks**
   - Implement training for all staff on understanding and addressing bullying and harassment.
   - Implement training for students on identifying and reporting harassment.
   - Provide monitors or additional adults in highly unsupervised areas (cafeterias, playgrounds, school busses & hallways)
   - Determine an appropriate support team and necessary services to support victims
   - Pre-plan remedies to limit interactions between harassers and their targets
   - Provide the harassed student an additional opportunity to obtain an educational benefit that was denied

 **And for the School board**,
   - Develop, revise, and publicize the school's policy prohibiting bullying, harassment and discrimination. Develop procedures that identify specific individuals for carrying out these policies, train school staff in these procedures, and create a mechanism for ensuring that the responsible person follows through.
   - Develop and provide training that goes beyond required safety instruction to equip bus drivers, aides, and monitors with the information and tools necessary to adequately supervise and protect students from harm. Ask the question: "If a bus driver observes certain concerning behaviors on his or her bus, will the driver recognize it as bullying or sexual harassment — and how will the driver respond?" This is done under the theory of *in loco parentis* and the school's basic responsibility to protect students and act as any reasonable parent would, based on the circumstances and known information.  Develop procedures that identify specific individuals for training such staff in these procedures, and create a mechanism for ensuring that the responsible person follows through.
   - Focus on the safety of students through clear policies that establish standards for handling and reporting inappropriate student behavior.
   - Collaborate with the community through a parent advocacy group.
   - Implement training for administration on understanding and addressing bullying and harassment. Thus training should be interactive and include a trauma-informed interview protocol.
   - Implement a district wide social emotional curriculum. (*Open Circle*)
   - Allow students to understand, process, and reflect on real-life situations. *Bully on the Bus*

**At a minimum**,

1. Re-investigate ███████████ Sexual Harassment complaint with an appropriately trainer investigator, not employed by the district. Watch the bus video from all three camera angles, for the afternoon route on 1/29/21.
2. Conduct a district-wide environmental risk assessment and implement remedies.
3. Properly train DASA coordinators, Title IX investigators, & any other staff involved in investigations of such nature.
4. Assess the risk of Ken Bee as a current employee of the school district.
5. Investigate retaliatory behavior of Michael Brannigan ("Talk swirling in the community", "spreading rumors", intimidation to retract reports)
6. As stated below, Establish and Incorporate Social Emotional Learning Curriculum (SEL) and Practices to Improve Student Wellness ASAP (Number 1 priority of the QUFSD School Improvement Plan below)

At the end of the 20-21 school year I had given up any hope that anything would ever get better. I have received many stories from other parents regarding similar and worse situations where the district covers up major incidents. My children continue to struggle and there is no plan in place to support their needs going forward. The worry and stress I have endured during this time is also affecting my health and employment. I saw no other option than to leave the school district to get the necessary protection and support ███████ and ████████ deserved. We looked into Saint Mary's private school but it only goes up to the 8th grade and another transition with the "unknown" was not suggested by ████████ counselor. We then considered sending the kids back to Hudson Falls where they had always been safe in the past and would be surrounded by friends for support. I spoke to the Hudson Falls Superintendent at the beginning of the summer and explained that we regretted moving and asked about the possibility of coming back. He looked into the school policy on tuition and called me back a few days later. "It sounds like everyone would love to have the ████████ kids back," he said. He had the business office reach out to me to discuss tuition and the board policy. I was told the tuition would be $4,000/year for each of my kids to come back. I knew this was a better option so I asked about the process. I was told to complete paperwork and then wait to hear back after board approval. On August 28, 2021 I received a letter from Hudson Falls stating "Unfortunately, at this time we can not accommodate your request." with no further explanation. I have called Daniel Ward, the school superintendent several times to ask what happened and he refuses to return my phone calls. I have left several

messages requesting a meeting as well, but they are all ignored. I recently found out that Karla Beuttner, the Queensbury Attorney, also represents Hudson Falls School District.

**HUDSON FALLS**

August 25, 2021

Dear ███████

Thank you for your request to have ████████████████ attend the Hudson Falls Central School District as tuition students for the 2021-2022 school year.

Unfortunately, at this time we can not accommodate your request.

Additionally, I wanted to express my thanks for taking the time to speak with me by phone earlier this summer. I wish you and your children the best.

Sincerely,

*Daniel A Ward*

Daniel Ward
Superintendent

I am currently out of work on Paid Family Leave until October 19th to care for ███████ I am homeschooling both ██████ but have not submitted any homeschooling paperwork or officially un-enroll them.

9/9-First Day of School (No call from attendance nor any school staff, bus did not stop)
9/10-No call from attendance nor any school staff, bus did not stop. Voicemail received from School Counselor Becca Carnella asking why ████████ and ████████ had not been

in school and asking if there was anything they could do to help. I sent an email that states "Hi Becca, █████ and █████ have not been at school due to many reasons. █████ and █████ exposure to the sexually threatening situations have yet to be remedied. █████ special education needs are not being met. Neither of them have safe transportation to school. They are both fearful of students in the middle school and nothing has been put in place to keep them safe. I assumed the school knew they were not ready to come back since I never received any paperwork regarding their teachers, school hours, supplies ect... Attendance has not reached out regarding their absence and I also heard there was a 6th grade orientation recently, yet I never got any information for this. All I received for them was a postcard with bussing information.Their perpetrators are on this bus and everyone is aware of the fear they still have due to the improper handling of the situation. I appreciate that you reached out regarding a tour and I was hopeful that things would be put in place to ensure their safety so I could have scheduled that with you and encouraged them to attend. Neither of them want to go to school and it would be negligent to force them into an unsafe situation. Leading up to school time they both began having nightmares and complained of stomache aches and headaches. █████ has started having anxiety again when he hears school busses drive by. I have reached out to their doctors for advice but If you have any suggestions to keep them safe at school and support their return please let me know. Thank you, █████ █████



**No response received yet

9/13-No call from attendance, bus did stop
9/14-Bus stopped, attendance recordings received explaining █████ and █████ had been reported absent today. I called attendance back and left a message asking for a return call. I also called Becca Carnavella and left a message asking if she got my email and requested a call. Voicemail received from Principal Michael Brannigan. Called back immediately and spoke to his secretary. She reported he was on the other line and she would let him know I called. Tried 2 more times-message left with secretary asking for Mr. Brannigan to return my call.

Below are some of the allegations Kevin Pendergast and I have discussed(current attorney for special education): Possible IDEA/ADA/Title IX/1983 claims to be filed in federal Court. He is encouraging me to seek additional representation after seeing the bus video himself on August 20th.

(a) Queensbury Union Free School District failed to identify, locate, and evaluate ▮▮▮▮▮ as a student in need of receiving special education and related services.
(b) Queensbury Union Free School District has failed to establish that it provided a program reasonably calculated to enable my son ▮▮▮▮ ▮▮▮▮ to make meaningful gains in light of his circumstances, and therefore has failed to establish it provided a FAPE. (Queensbury Union Free School District still believes ▮▮▮▮ does not need an IEP, but has agreed to put one in place just to avoid litigation.)
(c) Queensbury Union Free School District did not ensure effective implementation of procedural safeguards under IDEA as I was denied access to ▮▮▮▮ educational records prior to a CSE meeting regarding an IEP.
(d) The Director of Student Support Services made a recommendation prior to any CSE meeting where she could have obtained information from other committee members, and that that constitutes an impermissible predetermination which denied myself, the parent, meaningful participation.
(e) Queensbury Union Free School District has denied the $3,200 payment for an IEE necessary to properly evaluate ▮▮▮▮ needs, but also failed to initiate due process to defend their own evaluation.
(f) Queensbury Union Free School District was out of compliance as they did not arrange for a meeting during the resolution period of the original complaint. Due to this, I had to hire an attorney for representation. (REFUSES TO PAY ATTORNEY FEES IN SETTLEMENT)
(g) Queensbury Union Free School District has failed to ensure ▮▮▮▮ safety within the school environment and has continued to deny or delay necessary services recommended by medical professionals treating ▮▮▮▮
(h) Queensbury Union Free School District held a hearing under the Dignity Act of the State of NY without offering equal legal representation.
(i) Queensbury Union Free School District was aware that ▮▮▮▮ often thought about harming himself in school, yet failed to take any reasonable steps to ensure his safety.
(j) Queensbury Union Free School District did not take steps to ensure that ▮▮▮▮ a child with a disability, had available to him the variety of educational programs and services available to nondisabled children in the area served by the agency; such as transportation, music programs, and school sports. ▮▮▮▮ no longer wants to play the violin or baseball because he perceives these previously enjoyed activities as areas of increased difficulty, stress, and bullying.
(K) Queensbury Union Free School District has failed to ensure ▮▮▮▮ safety within

the school environment.
(L) FERPA Violation-███████ & █████████
(M) 504 violation-Bradyn (10th grade son)

# Special Education Timeline

4/23/21 Met Ms. Agans in person to discuss my request for an evaluation. Principal Gwynne Cosh, and assistant principal Mrs. Denno were also present. Consent to conduct a special education evaluation was signed on the spot. Parent rating Basc-3 scales and informational sheet given for me to complete at home. Mrs. Denno explained the importance of ██████ meeting Monique prior to the evaluation and being pre-set for each additional meeting. Monique prefers observing children before they know about testing so she will be in touch after observation.

4/24/21 Dropped off all parent documentation and records from my son's prior school district as requested.

5/3/21-Email sent to Ms. Agans: "Hi Monique, thank you for the heads up. Were you able to complete the observation yet so I don't spoil the anonymity of that? Also Mondays are a very high-anxiety day, but if it is what works best for your schedule, I can certainly pre-set him for that day. Knowing the time would be helpful for the first time you meet and if a familiar face could pick him up to bring him to you the first time, I also think that would help. Maybe Mrs. Denno or Mrs. Cosh? ██████ has been struggling emotionally a lot lately, nightmares are affecting sleep right now and he is not engaging in baseball as he has in the past, so there is some overwhelming anxiety. His medication will be increased on May 12th, so you may or may not see a difference in him after that date. I spoke with Kelly from Parsons today and she is seeing what I am: school-based fears. She is hopeful he can progress with her because he is engaging in treatment and thoughtful around their conversations but they are still in that rapport building stage. She also thinks the social piece could play an important role for him, such as having support to identify a friend at school this year, and/or when considering an IEP. If during your assessment you need to speak with her, please let me know what I need to sign for you to be able to do that. For the BASC-I am expecting him to have to have support after so he may have to go home with me after or if it can be scheduled at the end of the day on a Wednesday-he would have counseling right after with Kelly. Topics such as having friends, feeling safe..ect...will be topics he will internally dwell on after. Thank you for your help, ██████ ████████

Ms. Agans replied that she conducted the classroom observation of ██████ today and gave me the go-ahead to discuss testing with him and pre-set him for meeting with her to begin the testing.

5/10/21 Consent to speak with ██████ counselor signed and sent to Ms. Agans and the provider through email.

5/11/21- ██████ first testing day with Ms. Agans. Email received from Ms. Agans: "You'll have to get the full report from ██████ but I think although he looks a little uncertain when he entered, I think he was able to readily adjust to the test setting and we chatted briefly about what I was going to be asking him to do prior to jumping in.  This seemed to relax him a little and then I think the variety of tasks I presented today made him feel confident.  Before we returned to his classroom, I preset him for what our next session will look like in terms of the activities I'll be presenting so I think he's prepared for our future sessions.  I hope he gives you a similar report to what I observed.  I'll reach out as soon as I have an idea of when we'll be doing the self-assessment for the BASC-3."

5/19/21 Email sent to Ms. Agans. "Hi Monique, I expect this lack of awareness to be a hurdle in the eval process so I wanted to share the portion about the classroom example from this email with you. His anxiety is perceived as shyness and his academic decline is perceived as an overall weakness when in fact his anxiety and depression correlates to this academic decline. His inability to seek friends/partners leads to lost learning. He has to be able to work with others to benefit from his education. His struggle with math is not due to cognitive abilities as outlined in his past academic records and first quarter grades at Queensbury. His learning is directly impeded by his social and emotional needs not being met. His needs are not even appropriately recognized as neither teacher identifies these types of concerns, but his ██████ in his class told me about it. He needs at the least indirect support of a special educator to recognize his needs. Can you update me where we are in the evaluation process? Thank you, ██████ ██████

This email was referencing a forwarded email conversation with classroom teachers which was forwarded onto Ms. Agans: "Happy Teacher Appreciation week! I hope you were both showered with thankfulness! We are supposed to meet Monday but I had a meeting at my work scheduled for Monday morning so I will have to reschedule. I wanted to send you some general info sooner than later about the purpose of the meeting. At the parent/teacher conference in November it sounded like the ████ were doing well in school and although I had expressed concern for ██████ emotional status-it was clear to me you were not seeing any physical indicators of distress and it didn't appear to be impacting his academics. There were some complaints from the ████ about bullying in the fall, but it seemed mainly to be bus-related so I was relaying those

concerns to administration. However, due to ███████ school avoidance and emotional reactions getting off the bus in the winter, he did start seeing a psychiatrist and it was through these conversations that school-based anxiety and fears really became evident. Unfortunately it came to fruition at the end of January that ███████ and ███████ had been sexually harassed on the school bus for a while and this was really affecting them. As you may know, I have been working with administration to figure out other transportation, counseling, and now mentoring. They both have fears associated with school, but they both handle this very differently. ███████ can be a little deceiving and put on a front that everything is A-Okay. She has coped with things a little better than ███████ but her psychologist thinks her recent decline in work attentiveness and not always making good choices is a way of gaining some control after feeling like she lost control. She does not get breakfast at school anymore because she did not feel safe and was not seeking adult help appropriately. ███████ holds his emotions in as much as he can and may come across at quiet-when in reality he is struggling. There is nothing quiet about ███████ when he is happy and comfortable.  He has told me about other kids in school being mean to him and that he doesn't have any friends. He has told me how work is often too hard for him, but he doesn't ask for help. There have been quite a few instances where he has felt isolated or invisible to others in school. He says kids pick on him on the playground about not having any friends and how he feels a disconnect with school staff. It has been a very challenging year, but I am sure we are not alone in some of these challenges. I want you to know my email is not a complaint, but rather to bring awareness to their situation and perceptions. As you probably know, I have requested an IEP evaluation for ███████ because his fears are significantly impacting his education. He is embarrassed of his grades and has been throwing away tests. In his words..."he doesn't want to disappoint us". A couple recent incidents and the correspondence that he is doing well socially and emotionally, made me realize that he would specifically benefit from increased supervision and support. If there was any way to help him build friendships that would also be great. I am sure you know about the incident with violet yesterday and although I do feel the kids were under-supervised on the playground-███████ should have told an adult as soon as she came in. ███████ also recently told me that ███████ was sitting alone during class when no one wanted to be his partner, so she asked him to join her group. She said he was silent the entire time. I try not to question her too much about her brother, because I don't want her to have that burden, but sometimes it is the only way to know what happened to ███████ My hope is that the last couple of months in school can be as positive as they can be. If you have any questions, concerns, or suggestions please feel free to reach out by email or phone. ███████. I am hoping to reschedule the meeting next week once I get my complete work schedule. Thank you, ███████ ███████

 "The recent partner situation I mentioned was during ELA. He said they were working on themes from Charlotte's web and the class was asked to find a partner for discussion. He said he did not seek out a partner and no one came to him. He said ███████ (███████ waved him over to her group but by that point he was "feeling bad" so essentially learning was lost there. He

said he gets spoken to a lot in ELA about not sitting the right way. He said it's hard to sit all day and he doesn't realize he starts to sit on his feet. He said he feels embarrassed when he is called out across the room about this. He said Mrs. Bureau is strict (this is not a negative quality in my book whatsoever) but says he is "afraid" to ask for help. I explained to him as I have done many times before that he has to verbalize a need for help. This is a struggle this year and something he could benefit from more support around. He said he is currently having a hard time with the literary essay assignment and has no idea if he is doing it correctly."

5/19/21 Email received from Ms. Agans thanking me for informing her of the above info and that she had completed all "direct" testing.

5/25/21 Email from Ms. Agans "██████ and I finished up with the testing I was doing with him today and I'm hoping to schedule a time with you next week so he can complete the BASC-3 self-assessment." A follow-up email states "I did talk to him a little yesterday about us completing the scale and I told him you'd be in the room so you just may want to talk to him about the new plan for it to be just he and I.  He seems comfortable with me so I'm confident that it will go very smoothly."

5/26/21-Ms. Agans has not requested any information from the counselor yet. (Email) Email sent to Ms. Agans and counselor stating "Hi Monique and Kelly, I spoke with ██████ about the BASC today just stating this test will ask him questions about him. He said "So questions like I talk about with Kelly?" I said "yes, there could be. " He also said "Mr. Agans told me there are no right or wrong answers" I thought he would feel okay with seeing Kelly right after, but he was not. He said "what if I need a hug or need to hold your hand, I can't hug Kelly." That broke my heart a little. I told him I would be sitting on the other side of the room and that he is just needed to answer questions truthfully and then I will be there to comfort him when he is done if needed. So Monique please tell me what time on Wednesday to be there and I will make it work. I'm also wondering about the location. He had a traumatic experience there when he had to talk about hard things before...so I'd like it to be a comfortable, familiar place. If he gets upset I would like him to be able to take a break. He told me he would feel safe with me there so hopefully these extra thoughts are not necessary but I would like to pre-plan to support his needs as much as possible. Thanks! ██████

6/2/21 ██████ completed Basc-3 self assessment in my presence. Significant eye blinking noted and confirmed by Ms. Agans.

6/11/21 Email to Tina Bureau (██████ ELA teacher): "Hi, I'm sure Gwynne talked to you about it but I have some questions about the ELA program. With Monday being the first time I

assisted him with school work this year, I was shocked and saddened to see his lack of ability and confidence. She happened to call me about something else so I asked about the curriculum before you responded to my email. What I'm seeing is not what I have experienced in reading and writing workshop so I don't even know where to start as far as helping him. Could you give me a call Monday and explain your programing so I have a better understanding? I'm sure I'm missing something. Also I'm sure the ███ missed other ELA work this week so please let me know what they can do to catch up. All 3 kids were very sick this week and although I'm hoping they can return Monday, they still have low grade fevers so I can't say for sure. They both did the one ELA response and the packet that goes with the story, but I didn't see any other ELA work in the things I picked up yesterday. Thank you, ██████ ██████ (*she never responded regarding work all week)

6/14/21 Phone call from Mrs. Bureau. We discussed the ELA programming and

6/14/21 Email received from Ms. Agans: "It is still going to take me a few more days to finish ███████ report but I wanted to ask you again which days are best for you with respect to days we could schedule a CSE meeting for next week if the options are Monday, Tuesday or Wednesday?" Please let me know so our secretary can find a time for us to meet to review the results of the testing.

6/15/21-Email sent to Ms. Agans: "Hi Monique, I want to make sure I have enough time to review the evaluation. I'd also like to review all of ██████ educational records maintained by the district this year and those used for the evaluation prior to the CSE meeting. Should I set up a time to come in and do that next week first? Thank you for the follow-up, ██████ ██████

6/17/21-Email from Ms. Agans: "I should have ██████ report completed by the end of the day, today. You are welcome to come in tomorrow morning to review the protocols I used for the testing, This must be done in my office as I cannot provide copies of those. I can schedule a 30-minute block if that works. I have a group that meets at 10:30 so the time I have to schedule the review would need to be done prior to that time. We also have the printed report cards from this year. If you want to wait until next week, I also have some availability for scheduling on Monday. The CSE meeting will need to be scheduled by Thursday to ensure Mrs. Bailey is in attendance. Please let me know what you decide. My email response back to her: "Hi Monique, I'd like to review all of ██████ records, not just those used for the eval. Could those be available for review tomorrow as well?" Email response from Ms. Agans: "I'm unsure what you mean by all his records. If you can clarify specifics, I'll reach out to Mrs. Cosh to determine if it could be gathered in time for tomorrow morning."

Afternoon of 6/17/21-I received the evaluation in my email.

My email to Ms. Agans responding to earlier email: "I'd like to review all of ████████ educational records maintained by the district this year and those used for the evaluation prior to the CSE meeting. I got the report, thank you. I haven't looked at it yet to see what data is included but I think it would specifically be important to review, but not limited to, counseling records, bullying records, and assessment records maintained by the district. I'm not sure it's reasonable to have everything gathered by tomorrow so let me know. Thank you, ████████ ████████

Email from Ms. Agans: I have passed your request onto Mrs. Cosh.  I have the protocols and information I gathered to complete the psychoeducational assessment which you are welcome to come in to review tomorrow morning.  If you prefer to review all of my information as well as the additional information you're requesting at one time, another time will need to be scheduled with Mrs. Cosh.  Please let me know if you do want to come in tomorrow to review my materials.  If not, I'll wait to hear from Mrs. Cosh as to when you will be coming into school for that purpose and I'll provide the materials you're asking to review that I have on file.

Email to Ms. Agans: "I might as well do it all at once. Thank you, ████████ ████████

Email from Ms. Agans: "You will be hearing from Mrs. Cosh to set up a time."

6/18/21-Call from Mrs. Cosh. She will gather all records and get back to me with a time to come in and review everything.

6/23/21-Email from Mrs. Cosh to Ms. Agans and myself: "I have gathered the materials you were looking for. I will leave it in an envelope in the office for you to pick up at your convenience. Also, Monique will be working next week if you would like to set up a time to review the protocols. Please connect with her for a time that will work for both of you. I know she will be in at 7:30 each morning and Wednesday may not be available." Envelope of records picked up afternoon of 6/23.

6/25/21-Email sent to Mrs. Cosh, Ms. Agans, and Superintendent Gannon: "Hi Gwynne, I have reviewed the records in the envelope and did not see any DASA records, Title IX records, or counseling records. I also did not see any non-subjective assessments or progress monitoring data. I know the CSE meeting is overdue at this point so I have attached an official records request starting with a list of records maintained by the district and where they are kept. I have

included Monique because this is a right under IDEA. I have included Kyle because this is a district request. Please let me know if you have any questions. Thank you, █████ █████ (records request PDF attached to email)



June 25, 2021

As you know █████ has a medical disability and is being evaluated to see if his disability is affecting his education. Title II of the American Disability Association requires that individuals with disabilities, including students, shall not be excluded from or denied the benefits of services, programs or activities of a public entity, or otherwise subjected to discrimination by a public entity, by reason of a disability. █████ is being denied educational benefit and access to his education and there is not a plan at this time for how his needs will be met. When I requested █████ to be evaluated, I specifically mentioned educational concerns relating to █████'s social and emotional needs, as well as bullying and harassment.

According to the US Dept of Education, "If a student's disability is causing them to exhibit behaviors, which are making them particularly vulnerable to harassment by their peers, or to fail to understand appropriate social interaction in the "mainstream," then this needs to be addressed in the student's special education program. —i.e., the conduct was sufficiently serious to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school. The school district needs to recognize the difference between a school-wide approach to bullying, and a child-centered approach that is necessary for a child without appropriate social and emotional skills. According to IDEA, states must make a free appropriate public education available to "any individual child with a disability who needs special education and related services, even if the child has not failed or been retained in a course or grade, and is advancing from grade to grade." [§300.101(c)(1)]

IDEA also guarantees parents the right to inspect and review any educational record of his/her child that the school system (or other participating agency) collects, maintains, or uses with respect to the identification, evaluation, and educational placement of his/her child, and the provision of FAPE. As outlined in the Special Education parent guide you provided me, the school agency must provide me with all of █████ records without undue delay and before any meeting regarding an IEP. On June 17, 21, by email, I stated "I'd like to review all of █████s educational records maintained by the district this year and those used for the evaluation prior to the CSE meeting". I also stated in the email "it would specifically be important to review, but not limited to, counseling records, bullying records, and assessment records maintained by the district." The packet of records I picked up on June 23, does not provide any meaningful information. The assessment records are subjective in nature, the counseling worksheet is simply a memory aid, and no DASA or bullying records of any kind are included. **At this time I am requesting a list of the educational records held and used by the school district, including information as to where the records are kept, regarding my son █████.** After this list is available, please reach out to me to set up an appointment to review the records so that I may meaningfully participate in a CSE meeting that is now overdue. I am asking this to be done without further delay.

Thank You, █████

Email response from Mrs. Cosh sent to Ms. Agans, Mr. Gannon, and myself: "Thank you for your clarification and request. We are happy to work with you and to provide an opportunity to

review appropriate records. Can you please provide clarification on the non-subjective assessments and progress monitoring data or anything else specific as I want to make sure I am able to gather all the materials that you are looking for. I am away through the fourth of July and we will need some time to gather the materials and will work with Denise Trolestra to gather all that you are asking for. Once I am back I will let you know when would be a good time to meet for you to review the records." 8:20pm (email with PDF request attached forwarded onto Kris Bennett-Barnes CSE chairperson)

6/28/21-Email from Kris Bennett-Barnes: "████ I do feel we have all the data/information we will need for everyone, including yourself, to be a meaningful participant in your son's initial eligibility meeting. If there is something in particular you feel is necessary which will impact the team's decision please let me know and I will expedite the printing of those materials. I am also available at any time if you have any questions/concerns."

Email back to Kris Bennett-Barnes: "Hi Kris, I know we haven't met yet so I am not sure how much you know about ████ My request for an evaluation was due to social and emotional concerns affecting his education. Let's say he did qualify for an IEP, I don't see any relevant information that could be used to develop an IEP that would reflect ████ unique needs in school. ████ inability to recognize social cues, inability to respond effectively (strategy bank) , and inability to self-advocate and seek help were some of my initial concerns that were not included. There are a lot of people involved that could provide meaningful information. For starters, bullying and harassment reports and/or other documentation relating to social interaction and displayed emotion would be important to review. The school counselor's notes are imperative to review as well. As far as academics, he is intelligent, but I do not see any data that monitored progress this school year included in the report. The only benchmark assessment I received from Mrs. Cosh was a F & P report, which I have questions about but she is away. I also asked to view his writing portfolio, but there wasn't one I was told. I asked to see a writers or reading workshop notebook which should show progress, but I was told there wasn't one. At this time, I don't know what else to ask for so it would be helpful to know what records the district maintains and where they are kept, so I can request them appropriately. As outlined in the parent's rights section of the packet mailed to me from the district, who will be providing the list of educational records held and used by the school district, including information as to where the records are kept, regarding my son ████ ████ Thank you, ████ ████

7/1/21: Email back from Kris Bennett-Barnes: "████ Please feel free to contact me at my office any time at ████. I really believe you have all the information you need to be a meaningful participant in your son's meeting. As a multidisciplinary team everyone will bring important information to the meeting which will be used in a final determination. Most of the educational records for ████ would be on Schooltool as part of his permanent records. Please

let me know if there is some other specific information you are looking for and I will do my best to provide it in a timely manner so we are able to schedule his meeting and determine eligibility. Best, Kris Bennett-Barnes"

Email to Kris Bennett-Barnes: "Are you going to provide the list of records as I requested? "

7/6/21: Email from Kris Bennett-Barnes: "███████  I reached out to Denise Troelstra for more information and she shared that she is working with Gwynne Cosh to gather any additional educational records that might be available.  Please keep in mind that the district has up to 45 days to gather this material but they are working to get it to you as soon as possible.  Would you prefer we not schedule the initial eligibility meeting until you have the records or would you like me to proceed?  Best, Kris Bennett-Barnes

Email Response to Kris Bennett-Barnes: "Hi Kris, Please schedule the meeting for this week but I've attached the portion of the procedural safeguards, which you sent to me, which clearly describes my right to review the records "before any meeting regarding an IEP," not 45 days. I can be available for the CSE meeting any day this week. I will not be available the following week or the week after that. Thank you, ██████ ██████ <span style="color:red">Attachment sent with email shown here:</span>

## ACCESS RIGHTS

### 34 CFR section 300.613; 8 NYCRR sections 200.2(b)(6) and 200.5(d)(6)

The participating agency must permit you to inspect and review any education records relating to your child that are collected, maintained, or used by your school district under Part B of IDEA.  The participating agency must comply with your request to inspect and review any education records on your child without unnecessary delay and before any meeting regarding an IEP, or any impartial due process hearing (including a resolution meeting or a hearing regarding discipline), and in no case more than 45 calendar days after you have made a request.

Your right to inspect and review education records includes:

1.  a response from the participating agency to your reasonable requests for explanations and interpretations of the records;

2.  a request that the participating agency provide copies of the records if you cannot effectively inspect and review the records unless you receive those copies; **and**

3.  to have your representative inspect and review the records.

The participating agency may presume that you have authority to inspect and review records relating to your child unless advised that you do not have the authority under applicable State law governing such matters as guardianship, or separation and divorce.

7/6/21 9:17am voicemail left by Denise Troelstra (saved): "Hi Krisitna, it's Denise Troelstra. Hope you are doing well. I just wanted to touch base with you about the records request. I wasn't on the email but Kyle was and there was a request for DASA and Title IX records. We have provided all those records that we have, have been provided to you. We don't have anything else to provide. But I'm happy to answer any questions you have. I've also been working with Gwynne and Kris because I know that there is a request for an earlier CSE meeting and we are happy to get that in process sooner and I want to make sure you are getting what you are looking for and I know that Gwynne has given you quite a few records. So please let me know if you have any questions. Give me a call back at 824-5612 and Kris will work with you on expediting that CSE meeting. Have a great day, thanks, Bye"

7/6/21 Email to Denise Troelstra: "Hi Denise, I can call you on my lunch break but I wanted to let you know I got your voice-mail. I'm not sure if you got this information I have attached here. Thanks, ███████ ████ Attachments included in Drive (and below here):

## ACCESS RIGHTS

### 34 CFR section 300.613; 8 NYCRR sections 200.2(b)(6) and 200.5(d)(6)

The participating agency must permit you to inspect and review any education records relating to your child that are collected, maintained, or used by your school district under Part B of IDEA. The participating agency must comply with your request to inspect and review any education records on your child without unnecessary delay and before any meeting regarding an IEP, or any impartial due process hearing (including a resolution meeting or a hearing regarding discipline), and in no case more than 45 calendar days after you have made a request.

Your right to inspect and review education records includes:

1. a response from the participating agency to your reasonable requests for explanations and interpretations of the records;

2. a request that the participating agency provide copies of the records if you cannot effectively inspect and review the records unless you receive those copies; **and**

3. to have your representative inspect and review the records.

The participating agency may presume that you have authority to inspect and review records relating to your child unless advised that you do not have the authority under applicable State law governing such matters as guardianship, or separation and divorce.

## LIST OF TYPES AND LOCATIONS OF INFORMATION

### 34 CFR section 300.616

On request, each participating agency must provide you with a list of the types and locations of education records collected, maintained, or used by the agency.

June 25, 2021

As you know ▮▮▮ has a medical disability and is being evaluated to see if his disability is affecting his education. Title II of the American Disability Association requires that individuals with disabilities, including students, shall not be excluded from or denied the benefits of services, programs or activities of a public entity, or otherwise subjected to discrimination by a public entity, by reason of a disability. ▮▮▮ is being denied educational benefit and access to his education and there is not a plan at this time for how his needs will be met. When I requested ▮▮▮ to be evaluated, I specifically mentioned educational concerns relating to Bentley's social and emotional needs, as well as bullying and harassment.

According to the US Dept of Education, "If a student's disability is causing them to exhibit behaviors, which are making them particularly vulnerable to harassment by their peers, or to fail to understand appropriate social interaction in the "mainstream," then this needs to be addressed in the student's special education program. —i.e., the conduct was sufficiently serious to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school. The school district needs to recognize the difference between a school-wide approach to bullying, and a child-centered approach that is necessary for a child without appropriate social and emotional skills. According to IDEA, states must make a free appropriate public education available to "any individual child with a disability who needs special education and related services, even if the child has not failed or been retained in a course or grade, and is advancing from grade to grade." [§300.101(c)(1)]

IDEA also guarantees parents the right to inspect and review any educational record of his/her child that the school system (or other participating agency) collects, maintains, or uses with respect to the identification, evaluation, and educational placement of his/her child, and the provision of FAPE. As outlined in the Special Education parent guide you provided me, the school agency must provide me with all of ▮▮▮ records without undue delay and before any meeting regarding an IEP. On June 17, 21, by email, I stated "I'd like to review all of ▮▮▮ s educational records maintained by the district this year and those used for the evaluation prior to the CSE meeting". I also stated in the email "it would specifically be important to review, but not limited to, counseling records, bullying records, and assessment records maintained by the district." The packet of records I picked up on June 23, does not provide any meaningful information. The assessment records are subjective in nature, the counseling worksheet is simply a memory aid, and no DASA or bullying records of any kind are included. **At this time I am requesting a list of the educational records held and used by the school district, including information as to where the records are kept, regarding my son** ▮▮▮▮▮▮▮ After this list is available, please reach out to me to set up an appointment to review the records so that I may meaningfully participate in a CSE meeting that is now overdue. I am asking this to be done without further delay.

Thank You, Kristina Tucker

7/6/21 Email response received from Denise Troelstra: "Hello ▮▮▮ I am free now and from 1:00-3:00, to speak with you. Thank you for the information. Denise

7/6/21: Telephone call to Denise Troeltra 11:27am: I explained to Denise that it was my right to review the district records and I didn't understand the district not letting me see them. She said educational records are those only on School Tool. She looked up ▓▓▓▓ account and said he only had grades and F&P scores. I explained that I did not have access to those F&P scores online. She emailed them to me during the phone conversation. I told her I was concerned that ▓▓▓▓ needs would not be met and I didn't feel that he even had a chance without the committee having records to view. She said she would work with Gwynne to get the records together but not to worry and that it's "obvious" he will get the help he needs.

Email received from Denise with the following attachment:



*Note F&P scores are different from the prior record. This actually indicates regression

7/7/21: Telephone call to ▓▓▓▓ Bennett-Barnes 9:33am. Kris said after reviewing the evaluation "I see a 504." I explained my concern of her making a determination out of committee and prior to any committee input. I also explained I did not feel I could meaningfully participate in the meeting due to denying me access to educational records.

7/8/21: Email sent to Gwynne Cosh, Denise Troelstra, and Kris Bennett-Barnes: "Good Morning. Just to have everyone on the same page here… "Following my records request, Gwynne provided records to me; however, they were incomplete. I specifically did not see any bullying

records, counseling notes, nor objective academic records that monitored ███████ progress this year. I spoke to Denise and it seems there are not any academic records to obtain other than what is on School Tool, which is just report card scores. Apparently there were not any DASA records made this year for ███████ either. My impression is that the district feels there is nothing else to provide me. I want to make sure my understanding is correct. After speaking to Kris yesterday, it is clear ███████ will not be given an IEP at tomorrow's meeting due to academics, yet-I have never seen any records that show he made meaningful progress this school year. I received the notice for tomorrow's meeting asking me to waive my rights for the 5-day notice. A parent cannot "waive their rights"-however we can agree on the meeting date. I would like to move forward to see if the school is going to meet ███████ needs, because if not, someone needs to. I would like to come in and review all of ███████ records today prior to the CSE meeting tomorrow, or I would like prior written notice as to why I cannot. If I am able to view the records or get a letter saying I cannot review the records because there isn't any to review...then I agree to move forward with the CSE meeting. Thank you, ███████ ███████

Email received from Denise Troelstra to myself, Gwynne Cosh, and Kristine Bennett-Barnes: "Hi ███████ Thank you for reaching out. On Monday, we discussed that all educational records for general education students are housed in a web-based system, Schooltool. Please let me know if you received: copies of attendance records, report card, progress report, attendance letters, and F&P assessments. There would be no discipline records, since ███████ has not had a discipline offense. As previously discussed, all DASA and Title IV information was provided to you. We can reach out to the nurse to see if there are any records she can provide. Gwynne has contacted all of ███████ teachers and they provided the educational records they had, including copies of their grade books and any academic assessments they still had. They send assessments home with students. I am assuming that you have all recent information regarding the request to evaluate ███████ for special education services. What additional information can we provide? We are happy to work with you. Clarification on the waiver- The five day waiver is only to waive the required five day notice to parents for a CSE meeting. Since the meeting was scheduled under the five day limit, we are asking you to sign to be in compliance to hold the meeting. The committee will determine tomorrow, if you meet, the outcome of services. Please let Kris know tonight or tomorrow morning if you would like to proceed with the meeting. Thank you, Denise"

7/8/21 Email sent to Denise Troelstra, Gwynne Cosh, and Kristine Bennett Barnes: "Hi Denise, New York State's Procedural Safeguard Notice related to students suspected of having a disability says I have the right to inspect and review all educational records before any meeting to discuss a possible or existing IEP. The records are defined as those collected, maintained, or used regarding my son ███████ ███████ At this time I have F & P records (two different ones), as well as report cards with attendance records. The Title IX records I have are those mailed to me prior to the evaluation. I have not reviewed or inspected those maintained by the district. I do not have any DASA records. I have not received any academic assessments from classroom teachers

but did receive copies of their records books. As you know ▮▮▮▮ began throwing away assessments he was not proud of so I do not have those sent home, besides one math test I pulled out of the garbage. I have not been provided with any records used for the special education evaluation. While we disagree on how educational records are defined, it would be helpful for me to see a complete list of the records collected, maintained, or used by the district, as outlined in the procedural safeguards. It is hard to believe the district does not maintain any type of cumulative folder with writing samples, counseling notes, observations, ect... If I had this list I would be able to accurately identify what I have or do not have, and specifically request certain records. If the district feels confident that all records have been provided, then we should move forward with the meeting tomorrow so there is no further delay to discuss ▮▮▮▮ needs. A time frame is not important to me if no further records can be provided to me. Just as the district does not want to provide me with a list of records, I am not comfortable signing something saying I'm waiving my rights. I'm not even sure someone can be asked to do this. I do however agree that the meeting tomorrow is a mutually agreed upon time and this statement would imply that I am aware of the 5 day notice and agree to meet anyway. The district also is over the 60 day time limit to evaluate, but again the best interest of ▮▮▮▮ is to move forward. I will be there tomorrow at 9am for the CSE meeting unless I hear otherwise. Thank you, ▮▮▮▮ ▮▮▮▮

7/9/21 (Friday): First CSE Eligibility Meeting 9am. Meeting tabled by myself due to not being able to ask questions about the evaluation or view the records. (Meeting recorded) Minutes from the meeting here:

Email from Gwynne Cosh (2:07pm): "Hi ▮▮▮▮ I was able to get back to the office to get ▮▮▮▮ Data Tests. I have put them in the main office in an envelope. The office staff is here until 3:00. Have a great weekend!" (During the CSE meeting Gwynne mentioned the students are given a data test before state testing to identify gaps. She said it is practice NYS questions and that she could get that for me) Response sent back at 3:22pm: "Thanks Gwynne. I ended up bringing ▮▮▮▮ to a friend's house so I didn't get back up there but I will swing up on my lunch break Monday and grab it. ▮▮▮▮

Email received from Denise Troelstra (4:22pm): "Hi ▮▮▮▮ I am happy to provide you list of the educational records. I will reach out to you on Monday. Thank you, Denise" (*She did not reach out Monday)

7/12/21 (Monday): Email sent to Denise Troelstra: "Hi Denise, sorry I didn't get a chance to call you back today. I also didn't get a chance to run up to the WHBI today to grab the paper Gwynne has for me so I need to do that tomorrow. Can I also pick up the list of records tomorrow? If so, let me know where to pick it up. Thanks! ▮▮▮▮

7/13/21 I went to the WHBI to pick up the data test. Unexpectedly Monique Agan's folder was also available to look at. The secretary made me a copy of Basc reports used for the evaluation and I took pictures of all contents within the folder. The secretary saw me taking pictures and did not say anything. I asked if Gwynne was available to answer questions about the data test. She said she was not, but I could see her in her office. Conversations all on recording. (█████ indicated on the Basc self-report that he often thought about harming himself. Due this new concern that I was never made aware of...I left and went over to the superintendent's office)

Conversation with Kyle Gannon and Denise Troelstra (Denise missed the first few minutes of conversation. I was emotional and wanted to know why I was not informed about █████ intention to harm himself and why the district was hiding records. This turned into a lengthy conversation. All recorded.

7/14/21 Second CSE meeting 12pm. Records conversation in the beginning of the meeting. At the end of the meeting I asked Monique Agans about █████ indicating he often thought about harming himself on the BASC self-report. She admitted she did not do anything with this information. She did not ever speak to him again after obtaining that information. █████ denied eligibility and will be referred to the 504 committee. I disagreed with the decision and requested an IEE. Kris Bennett Barnes stated parents always have that right. I inquired about paperwork regarding an IEE under the procedural safeguards. She said she would schedule it and I told her I understood my rights and would be scheduling it on my own under their conditions that should be outlined in the paperwork. Kris acted like she had no idea what I was talking about and said she would look into it. As I was packing up, the classroom teacher who attended virtually said "Hey Guys, are we alone?" (Meeting was recorded)

7/15/21 Kris Bennett-Barnes left a voicemail asking me to reach her at the office. Call back to Kris Bennett Barnes: She has decided to deny the IEE. (phone call recorded)

7/20/21 State complaint mailed via postal service re: Monique Agans Moral Actions

7/20/21 Email from Denise Troelstra: "Hello █████ I hope all is well with you. You had requested a list of educational records, and I hope this list helps to clarify what an educational record encompasses. Please let me know what you have been provided by Gwynne and what you are requesting as defined by this guidance. I am happy to help. Thanks, Denise."

Reply to Denise's email sent 7/21/21: "Hi Denise, I attached a letter I sent to the board today. I know Kyle doesn't want me to continue to bother all of you so I put all of my current concerns in one document. The records info is in here, including specific requests. I have not been provided much by Gwynne. Most things were memory aids and of no value to me. It would be best to view the complete record maintained by the district so there is no confusion as to what could be missing. Thanks, █████ (Reply received from Denise Troelstra 7/22/21: "Thank you █████

7/21/21: Email sent to Patricia Belden, Francis Cabana, Stacy Flaherty, Kathleen Holser, Amy Molloy, Michael Shea, Timothy Weaver, Dawn Bleyenburg, Jamey Hardesty, Daniel Mannix re: Records Request, Lack of prior notice, and Moral conduct complaint (Email and attached letter in drive folder. Acknowledgement of receipt received from Mr. Mannix 7/23/21

7/21/21 Voicemail received from Vicki Sweet asking to schedule a 504 meeting for 8/5/21.

7/22/21 Email received from Vicki Sweet (see in drive): "Hi █████ I left you a voice mail message yesterday, but am following up with this email today. We would like to schedule a 504 meeting for █████ for Thursday, Aug. 5 - at 12:00 or after. We'd like to get an exact time nailed down very soon to make sure we can have all of the meeting participants available, since some don't work daily during the summer. If you could please let me know as soon as possible if this time would work for you, I'd appreciate it. Also, we would prefer to have the meeting in person, here in the middle school, if you are comfortable doing that. If you'd rather, we can hold it via Google Meet - just let us know your preference. And we also request that you provide us with a written copy of █████ diagnosis and recommendations for school accommodations from a doctor. Thanks very much, and I look forward to hearing from you soon. Vicki Sweet, 504 Building Secretary"

Response sent 7/22/21: "Hi Vicki, yes I got your voicemail. Sorry I didn't get a chance to call you back yet. I am however waiting on a 504 referral and refusal notice from CSE. Once I get those documents I can schedule the meeting so I meaningfully participate in the 504 meeting and provide what you need. If you have those, could you send them to me? Thanks, █████ █████

7/23/21 Email from Kris Bennett Barnes: "█████ Please see attached documents per our CSE Initial Eligibility meeting held on July 9, 2021 and July 14, 2021. A hard copy has been mailed to your address on file. Please feel free to contact me if you have any questions or concerns. Best, Kris Bennett-Barnes" with the following attachments:

**3 Attachments**



7/25/21: Reply sent to Kris Bennett-Barnes: "Kris, from the attached letter it appears that ████ is ineligible for an IEP because the "Committee has recommended that your child does not meet the criteria to be classified as a student with a disability and does not require special education at this time." Although I thought a parent is a member of the committee and my disagreement would be at least noted, can you please be more specific in your reasoning? Can you please explain why he does not meet the criteria of either Emotionally Disturbed or OHI? Also please explain why he does not need special education services? It doesn't make sense to say the determination was made solely based on the records, when the only records mentioned here are those that you chose to highlight. It certainly is not a complete list nor accurate summary of records reviewed. Also you mention records that were not reviewed by the committee. Can I please see a copy of the "classroom-based assessments in specific academic areas including reading, math, written expression, and any other pertinent area." We did not review a single classroom-based assessment nor any data regarding classroom assessments. Report cards are subjective measures of overall performance, so seeing these classroom assessments you mention would be very helpful for me to see. Please let me know if you can send these records to me or need me to come in and review them. I wanted to remind you I also have not received the meeting minutes or sign in sheet from the last CSE meeting. Lastly, please send the 504 referral so I specifically know why you are referring him to the 504 committee. It's important for me to know your professional opinion of why you suspect he needs to be considered for services under section 504. Thank you, ████ ████ (Reply received July 29th-see below)

7/27/21 Email sent to Vicki Sweet: "Hello again, I received the refusal notice. So now I only need the 504 referral. Do you have this to send to me? Thank you, ████ ████

7/27/21: Phone called from Vicki Sweet: recorded

7/27/21 Email received from Vicki Sweet: "Hi ████ Attached please find the documents we just discussed. Please look them over and get back to me as soon as possible so that we can move forward with scheduling an Initial Eligibility Determination meeting. Thanks so much! Vicki

Sweet" (Attached was consent to evaluate form and 504 referral) Email reply sent to Vicki Sweet and Kris Bennett Barnes 7/27/21: "Kris, why do you need consent to evaluate when he has already been evaluated? What additional evaluative information do you need? Also a referral should include your reasoning why you suspect ███ needs services under section 504. I can't meaningfully participate in ███ educational decisions without knowing specifically why he was ineligible for an IEP and why you suspect he needs a 504. Just as a parent cannot refer their child for special education on a hunch, everyone needs to know the reason for the referral? If I don't know this information, how can I obtain what you may need? Also I have still not been given the opportunity to review all of ███ educational records maintained by the school district, and still have not received the meeting minutes nor sign in sheet from the last CSE meeting. I also requested your specific criteria for an IEE and have not received that yet-so I cannot schedule anything. Can you also send me a copy of the district's due process procedures as well? Thank you, ███ ███

7/28/21: Reply received from Kris Bennett-Barnes: "███ I am in the process of answering all your questions along with collecting the documents you requested from your last email. The response would have included the 504 Referral letter. When you requested the letter from our QMS 504 Committee I forwarded the letter to the committee to be sent out prior to my email response. You will receive answers for all your questions along with the remainder of the documents within the next few days. Please feel free to give me a call if you have any questions. Best, Kris Bennett-Barnes"

7/28/21: Email sent to Vicki Sweet: "Hi Vicki, you can go ahead and just send me the meeting date and time that works for everyone else. I don't want all of this other stuff to hold anyone's schedules up. Whenever it is, I will make sure to be there. Thanks, ███ ███ Reply received from Vicki Sweet 7/28/21: "Good morning, ███ Thank you for your email. I have attached a meeting invitation for August 5th. This normally would get mailed to you, but I am sending it via email, due to the tight time frame. Have a great day! Vicki Sweet" (Meeting invitation attached for 504 meeting with invite of 8/5/21 11:45am 504 meeting)

7/29/21: Email reply received from Kris Bennett-Barnes: "███ Parents are definitely an equal member of the committee and your disagreement to the recommendation is part of the meeting minutes and noted in the recommendation to the BOE. Special education eligibility is bound by IDEA but there are no definite rules for determining who is eligible for special education and this is a very important concept to understand. It means that under the law, the IEP team has the flexibility to determine if a child qualifies for services. Criteria states that to qualify for special education services, a child must have one of the 13 disabilities as defined by IDEA and the impact of the disability must create a need for services. If the CSE Committee had determined that ███ qualified for services provided under an IEP both the classifications of

Emotionally Disturbed and Other Health Impaired would have been considered and the CSE Committee would have determined which classification would have been most appropriate given the circumstances. Once the individual evaluation is completed, the CSE Committee must convene a meeting to determine whether the student is or continues to be a student with a disability.  In making this determination, the CSE must consider the results of the individual evaluation to ascertain: whether the appropriateness of the resources of the regular education program, including educationally related support services, and academic intervention services have been considered. whether the student, because of mental, physical or emotional reasons, requires specially designed individual or group instruction or special services or programs to meet his or her unique needs and to participate and progress in the general curriculum . You state in your email that not all records that were reviewed are listed in the ineligibility letter.  Please advise as to which records you are referring to which you would like included. Please refer to the background information on the psychoeducational evaluation for a summary of academic performance during his time at Hudson Falls School District and Queensbury Union Free School District.  Although the report does not specifically list specific classroom-based assessments, those assessments are used in determining report card grades. As per your request the meeting minutes and sign in sheet are attached and the 504 Referral Letter has been mailed. When the CSE Committee finds that your child does not qualify for special education services it is important to consider whether or not your child should be referred to other resources that may assist him/her including the student study team, the 504 process, to a school counselor or to other programs and/or services that can assist you in improving your child's performance. These programs are all provided within the general education system.  After hearing reports from all members of the committee I felt  should be considered for accommodations provided on a 504 Plan.  Best, Kris Bennett-Barnes" (Meeting minutes attached-see in drive) Received a bit later: "         So sorry, I intended to also attach the sign in sheet.  Best, Kris Bennett-Barnes" (Sign-in sheet received-see in drive)


7/30/21: Due Process complaint emailed to BOE: "Please see the attached Due Process Complaint. I hope to be able to resolve these issues in a timely manner. Thank you,         " Due Process complaint attached and in drive.


7/30/21: Email received from Kris Bennett Barnes with payment allowance for IEE. See whole email thread regarding an IEE in drive. (started 7/23/21)


7/31/21: Email received from Daniel Mannix (in reply to Due Process Complaint): "Mrs         We have received your email and will forward it to the proper administrator for review. Regards Dan Mannix"

8/2/21 Email sent to Gwynne Cosh: "Hi Gwynne, Could I stop by and get the benchmark records for ███████ this past year?" (No response), follow-up email sent 8/5/21 (see below)

8/3/21: Email received from Elizabeth Eisenhart(Superintendent's Secretary): "Good morning, Please see the attached letter from Mr. Gannon.  Elizabeth" (Class List and document "███████ Response" see large view in the drive )



Reply sent 8/3/21 to Elizabeth, Daniel Mannix, Kyle Gannon, and Denise Troelstra: "Good Morning, Thank you for the class list and detailed response regarding records; however, we both

know I have the right to inspect and review my child's educational records at any time so it does not matter that I have been given a few things here and there. I feel it is a waste of everyone's time to use semantics to continually stall and delay my rights as a parent. According to education law, counselor's notes are educational records and must be retained by the district up until six years past the child's graduation. I am also aware that there are academic records I have not seen, such as benchmark assessment data. Amanda Denno specifically stated on record at the last CSE meeting that there were data meetings held for every student this past year and when I asked if I could get a copy of the records for ▆▆▆▆ she said "possibly." It is important for me to view this information to be able to meaningfully participate in my child's education. Neither Mrs. Denno nor Mrs. Bailey knew if ▆▆▆▆ was supposed to be receiving tier 2 services or not after quarter two. Mrs. Bailey thought he might have been put "on watch"...Mrs. Denno thought he could have been identified as needing tier two support, but there were no providers to service him at the time. School districts are required to maintain academic records, such as writing samples, to demonstrate progress in a child's cumulative folder, and I have never seen this either. I also need to view my child's health record maintained by the school nurse and the witness statements taken about my child so I can understand what we went through. I have never viewed the full evidence used, including but not limited to, the witness statements and all video reviewed by school staff from the Title IX investigation. Also Mrs. Cosh informed me that there were no DASA records on file I could view because they were maintained as discipline records. If they involve my child, then I have the right to see them (with the other child's name redacted). I have not seen a single discipline record involving my child and there should be a record from October and January at the least. I have never reviewed nor inspected the full Title IX or DASA record maintained by the school district. It is the parent's right to review the records maintained by the district. To be very specific: I have the right to sit down in your school and look through a folder and digital file of my child's records. I also have the right to do this more than once within a reasonable time frame. It is not reasonable to expect that I know every record that the district maintains to request separately. I am well aware that the district sets up times for parents to come in and review their child's educational records following a request, so why wouldn't I be afforded the same opportunity? I am requesting to inspect and review all educational records, omitting nothing, maintained by the school district regarding my son ▆▆▆▆ ▆▆▆▆ as soon as possible. I would like to come in and view the entire record. At this time I would also like to request to review all educational records, omitting nothing, regarding my daughter ▆▆▆▆ ▆▆▆▆ Please let me know a reasonable date I can come into the district to inspect and review all of ▆▆▆▆ educational records, within the next 45 days. Thank you, ▆▆▆▆ ▆▆▆▆

Response received from Daniel Mannix 8/3/21: "Received, thank you."

8/5/21 Email sent to Gwynne Cosh: "Hi Gwynne, Can I pick this up today while I am at the school?" Reply received 8/5/21 from Gwynne Cosh: "Hi ▆▆▆▆ I am out of the office and

Denise Trolestra will connect with you on this request. Gwynne" (Email thread that began on 8/2/21 in drive)

8/5/21: 504 Meeting (recorded-in drive) *Noticed Melissa Seele's name may not be on the letter. I will clarify with her and let them know.

8/6/21: Email sent to Mr. Brannigan and Kris Bennett-Barnes: "Hi Kris and Mike, I asked Melissa Seele if she could clarify that the scribble mark on the first letter was her signature so she sent this version to me so there was no confusion as to who signed it. She did say she signed the first one too, but I just wanted to verify that. Thanks, ███ New letter attached:

---

**GLENS FALLS PEDIATRIC CONSULTANTS PC**
**PEDIATRIC ASSOCIATES OF SARATOGA**
1 LAWRENCE STREET, GLENS FALLS NY 12801 (P) 518-798-9985 (F) 518-761-7043
4 CARPENTER LANE, SARATOGA SPRINGS NY 12866 (P) 518-587-3823 (F) 518-587-6677

August 5, 2021

RE: ███
    DOB: ███

To Whom It May Concern:

███ is a patient in our practice. ███ is seen in our office and also by Melissa Seale, Pediatric Psychiatric NP. His diagnoses include Depression, Anxiety, and a Tic Disorder.
        ███ diagnoses cause a disability that negatively impacts his educational performance, and he needs Special Education and related services. He would also benefit from regularly scheduled counseling sessions and to monitor goals related to the counseling.

Sincerely,
*—melissa Seale, PNP*

Electronically signed by Wright, Stuart B, M.D. on 08/05/2021 at 7:53 am
**Stuart B. Wright, MD, F.A.A.P.**

---

8/6/21 Reply received from Mr. Brannigan: "Thank you Mrs. ███ we will update the records." (Kris Bennett-Barnes CC'd in his reply)

8/6/21 Email received from Denise Troelstra: "Hi ███ Thank you for your email. I am acknowledging receipt of your email and request for education records for your daughter, ███ Please let me know your availability next week and you can come in to review ███ education records. At that time, you will be able to review a copy of the Benchmark meeting minutes from 11/20/20, 1/29/21 and 6/1/11 for both ███ and ███ Mr. Gannon's letter on July 30th addressed the status of the items you requested previously. I have reached out to the WHBI nurse to obtain any records and those records will be included for both of your children for your review. Please let me know if you have any questions. Thank you, Denise"

(This was in response to August 3rd email from myself: "*Good Morning, Thank you for the class list and detailed response regarding records; however, we both know I have the right to inspect and review my child's educational records at any time so it does not matter that I have been given a few things here and there. I feel it is a waste of everyone's time to use semantics to continually stall and delay my rights as a parent. According to education law, counselor's notes are educational records and must be retained by the district up until six years past the child's graduation.  I am also aware that there are academic records I have not seen, such as benchmark assessment data. Amanda Denno specifically stated on record at the last CSE meeting that there were data meetings held for every student this past year and when I asked if I could get a copy of the records for* ▇▇▇▇ *she said "possibly."  It is important for me to view this information to be able to meaningfully participate in my child's education. Neither Mrs. Denno nor Mrs. Bailey knew if* ▇▇▇▇ *was supposed to be receiving tier 2 services or not after quarter two. Mrs. Bailey thought he might have been put "on watch"...Mrs. Denno thought he could have been identified as needing tier two support, but there were no providers to service him at the time. School districts are required to maintain academic records, such as writing samples, to demonstrate progress in a child's cumulative folder, and I have never seen this either.  I also need to view my child's health record maintained by the school nurse and the witness statements taken about my child so I can understand what we went through. I have never viewed the full evidence used, including but not limited to, the witness statements and all video reviewed by school staff from the Title IX investigation.  Also Mrs. Cosh informed me that there were no DASA records on file I could view because they were maintained as discipline records. If they involve my child, then I have the right to see them (with the other child's name redacted). I have not seen a single discipline record involving my child and there should be a record from October and January at the least. I have never reviewed nor inspected the full Title IX or DASA record maintained by the school district. It is the parent's right to review the records maintained by the district. To be very specific: I have the right to sit down in your school and look through a folder and digital file of my child's records. I also have the right to do this more than once within a reasonable time frame. It is not reasonable to expect that I know every record that the district maintains to request separately.  I am well aware that the district sets up times for parents to come in and review their child's educational records following a request, so why wouldn't I be afforded the same opportunity? I am requesting to inspect and review all educational records, omitting nothing, maintained by the school district regarding my son* ▇▇▇▇ *as soon as possible. I would like to come in and view the entire record. At this time I would also like to request to review all educational records, omitting nothing, regarding my daughter* ▇▇▇▇ ▇▇▇▇ *Please let me know a reasonable date I can come into the district to inspect and review all of* ▇▇▇▇ *educational records, within the next 45 days. Thank you,*

▇▇▇▇ ▇▇▇

<span style="color:red">...This needs to be updated from 8/6/21 to present time</span>