UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
**K.T.**, *individually and as parent and natural*
*guardian of her infant children John Doe and*
*Jane Doe*

v.

**Board of Education of Queensbury Union**
**Free School District**, **Queensbury Union**
**Free School District, Superintendent Kyle**
**Gannon**, *in his individual and official*
*capacity*, **Assistant Superintendent Amy**
**Georgeadis**, *in her individual and official*
*capacity*, **Assistant Superintendent Denise**
**Troelstra**, *in her individual and official*
*capacity*, **Kenneth Bee**, *in his individual and*
*official capacity*, **Monique Agans**, *in her*
*individual and official capacity*, and **Michael**
**Brannigan**, *in his individual and official*

-------------------------------------------------------X

**ORDER TO SHOW CAUSE**

Civil Docket #: 1:22-cv-00230-TJM-CFH

       Upon the affirmation of Gerard V. Amedio, sworn to on the 10th day of August, 2023, and

the affidavit of K⸻T⸻, sworn to on the 10th day of August, 2023, it is ORDERED, that

Ryan Finn, Esq, show before this Court at Room _____, James T. Foley U.S. Courthouse,

Suite 509, 445 Broadway, Albany, New York 12207, on the 31st day of August 2023, at 1 o'clock

in the afternoon thereof, or as soon thereafter as counsel may be heard, why an order should not

be issued pursuant to Rule 11.1 of the Federal Rules of Civil Procedure:

      1.     Relieving Ryan Finn, Esq. as counsel to the plaintiffs in this action; and

      2.     Prohibiting Ryan Finn, Esq. from asserting a lien and/or receiving any funds from

any proceeds the plaintiffs may receive as a result of the above-captioned action;

   and it is further;

ORDERED that a copy of this order, together with the papers upon which it is granted, be served by e-mail upon Ryan Finn, Esq., and the attorneys for the defendants in this action on or before, 2023 by August 21st and that such service is deemed good and sufficient.

Dated:      Albany, New York

            August _____, 2023

            _____
            Magistrate Judge Christian F. Hummel

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

**K.T.**, *individually and as parent and natural*
*guardian of her infant children John Doe and*
*Jane Doe*

v.

**Board of Education of Queensbury Union**
**Free School District, Queensbury Union**
**Free School District, Superintendent Kyle**
**Gannon**, *in his individual and official*
*capacity*, **Assistant Superintendent Amy**
**Georgeadis**, *in her individual and official*
*capacity*, **Assistant Superintendent Denise**
**Troelstra**, *in her individual and official*
*capacity*, **Kenneth Bee**, *in his individual and*
*official capacity*, **Monique Agans**, *in her*
*individual and official capacity*, and **Michael**
**Brannigan**, *in his individual and official*

-----------------------------------------------------X

**AFFIRMATION IN SUPPORT OF**
**ORDER TO SHOW CAUSE**

Civil Docket #: 1:22-cv-00230-TJM-CFH

I, Gerard V. Amedio, an attorney duly licensed to practice before the Courts of the State of New York, does hereby affirm under penalty of perjury that:

1.      I am an active member of the bar for the Northern District of New York and my bar roll number is 106009.

2.      I have recently been retained by plaintiff, K.T., to represent the plaintiffs in the above referenced matter.

3.      I am familiar with the facts of this case and make this Affirmation in Support of the plaintiffs' Order to Show Cause requesting her previous attorney, Ryan Finn be relieved as counsel and that I may be substituted as counsel, as well as an Order prohibiting Attorney Finn from receiving any portion of any settlement of this matter as attorney's fees due to his misconduct during his representation of the plaintiffs.

1

4.     The plaintiff wishes to no longer have Attorney Finn represent her.  As indicated in her supporting Affidavit, the attorney-client relationship has significantly deteriorated to a point where the plaintiff can no longer work with Attorney Finn and terminated his representation for cause. *See* K. T. Affidavit submitted herewith.

5.     An attorney is found to have been fired for cause wherein there is "impropriety or misconduct on the part of the attorney." Oneida Indian Nation v. Cnty. Of Oneida, 802 F. Supp. 2d 395 (N.D.N.Y. 2011), *citing* Garcia v. Teitler, 442 F.3d 202 (2d Cir. 2006).  Cause can be found when an attorney fails to diligently prosecute the case, has improperly handled the case or committed malpractice.  FARB v. Baldwin Union Free School District, CV 05-0596 (E.D.N.Y. September 26, 2011) (Summary Decision attached hereto as Exhibit A), *citing* Coccia v. Liotti, 896 NYS2d 90 (2d Dept 2010).    Additionally, cause can when there is a "significant breach of a legally or ethically imposed duty".  FARB, *supra*, *citing* Allstate Ins. Co. v. Nandi, 258 F. Supp. 2d 309 (S.D.N.Y. 2003).  A violation of a disciplinary rule is sufficient to establish an attorney was discharged for cause. Holcombe v. Matisborchuk, 17-2758 (2d Cir. August 29, 2018) (Summary Decision attached hereto as Exhibit B), *citing* Schultz v. Hughes, 971 N.Y.S.2d 536 (2d Dept 2013).

6.     In Holcombe, the Second Circuit found that the attorney's abuse, and "improper threats to withdraw" constituted misconduct.  Holcombe, *supra*, *citing* Brooks v. Lewin, 853 N.Y.S.2d 286 (1st Dept 2008), Matter of Heller, 607 N.Y.S.2d 305 (1st Dept 1994).

7.     The Affidavit of K. T. establishes that Attorney Finn committed several violations of the Rules of Professional Conduct.

8.     Attorney Finn violated Rule 1.4 when he failed to properly consult with the plaintiff regarding her objectives; failed to keep the plaintiff informed of the status of the case;

2

failed to comply with plaintiff's requests for information and failed to explain the release to her

so that she could make an informed decision as to settlement. Rules of Professional Conduct (22

NYCRR 1200.0) rules 1.4 (a)(2), (3), (4), (b); Affidavit of K. T.

9.      Attorney Finn violated Rule 1.6 when he posted a public comment on a Facebook

page revealing confidential information regarding the plaintiff's minor children and their specific

injuries sustained by the defendants in the action. Rules of Professional Conduct (22 NYCRR

1200.0) rules 1.6. This is also in violation of Rule 3.6, as it is an extrajudicial statement which

had a substantial likelihood of materially prejudicing the proceeding. Rules of Professional

Conduct (22 NYCRR 1200.0) rules 3.6.; Affidavit of K. T.

10.      Additionally, when the plaintiff requested updates on the status of her case,

Attorney Finn threatened to withdraw as counsel, which is misconduct similar to what was found

in Holcombe, *supra*; Affidavit of K. T.

11.      It is well settled that an attorney who is discharged for cause is not entitled to a

fee. Stern v. Westerman Ball Ederer Miller && Sharfstein, LLP, 1:17-CV-34 (N.D.N.Y. July

24, 2017) (Summary Decision attached hereto as Exhibit C); *citing* Orendick v. Chiodo, 272

A.D.2d 901 (4ᵗʰ Dept 2000); Budin, Reisman, Jupferberg & Berstein, LLP v. Law Office of

Rosemarie Arnold, 79 Fed. Appx. 460 (2d Cir 2003); Oneida Indian Nation v. Cnty. Of Oneida,

802 F. Supp. 2d 395 (N.D.N.Y. 2011).

12.      Additionally, where an attorney's actions constitute professional misconduct,

those actions can serve as a basis for fee forfeiture. Stern, *supra* at 19, *citing* De Luccia v. Vill.

Of Monroe, 180 A.D.2d 897 (3d Dept 1992).

13.     The Second Circuit has determined that an attorney's right to fees is governed by New York law and under New York law, an attorney has no right to compensation if they are discharged for cause.  FARB, *supra, citing* Garcia v. Teitler, 443 F.3d at 211-12 (2d Cir. 2006).

14.     The Affidavit of the plaintiff establishes that Attorney Finn is an unpredictable, angry individual who has hardly any self-control.  When asked for a case status update, he told the plaintiff that she was being ridiculous, that he had other more important clients and to find a new attorney.  When she would not sign the release, he threatened to have her removed as guardian of her children's case.  When a random stranger on Facebook posted a comment about greedy lawyers, Attorney Finn publicly posted an entire diatribe disclosing confidential and very personal information about the sexual harassment of the minor child plaintiffs he was representing.  Affidavit of K. T.

15.     K.T.'s supporting affidavit clearly establishes a pattern of misconduct on the part of Attorney Finn which requires him to be relieved as counsel, and a forfeiture of any fee he may have been entitled to.

16.     This Order to Show Cause was originally filed on August 10, 2023.  Due to law office error, it was filed without the necessary redactions.  Redactions have since been made and this motion has been resubmitted.

17.     On August 10, 2023, I sent a copy of the motion to Attorney Finn via email.  I promptly received a response from him wherein he stated that he intended to "displace" me and K.T. from the suit.  He continued by making the following threatening remark: "I am not an angry man but you shall see how far I'll go for my true clients, the children."  He ended his email by stating that the plaintiff "is a liar and a piece of absolute garbage.".  I did not respond and

4

Attorney Finn sent another condescending email. *See* Email correspondence from Attorney Finn attached hereto as Exhibit D.

18.     Until this Court relieves Attorney Finn from representing the plaintiffs in this action, he remains the attorney of record for the plaintiffs and responsible for representing them pursuant to the Rules of Professional Conduct. Instead, he has resorted to threats and made yet another degrading comment regarding plaintiff K.T.

19.     Upon being fired by the plaintiff, Attorney Finn had a responsibility to withdraw as counsel with this Court. To date, he has not and it appears that he has no intention of doing so. Attorney Finn's representation has been terminated by K.T. for cause given the egregious behavior and misconduct by Attorney Finn. As a result of his unprofessionalism and violation of the Rules of Professional Conduct, Attorney Finn should be relieved as counsel for the plaintiffs and be prohibited from obtaining any of the proceeds from this action.

WHEREFORE, the plaintiffs respectfully request this Court grant the Order to Show Cause, relieving Attorney Finn as counsel for the plaintiffs, substituting Attorney Amedio as counsel for the plaintiffs and prohibiting Attorney Finn from receiving any portion of any proceeds that may result in this action, together with such other and further relief as to the Court may deem just and equitable.

Dated: August ___11___ , 2023
         Saratoga Springs, New York

                                        _____
                                        Gerard V. Amedio, Esq.
                                        340 Broadway, 3rd fl
                                        Saratoga Springs, NY 12866
                                        518-583-4123

# EXHIBIT "A"

CV 05-0596 (JS) (ETB)

United States District Court, E.D. New York

# FARB v. BALDWIN UNION FREE SCHOOL DISTRICT

Decided Sep 26, 2011

CV 05-0596 (JS) (ETB).

September 26, 2011

## MEMORANDUM OPINION AND ORDER

E. BOYLE, Magistrate Judge

Before the Court is attorney Thomas F. Liotti's Motion for Attorneys' Fees. On February 2, 2005, Plaintiffs Cheryl E. Farb and Harold R. Newman, through their then-counsel Liotti, filed this suit asserting causes of action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000-e et seq.; causes of action under 42 U.S.C. §§ 1981 and 1983; and various state law tort claims. Liotti was to be paid pursuant to a contingency fee agreement. On April 5, 2005, Liotti was terminated as counsel of record for plaintiffs and filed a Notice of Lien of Outgoing Attorney. The trial on the underlying action resulted in a jury verdict in plaintiffs' favor. The District Judge reduced the jury's award of damages and the parties subsequently settled the case. Thereafter, Liotti filed the instant Motion asserting that he is entitled to attorneys' fees for his earlier representation in the matter. Plaintiffs oppose the Motion, arguing that Liotti was discharged for cause and is therefore not entitled to attorneys' fees. An evidentiary hearing was held

2 on May 26, 2011, at which *2 the following witnesses testified: (1) Jamel Oeser-Sweat, Esq., an attorney formerly employed by the Law Offices of Thomas F. Liotti; (2) Lucia Maria Ciaravino, Esq., an attorney currently employed by the Law Offices of Thomas F. Liotti; and (3) Thomas F.

Liotti, Esq., each testified on behalf of Liotti; plaintiff Cheryl E. Farb testified on behalf of herself and co-plaintiff Newman. The parties have consented to the jurisdiction of the undersigned magistrate judge for the purposes of this Motion. For the reasons that follow, Liotti is not entitled to compensation for his representation of plaintiffs.

## FINDINGS OF FACT

## I. Facts and Procedural History of Underlying Case

Plaintiff Farb was employed as a dean at Baldwin Middle School in the Baldwin Union Free School District ("School District"). (Tr. 159). She shared the job with her co-dean, Alvis Brown. (Tr. 71-72). After Farb filed a sexual harassment and discrimination complaint with the assistant superintendent of the School District, she was referred by a family friend to Liotti. (Tr. 161, 174-75). On January 21, 2004, the Law Offices of Thomas F. Liotti filed a Notice of Claim against the School District on behalf of Farb and Newman alleging various civil rights violations and state law torts. (SUF ¶ 2; Exh. 5). On January 22, 2004, Farb signed a retainer agreement with the Law Offices of Thomas F. Liotti to represent her in a potential action against the School District and James Brown, Principal of Baldwin Middle School. (Proposed Stipulation of Undisputed

3 Facts[1] ("SUF") ¶ 1; Tr. *3 160-63; Hearing Exhibit ("Exh.") 2; Exh. 3). Liotti was to be paid on a contingency basis, receiving one-third of the amount recovered in the action. (Exhs. 2, 3). At some point after Liotti was retained, he hired Farb's husband, plaintiff Newman, as an associate attorney at the law firm, but assured Farb that

Newman would not work on her case. (SUF ¶ 3; Tr. 165-66). Farb was eventually fired from her position at the school. (Tr. 160-61).

> [1] Liotti submitted a Proposed Stipulation of Undisputed Facts prior to the hearing. At the hearing, counsel for Farb agreed to stipulate as to the facts included in the proposal, with a single objection to a paragraph asserting that plaintiff Newman took the file for the Farb matter from Liotti's Office without permission. Specifically, paragraph 5 of the Proposed Stipulation states, "Mr. Newman left the law firm and took the entire file with him without Mr. Liotti's permission." (SUF ¶ 5). Farb objected to the final five words of the paragraph. (Transcript of May 26, 2011 Hearing ("Tr.") 4). The Court will treat the remainder of the Proposed Stipulation as a joint Stipulation of Undisputed Facts.

On June 9, 2004, Oeser-Sweat represented Farb at a hearing held pursuant to New York State General Municipal Law section 50-h, which allows a municipal defendant, including a school district, to examine a claimant who has filed a notice of claim against it. See N.Y. Gen. Mun. Law § 50-h; (Exh. 6, at 1-3; Tr. 17). Personnel at the Law Offices of Thomas F. Liotti also drafted and filed a complaint on behalf of Farb with the New York State Commission on Human Rights, claiming Farb was discriminated against on the basis of sex and race, as well as retaliated against for her opposition to such discrimination. (Tr. 22-23, 49-51; Exh. 7).

At some point, Farb informed Alvis Brown, her co-dean at the school, that she was being represented in a legal action by Liotti. (Tr. 181, 187-88). On June 30, 2004, Alvis Brown retained Liotti to represent him in a discrimination action against the School District. (Exh. 25; Tr. 168-69, 182). The Alvis Brown case was treated as a "companion case" to the Farb matter because Farb and Brown had experienced similar problems with

the School District. (Tr. 70-71). Alvis Brown testified as a plaintiffs' witness in the trial of Farb's underlying action. (Tr. 78).

The Complaint in the instant case was filed on February 2, 2005. (Exh. 12). It included claims for sexual and racial harassment; religious discrimination; intentional infliction of emotional *4 distress; negligent infliction of emotional distress; defamation; retaliation by a public employer for whistleblowing; tortious interference with contract; and, on behalf of Newman, loss of consortium. (Id.). It named as defendants the School District, the School District's Board of Education, and four School District employees: James Brown, Arlene Guerrero, Kathy Weiss, and Lee Chapman. (Id.).

On or about March 6, 2005, Farb and Newman discharged Liotti, and Newman quit his job with the firm, taking the case file with him without Liotti's consent. (Tr. 101; Exh. 21). Liotti objected to the removal of the file. (Exh. 21). On March 17, 2005, Farb, Newman, and Liotti executed a Consent to Change Attorney form. (Exhs. 13, 14; Tr. 196). On April 5, 2005, Liotti was ordered terminated as attorney of record and Newman became attorney of record. (Exh. 13). On the same date, Newman was ordered terminated as attorney of record and Fred P. Bennett was substituted. (Id.). Thereafter, Liotti filed a Notice of Lien of Outgoing Attorneys with this Court. (Exh. 15).

Defendants filed a Motion to Dismiss, which the District Court granted in part on March 3, 2006. The Court first asserted that the Complaint's "lack [of] clarity and structure" hindered resolution of the motion. Memorandum and Order at 7, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Mar. 3, 2006), ECF No. 37. The District Court then dismissed (1) the Title VII claims against the individual defendants, noting that it is well-established in the Second Circuit that individuals are not subject to liability under Title VII, see id. at 7-8; (2) the religious discrimination claim, pointing out that the Complaint mentioned Farb's

religion only once and "did not allege any facts giving rise to an inference that the harassing conduct directed at Farb was because of her religion," id. at 9; (3) the §§ 1981 and 1983 claims against defendant Weiss in her individual capacity, noting that the Complaint was not clear as to whether all individual defendants were even *5 charged under the sections, see id.; (4) all of plaintiff's emotional distress claims except for those against James Brown, see id. at 15-18; (5) the defamation claim, see id. at 23, 24; (6) the claim under New York's Whistleblower statute, noting that only equitable remedies were available under the statute and plaintiff failed to seek such remedies, see id. at 24-26; and (7) a respondeat superior "cause of action," emphasizing that it is not a cause of action but a theory of liability, see id. at 27.

On March 30, 2006, plaintiffs, through attorney Bennett, filed an Amended Complaint, which Liotti's firm did not prepare. (See Tr. 109; Exh. 20). The Amended Complaint alleged sexual harassment and racial discrimination against the School District, Board of Education, James Brown, Guerrero, and Chapman; intentional and negligent infliction of emotional distress against James Brown; tortious interference with contract against all defendants; and, on behalf of Newman, a claim against James Brown for loss of consortium. (Exh. 20). Bennett was later removed and Leeds, Morelli Brown was substituted with Rick Ostrove serving as lead attorney for plaintiffs. (Exh. 13).

As the trial neared, plaintiffs' attorney Ostrove approached attorney Ciaravino, who was assigned to the Alvis Brown case, to ask whether Alvis Brown would testify as a witness on Farb's behalf. (Tr. 70, 75-76). The trial began on April 27, 2009. See Minute Entry, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Apr. 27, 2009), ECF No. 114. Alvis Brown ultimately testified on behalf of Farb. (Tr. 78). A jury awarded Farb $4 million in compensatory damages and $1 million in punitive damages, and awarded Newman

$250,000 for his loss of consortium claim. See Memorandum Order at 4, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Feb. 3, 2010), ECF No. 157. The Court reduced to $500,000 the jury's award of $4 million in compensatory *6 damages on plaintiffs' Title VII retaliation claim[2] and intentional infliction of emotional distress claim, finding that the award exceeded the statutory maximum for Title VII damages against employers with more than 500 employees, and that the award was excessive for the intentional infliction of emotional distress claim. See id. at 11-16. The Court also found the $1 million punitive damages award excessive, ruling that $500,000 was a sufficient punitive damages award. See id. at 19. The Court thus reduced the damages to $1.25 million in a conditional remittitur. See id. at 4, 19 n. 5. The case eventually settled for $1.6 million. (Tr. 116).

> [2] The Court noted that a retaliation claim was not included in the Amended Complaint, but nevertheless instructed the jury on the issue after listening to the evidence presented at trial. See Memorandum Order at 11, Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (Feb. 3, 2010).

## II. Motion for Attorneys' Fees and Hearing

On January 26, 2011, Liotti filed the instant Motion. The Motion asserts that Liotti's firm performed various legal services in connection with the Farb matter, such as drafting correspondence, press releases, and various legal papers, including the original Complaint in this action; attending Farb's 50-h hearing; and cooperating with Farb's trial counsel by helping to prepare Alvis Brown for his testimony in the trial. (See Affirmation in Support of Motion ("Liotti Aff.") at 3-5). Liotti states that his firm "devoted 127.05 hours" to the matter (Liotti Aff. at 3) and supports this number with a document purporting to be a record of legal services the firm performed (see Motion, Exh. E). As compensation, Liotti

asks for one-third of the total attorneys' fees awarded in the action.[3] (Motion at 2; Liotti Aff. at 2). Plaintiffs' opposition asserts that Liotti was discharged *7 for cause and is therefore not entitled to attorneys' fees. (See Plaintiffs' Memorandum of Law in Opposition to Mr. Liotti's Re-Filed Motion ("Opp.") at 2-3).

> [3] The Motion requests a percentage of the attorneys' fees already recovered in the action. However, in Liotti's Reply in Opposition to Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Reply"), which was filed after the hearing, Liotti seeks $186,666.00 in quantum meruit attorneys' fees and $20,000 in sanctions against plaintiffs for asserting a meritless defense to Liotti's application, for a total award of $208,176.08. (See Reply at 35). The sanction was raised for the first time on Liotti's post-hearing Reply and as such will not be recognized by the Court. See, e.g., Wong v. Yoo, 649 F. Supp. 2d 34, 76 (E.D.N.Y. 2009) (issues raised for the first time in a reply brief need not be considered). Moreover, given the outcome of this proceeding, the request is devoid of any merit.

As noted above, an evidentiary hearing was held on May 26, 2011. Oeser-Sweat, an attorney formerly employed by Liotti's firm, Ciaravino, an attorney employed there, and Liotti testified on Liotti's behalf. Farb testified on behalf of herself and co-plaintiff Newman.

A. Alan Ansell

Alan Ansell is a former attorney who was suspended in 1991 by the Appellate Division, Second Judicial Department, for five years for neglect of numerous actions and subsequent attempts to conceal the neglect from his clients, as well as failure to cooperate with investigations into his neglect. See In re Ansell, 572 N.Y.S.2d 366, 366-68 (App. Div. 1991). In 1995, Ansell was disbarred when he defaulted in proceedings charging him with further professional

misconduct, including "conduct involving dishonesty, fraud, deceit, and misrepresentation." In re Ansell, 628 N.Y.S.2d 604, 604-05 (App. Div. 1995). Like the order suspending Ansell, the order disbarring him prohibited him from "practicing law in any form, either as principal or as agent, clerk, or employee of another" and from "giving to another an opinion as to the law or its application or any advice in relation thereto," among other restraints. In re Ansell, 572 N.Y.S.2d at 368; In re Ansell, 628 N.Y.S.2d at 605. All of this, of course, is a matter of public record. The relevant period of time that *8 Farb and Newman were represented by Liotti is from January 21, 2004, until March 6, 2005. (See Exhs. 5, 21).

At the time that Liotti employed Ansell as a law clerk in his office, Liotti knew that Ansell was not a member of the bar. (See Tr. 142-43; see also Proposed Findings of Fact and Conclusions of Law ("Liotti's Proposed Findings") at 13). Specifically, Liotti stated, "I was under the impression, because he told me this, that he had just been suspended. And for whatever reason had not reapplied for admission. And the suspension, which was documented, had ended." (Tr. 142). Liotti further asserted that he did not find out until late 2005 that Ansell had been disbarred. (Tr. 142). However, an affidavit by Ansell, which Liotti submitted to the Court after the evidentiary hearing, states that Ansell informed Liotti of his disbarment at the end of 2004. (See Liotti's Proposed Findings, Exh. C ("Ansell Aff.") at 2). Between the conflicting evidence in the record before me, I credit the Ansell affidavit on the issue of when Liotti was informed. Oeser-Sweat testified that while he was employed at Liotti's firm he "heard some rumbling" that Ansell had been disbarred. (Tr. 56). Liotti further acknowledged that his research showed that, "a disbarred lawyer certainly should not work in a law office. A suspended lawyer probably shouldn't either. But . . . [two] bar associations in their opinions said that the disbarred or suspended lawyer in any event should not have contact with

clients." (Tr. 142-43). Liotti argues that when he learned of the disbarment, he "began to sever" his employment relationship with Ansell. (Liotti's Proposed Findings at 13). It is not disputed that Ansell remained affiliated with Liotti at the time of the latter's discharge in early March 2005.

It is undisputed that, under the auspices of Liotti's firm, Ansell performed legal work on Farb's case. Farb testified that Ansell was the "attorney [sic] that [she] dealt with most in th[e] office." (Tr. 164). She "spoke with him quite often"-"almost all the time" (Tr. 164) — and related *9 the facts of her case to him (see Tr. 167, 172). Ansell expressed his opinion about how she should proceed with her case and prepared documents on her behalf. (See Tr. 173). Ansell prepared her for the 50-h hearing. (Id.). Indeed, Farb testified that Ansell was "the only one [she] was working with." (Tr. 172). The Court credits this testimony by plaintiff Farb. Additionally, although Oeser-Sweat failed to mention Ansell's employment with the firm on direct examination, on cross-examination he stated that Ansell worked as a clerk on the Farb matter and specifically noted that Ansell would "absolutely" have reviewed the Complaint and "probably" offered opinions on it. (Tr. 55).

Thus, the credible evidence shows that Liotti hired disbarred attorney Ansell, whom he believed was suspended and not reinstated, and that Ansell performed substantial legal work on matters including the Farb litigation. The evidence further shows that Ansell worked on the Farb matter under the auspices of Liotti's firm notwithstanding Liotti's knowledge of Ansell's suspension and disbarment. It is further undisputed that Liotti did not inform Farb that Ansell had been suspended or disbarred; rather, she found out from her husband sometime prior to the end of 2009.[4] (Tr. 204-207).

[4] After plaintiffs fired Liotti, Ansell continued to work on the matter with plaintiffs' next attorney, Bennett, and thereafter until plaintiffs hired Ostrove to represent them in July 2008. (See Tr. 202-04, 207); see also Notice of Appearance,

Farb v. Baldwin Union Free Sch. Dist., No. 05-cv-0596 (July 30, 2008), ECF No. 97. Ostrove did not represent plaintiffs at the evidentiary hearing, having been substituted by Jeffrey Alan Hoerter on April 27, 2011.

B. Inconsistencies in Exhibit 16 and Testimony by Liotti and Oeser-Sweat

The extent of Ansell's work on the case is also supported by documentary evidence introduced by Liotti at the hearing. Exhibit 16 is a document dated July 23, 2009, which is a *10 "summary" of the work performed by Liotti's firm on the Farb case. (Tr. 101-02). Both Liotti and Oeser-Sweat testified that not all of the work performed is reflected on the document. (See Tr. 31, 102). Liotti testified at the hearing that the handwritten time sheets upon which the firm's timekeeping were based were "probably" "in storage in the basement of [his] office," but that it would "involve a great deal of work and time and everything else" and a "tremendous search," which would be "useless and unnecessary," to find and evaluate them. (Tr. 103-04, 130-31, 153). For this reason, Liotti failed to produce these records.

Exhibit 16 is a record of time expended on the case, including the date of work, a description of the task, the amount of time spent on the task, and the person performing the task. Liotti is represented by a "T" on the document; one or more law clerks are represented by an "LC" on the document; and one or more paralegals are represented by a " PL" on the document. Exhibit 16 reflects that these timekeepers performed work on the matter. (See Exh. 16 at 6). The document also mentions Oeser-Sweat and Newman as having participated in the case. (See id. at 2-6).

As noted above, Ansell worked as a law clerk at Liotti's firm during the relevant period. (Tr. 143). Farb testified that she worked extensively with Ansell on the case, speaking with him regularly. (Tr. 164). Exhibit 16 shows that a law clerk performed over 25 hours of work on the case

between January 29, 2003, and February 15, 2005, for which Liotti seeks payment. (See Exh. 16). These tasks included meeting with plaintiffs to review the facts of the case, performing legal research and drafting court documents, and fielding numerous telephone calls from Farb. (See id.). For example, within the first few months of Liotti's representation, an unnamed law clerk met with Farb and Newman twice (on January 29 and May 8) and had six telephone conferences with Farb (one on February 26, three on March 16, one on April 21, and one on May 4). (See id. at 1-2). Moreover, *11 an unnamed law clerk reviewed and revised parts of the Complaint, including the facts section. (See id. at 5). In short, a law clerk is listed as performing the tasks that Farb asserted Ansell performed. When questioned at the hearing, Liotti acknowledged that Ansell "might be one of the LCs" listed on Exhibit 16. (Tr. 143). Indeed, unrebutted testimony, in tandem with Exhibit 16, shows that Ansell performed significant legal work on the Farb matter while he was employed at Liotti's firm.

Exhibit 16 also shows that plaintiff Newman worked as an attorney on the Farb matter. Although he is not an identified timekeeper on the document, he is mentioned as a participant in a number of conferences. For example, a June 15, 2004 entry reads, "Conference with Harry Newman regarding Alvis Brown." (Exh. 16 at 2). On August 17, 2004, Newman and the law clerk had a telephone conference with a witness. (See id., at 3). Newman also participated in the preparation of legal documents, such as a filing with the Equal Employment Opportunity Commission (see id. at 4 (entry for Oct. 27, 2004)) and the Complaint. (See id. at 5-6 (entries for Dec. 28, 2004; Jan. 10, 2005; Jan. 26, 2005; Jan. 27, 2005; and Feb. 2, 2005); see also Tr. 20). This work occurred even though undisputed testimony by Farb established that Liotti assured her that her husband would not work on their case and that Liotti would handle it himself. (Tr. 165-66).

Exhibit 16 becomes more troublesome when examined in light of the other evidence submitted at the hearing, much of which is uncontested. According to Exhibit 16, Liotti accrued the bulk of the 127.05 hours expended on the Farb matter. Indeed, 94.1 hours-nearly 75% of the hours listed-are ascribed to Liotti. (See Exh. 16). Liotti asserted at the hearing that he was scrupulous about keeping track of his time, stating, "I have to say, it is my firm. I'm pretty religious about it because it's my money." (Tr. 128). Exhibit 16 shows that Liotti's tasks included legal research; *12 drafting correspondence; attending Farb's 50-h hearing; drafting and reviewing court documents, such as the Complaint; and filing and serving the Complaint. (See Exh. 16).

Notwithstanding Liotti's assertedly meticulous time-keeping and his affirmation of the accuracy of the document (see Tr. 123, 153), the exhibit is clearly inaccurate and unreliable as a record of the tasks performed and time spent by Liotti on the Farb matter. For example, according to the document, Liotti spent 18.8 hours researching, revising, and drafting the Complaint. (See Exh. 16 at 5). With the exception of Newman, who is described as having reviewed the facts section with the law clerk, no other attorney is listed as having expended time on the Complaint. (See id.). However, Oeser-Sweat testified that he drafted the Complaint: "I played the majority of the role. It was probably, to the best of my recollection, it was my complaint. I did draft it." (Tr. 20). Oeser-Sweat stated that he received assistance from paralegals and from Newman. (Tr. 20). However, he fails to mention that Liotti played any role in the drafting of the Complaint, let alone that Liotti did the bulk of the work.[5] A post-hearing submission by Liotti seems to admit that Oeser-Sweat took the lead in drafting and revising the Complaint, asserting that Liotti's firm should be compensated for the time Oeser Sweat "spent drafting the Summons and Complaint [and] . . . spent reviewing and making revisions to the Summons and Complaint." (Reply at 13). In a similar inconsistency, Exhibit 16

shows that Liotti spent 7.6 hours preparing for and attending Farb's 50-h hearing. (See Exh. 16 at 2). Oeser-Sweat testified that he "prepared for the 50-h hearing" and "subsequently appeared at the hearing where Ms. Farb was questioned for the majority of the day, maybe six or *13 seven hours." (Tr. 17). Oeser-Sweat also testified that Liotti was not present at the 50-h hearing (see Tr. 48), a fact which is borne out by the transcript of the hearing, which reveals that only Oeser-Sweat appeared for Farb. (See Exh. 6 at 2). Liotti acknowledged-as he must-that he did not appear at the 50-h hearing. When presented on cross-examination with the entries from Exhibit 16 (time records) regarding the 50-h hearing, he asserted that he did not actually attend, concluding, "So why that would indicate Tom [Liotti] and not Jamel [Oeser-Sweat], I don't know." (Tr. 137). And in a post-hearing submission, he asserts that Oeser-Sweat "prepared for and accompanied Ms. Farb to a General Municipal Law § 50-h hearing," which "lasted seven (7) hours." (Reply at 12; see also id. at 13). Moreover, Exhibit 16 shows that Liotti, himself, filed the Complaint in this Court on February 2, 2005. (See Exh. 16 at 5). Plaintiffs submitted conclusive evidence that established that Newman filed the Complaint and paid the filing fee on the date in question. (See Exh. C).

> 5  Until pressed to admit that Ansell worked on the Complaint (see Tr. 55), Oeser-Sweat also failed to mention that a law clerk assisted him, although Exhibit 16 reflects that one or more law clerks performed 8.75 hours of work on the Complaint, almost one-third of the total hours billed to its preparation. (See Exh. 16 at 5).

Other testimony elicited by Liotti at the hearing further disputes that Liotti performed the majority of the work on the Farb matter. Oeser-Sweat testified that he was the "primary attorney" on the case, with Liotti "basically supervis[ing]." (Tr. 18; see also Tr. 19 ("To the best of my recollection, just like any other case, [Liotti's] role is supervisory."). Farb testified that Liotti was almost

completely unavailable to her. (See Tr. 163 ("I did try to contact Mr. Liotti. He was often not available for me. I tried to go to the office. He was not available."); 166 ("Because I was concerned, I was not getting hold of Mr. Liotti."); 172-73 ("I tried many times to talk to Mr. Liotti about my concerns, and ask questions to meet with him. And I never got anything, any response from him."); 173 ("I didn't talk to Mr. Liotti. He didn't return calls to me. He didn't answer questions for me."); 184 ("Towards the end when I was trying to terminate Mr. Liotti, I did send him — we were conversing through emails, and I did tell him the reasons why I was terminating him. And *14 I actually had tried to go to his office, and he wouldn't see me. He refused to see me."). In a letter to Farb that post-dates his discharge, Liotti implicitly acknowledges that he performed little legal work on the case: Liotti states that he paid others (including law clerks) to work on the case, while he "review[ed] . . . paperwork and also arranged for press conferences and responded to other media contacts. . . ." (Exh. 21 at 3).

Moreover, even taken alone without reference to hearing testimony, Exhibit 16 is replete with internal inconsistencies which undermine its accuracy as a record of Liotti's time. For example, Liotti bills time for writing memos to himself. (See Exh. 16 at 2 (entry for June 15, 2004). There are multiple entries in which Liotti bills time for conferences with himself. (See, e.g., Exh. 16 at 2 (entries for June 3, June 7, and June 9, 2004). In short, this document is rife with absurdities. It cannot be relied on as a record of Liotti's time, and it undermines the testimony of both Liotti and Oeser-Sweat.

Notwithstanding Oeser-Sweat's testimony that he was the primary attorney assigned to Farb, as noted, Exhibit 16 does not record Oeser-Sweat as a timekeeper on the matter. Indeed, he is mentioned only once, in a May 14, 2004 entry that seems to memorialize a 12-minute meeting among Liotti, Oeser-Sweat, and a law clerk. (See Exh. 16 at 2). Oeser-Sweat testified that attorneys at

Liotti's firm "didn't always keep track of the time" they spent on contingency cases. (Tr. 48). While he did "keep notations of the hours . . . devoted to the Farb matter," he opined that the majority of his time was probably not documented "because it was a contingency matter." (Tr. 31). Oeser-Sweat worked on the case from "its inception" (Tr. 15) and estimated that he devoted "[a] couple of hundred" hours to the matter. (Tr. 31). Oeser-Sweat's estimate is neither reliable nor plausible. He asserted he arrived at the figure by assuming that he spent at least 15 minutes on the *15 case per day for a year-and-a-half.[6] (Tr. 53). Moreover, Oeser-Sweat's testimony regarding his work on the case is contradicted by other testimony and documentary evidence. While it is clear that Oeser-Sweat represented Farb at the 50-h hearing and played a role in drafting the Complaint, he also claimed that he had met with Farb "six or seven" times. (Tr. 53). Farb, however, testified that she never dealt with Oeser-Sweat and she met him only once-at the 50-h hearing. (Tr. 165, 170). In addition, Oeser-Sweat asserted that he was the primary attorney on the case during his time at Liotti's firm. (Tr. 17). But in a letter to Farb, Liotti asserted that he reduced Oeser-Sweat's role in the case after plaintiffs "expressed dissatisfaction" with him, bringing in Newman and law clerks to work on the case. (Exh. 21 at 3). Thus, Oeser-Sweat grossly overestimates the time he spent on the case and his role while the case was with Liotti.

> [6]  If Oeser-Sweat spent 15 minutes per day on the case every day, including weekends, from January 21, 2004 until March 6, 2005, a period of 411 days, that figure would only be about 102 hours.

Liotti insists that Exhibit 16 is an accurate record of the time entered into his firm's computers on the Farb matter. At the hearing, in response to the Court's observation that the document seemed a "reconstruction" made after the fact, Liotti answered, "No, not quite. Let me explain, if I can. This is accurate as to the time that was put into our computer in `04 and `05. . . . It is not a reconstruction." (Tr. 103). Later, he asserted that the document "is a business record kept in the normal course of business. And I will testify that I am the custodian and keeper of those records and I attest to their accuracy." (Tr. 123). Even during his cross-examination, after having been questioned about inconsistencies in the document, he insisted that the entries on Exhibit 16 "were the accurate records . . ., together with Mr. Sweat's testimony" of the hours expended on the Farb matter. (Tr. 153). He repeated that assertion in post-hearing submissions, stating that "Exhibit *16 16 reflected the actual time input into [the] computer in 2004 and 2005." (Liotti's Proposed Findings of Fact at 16).

C. <u>Alvis Brown</u>

It is undisputed that Liotti represented Alvis Brown and Farb simultaneously in their separate discrimination actions against the School District. (<u>See</u> Tr. 27-28; 71; Exhs 25 26). It is also undisputed that Alvis Brown was not named as a defendant or respondent in any of Farb's complaints. (Tr. 176; 189; 192; 195; Exhs. 5, 7, 12). Indeed, Farb testified in her 50-h hearing that she and Alvis Brown began to feel "like it was us against [the other school administrators]," and that she did not think that Alvis Brown was harassing her; rather she thought "that he was as fearful as I was." (Exh. 6 at 28, 185-86). However, at the attorneys' fees hearing, Farb testified that she was uncomfortable that Liotti's firm was representing Alvis Brown because he had participated in the harassment that was the subject of her suit. (Tr. 167-69, 173-74; 198). Farb asserted that she told Ansell "about the position Mr. Alvis Brown would put [her] in, in relation to working with the principal," defendant James Brown, by "disappear[ing] from his office for many hours, leaving me in charge and responsible for dealing with all of the [2400] children in that school." (Tr. 167). She also asserted that Alvis Brown, who was in charge of the school's security guards, "had the

security guards writing up letters that would subsequently be given to the principal and placed in [her] personnel file." (Tr. 167-68; 210).

### III. Liotti's Files from the Farb Matter

In connection with the Motion for Attorneys' Fees, Ostrove, who was plaintiff's attorney at *17 the time, offered to allow Liotti to examine five litigation boxes of files which assertedly include the remainder of Liotti's files regarding the Farb litigation. (Tr. 93). Liotti declined the opportunity to inspect the files. (Id.).

### DISCUSSION

Liotti argues he is entitled to attorneys' fees because he was terminated without cause. (Liotti's Proposed Findings at 11). Plaintiffs, however, assert that Liotti was discharged for cause and has therefore forfeited his fees. (See Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Plaintiffs' Proposed Findings") at 11). The Court find that Liotti was discharged for cause and is not entitled to attorneys' fees.

### I. Legal Standards

Liotti's right to attorneys' fees is governed by New York law. See, e.g., Garcia v. Teitler, 443 F.3d 202, 211-12 (2d Cir. 2006) (applying New York law to the question of a discharged attorney's contractual right to fees); Casper v. Lew Lieberbaum Co., 182 F. Supp. 2d 342, 346 (S.D.N.Y. 2002) (same). "Under New York law, an attorney may be dismissed by a client at any time with or without cause." Garcia, 443 F.3d at 211; see also Felix v. Law Office of Thomas F. Liotti, 25 Misc. 3d 1239(A), 2009 WL 4724684, at *2 (N.Y. Sup. Oct. 28, 2009). If an attorney is discharged for cause, "the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement." Campagnola v. Mulholland, Minion Roe, 76 N.Y.2d 38, 44 (1990); see also Garcia, 443 F.3d at 211. Rather, a charging lien (like the one Liotti attempts to enforce) is enforceable only by an attorney discharged without cause. See Stair v. Calhoun, *18 722 F. Supp.2d 258, 267

(E.D.N.Y. 2010) ("[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the attorney . . . is not discharged for `good cause.'"); Schneider, Kleinick, Weitz, Damashek Shoot v. City of New York, 754 N.Y.S.2d 220, 223 (App. Div. 2002) (noting that a charging lien is a remedy available to an attorney who is discharged without cause. "Poor client relations, differences of opinion, or personality conflicts do not amount to cause. . . ."Garcia, 443 F.3d at 212. Instead, "[a]n attorney may be discharged for cause where he or she has engaged in misconduct, has failed to prosecute the client's case diligently, or has otherwise improperly handled the client's case or committed malpractice." Coccia v. Liotti, 896 N.Y.S.2d 90, 100 (App. Div. 2010); see also Allstate Ins. Co. v. Nandi, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) (noting that under New York law a discharge is for cause when there has been a significant breach of a legally or ethically imposed duty). "Misconduct that occurs before an attorney's discharge but is not discovered until after the discharge may serve as a basis for fee forfeiture." Coccia, 896 N.Y.S.2d at 100. It is the client's burden to establish that the attorney was discharged for valid cause. See DeLucia v. Village of Monroe, 580 N.Y.S.2d 91, 92 (App. Div. 1992); Williams v. Hertz Corp., 457 N.Y.S.2d 23, 25 (App. Div. 1982).

In a dispute between a client and an attorney who has been discharged without cause, however, the attorney is entitled to compensation on a quantum meruit basis for the reasonable value of his services, unless the client and attorney have agreed otherwise. Levy v. Laing, 843 N.Y.S.2d 542, 544 (N.Y. App. Div. 2007); see also Universal Acupuncture Pain Servs., P.C. v. Quadrino Schwartz, P.C, 370 F.3d 259, 263 (2d Cir. 2004) ("`Recovery on a quantum meruit basis is called for . . . where the attorney discharged without fault was employed under a contingent fee contract.'"); Allstate Ins. Co., 258 F. Supp. 2d at 311-12. Under New York law, a court must consider various *19 factors in determining the

reasonable value of the services rendered by the attorney, including "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the amount at issue, and the results obtained." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148 (2d Cir. 1998); see also Smith v. Boscov's Dep't Store, 596 N.Y.S.2d 575, 576 (App. Div. 1993). The court may also take into account any contingency fee agreement that the attorney had with the client. See Ruggiero v. R.W. Gross Plumbing Heating, Inc., 641 N.Y.S.2d 189, 191 (App. Div. 1996). Such an agreement is not, however, the dispositive factor. Smith, 596 N.Y.S.2d at 576. Importantly, the attorney has the burden of proving the amount of legal fees due from client and, in so proving, is "held to the highest standards" of proof. Estate of Jackson, 508 N.Y.S.2d 671, 676 (App. Div. 1986).

The Second Circuit has held that an application for attorneys' fees must be supported by contemporaneous time records, except in the rarest of cases. See Scott v. City of New York, Nos. 09-3943-cv, 09-5232-cv, ___ F.3d ___, 2011 WL 1990806, at *2 (2d Cir. May 24, 2011); N. Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). However, that court has also recognized that, in cases in which the right to attorney fees is governed by state law, such as a contractual attorneys' fees case, New York's more liberal rule, which allows reconstructed records, should apply. See Riordan v. Nationwide Mutual Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992) ("State law creates the substantive right to attorney's fees, a right which cannot be deprived by applying the contemporaneous time records rule adopted in this Circuit" (internal citations omitted)); see also Schwartz v. Chan, 142 F. Supp. 2d 325, 331 (E.D.N.Y. 2001) ("[U]nder New York law, courts may award attorney's fees based on contemporaneous or reconstructed time records."). Nonetheless, the burden is on the attorney claiming such fees to "keep and present *20

records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." F.H. Krear Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987) (collecting New York state court cases); see also Estate of Jackson, 508 N.Y.S.2d at 676 (stating that attorneys are held to the highest standards of proof in fee disputes with clients); General Star Indemnity v. Custom Editions Upholstery, 940 F. Supp. 645, 653 (S.D.N.Y. 1996) ("[E]ven if contemporaneous records are not required, this court cannot rely on an admittedly `speculative,' `reconstructed hourly bill' to set compensation."); Dweck Law Firm v. Mann, No. 03 Civ. 8967, 2004 WL 1794486, at *3 (S.D.N.Y. Aug. 11, 2004) ("[B]ecause [the attorney] acknowledges that the total hours was nothing more than a `guesstimate,' and because there are no records to support the testimony, a 25 percent discount of that guesstimate is appropriate.").

## II. Liotti Aided a Disbarred Attorney in the Practice of Law, Entitling Plaintiffs to Discharge Him for Cause

Only attorneys may practice law in New York. See N.Y. Jud. Law §§ 478, 484. "A suspended or disbarred attorney holds approximately the same status as one who has never been admitted. . . ." In re Rosenbluth, 320 N.Y.S.2d 839, 840 (App. Div. 1971). Thus, a suspended or disbarred attorney may not engage in the practice of law. N.Y. Comp. Codes R. Regs. tit. 22, § 691.10(e); see also Coccia, 896 N.Y.S.2d at 101. "The practice of law involves the rendering of legal advice and opinions directed to particular clients." In re Rowe, 80 N.Y.2d 336, 340 (1992); see also In re Roel, 3 N.Y.2d 224, 229 (1957) ("Whether a person gives advice as to New York law, Federal law, the law of a sister State, or the law of a foreign country, he is giving legal advice. *21 Likewise, when legal documents are prepared for a layman by a person in the business of preparing

such documents, that person is practicing law. . . ."). Activities such as "preparing legal memoranda and documents to be filed in court"-even if signed by an admitted attorney-or conducting interviews with clients are forbidden to a suspended or disbarred lawyer. See In re McClain-Sewer, 907 N.Y.S.2d 485, 487 (App. Div. 2010) (" [R]espondent continued to perform substantial legal work . . ., preparing legal memoranda and documents to be filed in court . . ., and being compensated for that work through other attorneys in good standing under whose names that work was submitted."); In re Kuriakose, 576 N.Y.S.2d 293, 294-95 (App. Div. 1991) (holding that consulting with a client and preparing legal memoranda constitutes the practice of law).

Similarly, it is a violation of the ethical rules for an attorney in good standing to aid a suspended or disbarred attorney in continuing to practice law. See N.Y. Comp. Codes R. Regs. tit. 22, § 1200.16 ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."), superseded in 2009 by N.Y Comp. Codes R. Regs. tit. 22, § 1200.0, Rule 5.5(b) ("A lawyer shall not aid a nonlawyer in the unauthorized practice of law.");[7] Coccia, 896 N.Y.S.2d at 101; In re Riely, 475 N.Y.S.2d 473, 474 (App. Div. 1984); Kuriakose, 576 N.Y.S.2d at 295 (disciplining an attorney for aiding a nonlawyer in consulting with and preparing legal papers for a client; DR 3-101(a) ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."). Indeed, an attorney can be suspended for doing so. See In re Takvorian, 670 N.Y.S.2d 211, 212-13 (App. Div. 1998) (suspending attorney for one year for providing false and misleading testimony and for [*22] aiding a non-lawyer in the practice of law). Such misconduct is grounds for discharging an attorney for cause. See Coccia, 896 N.Y.S.2d at 100-01; see also Allstate Ins. Co., 258 F. Supp. 2d at 312 (noting that the breach of an ethically imposed duty is grounds for discharge for cause).

[7] The New York Code of Professional Responsibility was in effect when Liotti concurrently represented Farb and Alvis Brown. In 2009, the code was superseded by the New York Rules of Professional Conduct. See e.g., Gabayzadeh v. Taylor, 639 F. Supp. 2d 298, 303 (E.D.N.Y. 2009).

The situation presented in the instant case is quite similar to the issues raised in Coccia v. Liotti, a legal malpractice action brought against Liotti in state court. The plaintiff there claimed, among other instances of alleged malpractice, that Liotti knowingly aided a disbarred attorney in the practice of law. See Coccia, 896 N.Y.S.2d at 100-01. More specifically, the plaintiff in that case complained that Liotti knew that Ansell was a suspended or disbarred attorney and nevertheless allowed Ansell to work on her divorce case.[8] See Order at 4-5, 13, Coccia v. Liotti, Case No. 5195/06 (N.Y. Sup. Ct. Apr. 30, 2008), available at

[8] The divorce action "was commenced on July 16, 2002." Order at 1, Coccia v. Liotti, Case No. 5195/06 (N.Y. Sup. Ct. Apr. 30, 2008), available at

http://decisions.courts.state.ny.us/10jd/nassau/decisions/index/index_newally/2008may/005195-06.pdf. On appeal, the Appellate Division noted that the plaintiff alleged that Ansell met and consulted with her, drafted memos and notes, and was more familiar with her case than was Liotti.Coccia, 896 N.Y.S.2d at 100. The court held that the plaintiff had sufficiently alleged that Liotti knowingly aided Ansell in the practice of law, which would constitute professional misconduct. Coccia, 896 N.Y.S.2d at 100-01.

I find that Ansell-suspended in 1991 and disbarred in 1995-worked on plaintiffs' case throughout the time that plaintiffs were represented by Liotti's law firm-January 2004 through March 2005. (Tr. 141-43; 173). Testimony that Ansell prepared documents in the case and interviewed and provided legal advice to plaintiffs was unrebutted [*23] at the hearing. (Tr. 55; 173). Indeed, according

to the testimony of plaintiff Farb, which I credit, Ansell was the "attorney" with whom she had the most contact in Liotti's office. (Tr. 164). Liotti asserts that Ansell "misrepresented his status to me stating that he was suspended but that his suspension period had ended and that he was eligible to apply for reinstatement." (Liotti's Proposed Findings at 13). The suspension order in the Ansell matter, dated July 22, 1991, which is a reported decision of the Appellate Division, clearly states that the suspension shall continue "until the further order of this court."[9] In re Ansell, 572 N.Y.S.2d at 368. I do not credit Liotti's claims of innocent involvement. Liotti states that, once he found out Ansell was disbarred, he researched whether such an attorney may be employed to perform research and legal writing, and, having discovered the answer, began to sever his relationship with Ansell. (Liotti's Proposed Findings at 13-14). It is clear that Liotti knew that Ansell had been suspended and was not reinstated, and that he allowed him to work on the Farb matter.[10] (Tr. 141-42). Moreover, the affidavit by Ansell-ironically submitted post-hearing by Liotti-establishes that Liotti was told by Ansell of his disbarment in late 2004. (See Ansell Aff. at 2); see In re Raskin, 635 N.Y.S.2d 268, 269 (App. Div. 1995) (disciplinary action based on the intentional aiding of a non-lawyer in the practice of law). There is no dispute that Ansell continued to practice in Liotti's office until Liotti was terminated in March 2005. (See Tr. 202-24, 207). Nor is there any dispute that Ansell's suspension and/or disbarment was not disclosed to plaintiffs during *24 the time that Liotti represented them. Thus, the evidence clearly establishes that Liotti aided a suspended and disbarred attorney in the practice of law and allowed him to perform substantial legal work on the Farb and Newman action. This constitutes a substantial breach of a legal and ethical duty. See N.Y. Comp. Codes R. Regs. tit. 22, § 1200.16 ("A lawyer shall not aid a non-lawyer in the unauthorized practice of law."); DR 3-101(a) (same). As such, it constitutes good cause for termination, even though discovered

after plaintiffs terminated Liotti's services. See Allstate Ins. Co., 258 F. Supp. 2d at 312 ("Courts typically find a discharge `for cause' where there has been a significant breach of legal duty."); Coccia, 896 N.Y.S.2d at 100 ("Misconduct that occurs before an attorney's discharge but is not discovered until after the discharge may serve as a basis for fee forfeiture.").

[9]  The suspension provision in Ansell states, in relevant part, "ORDERED that the respondent Alan Paul Ansell is suspended from the practice of law for a period of five years, commencing August 23, 1991, and continuing until further order of this court. . . ." Id.

[10]  Liotti testified at the hearing that his research revealed that "a disbarred lawyer certainly should not work in a law office. A suspended lawyer probably shouldn't either. But both bar associations in their opinions said that the disbarred or suspended lawyer in any event should not have contact with clients." (Tr. 142-43).

## III.   Liotti's Simultaneous Representation of Farb and Alvis Brown did not Constitute a Conflict of Interest

Plaintiffs assert that Liotti's concurrent representation of Farb and Alvis Brown constituted a conflict of interest, arguing that (1) Alvis Brown participated in the harassment of which Farb complained; (2) because Alvis Brown would be a likely witness in the Farb trial (and vice-versa), Liotti could not zealously advocate on behalf of either of them because their interests were not fully aligned; and (3) one client could have disclosed confidential information detrimental to the interests of other client. (Plaintiffs' Proposed Findings at 13).

New York's ethical rules prohibit an attorney from "accept[ing] representation of a person whose interests are opposed to the client." In re Agent Orange Prod. Liability Litig., 800 F.2d 14, 17 (2d

Cir. 1986); see also N.Y Comp. Codes R. Regs. tit. 22, § 1200.24 (prohibiting *25 simultaneous representation when "the exercise of professional judgment in behalf of a client will be or is likely to be adversely affected by [the simultaneous representation] or if it would be likely to involve the lawyer in representing differing interests"), superseded in 2009 by N.Y Comp. Codes R. Regs. tit. 22, § 1200.0, Rule 1.7(a) ("[A] lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests.").

Alvis Brown's interests were not adverse to Farb's; indeed, he testified on her behalf at trial. Concurrent representation of a party and a non-party witness constitutes a conflict of interest only if the witness is expected to give testimony adverse to the client. See Ritchie v. Gano, No. 07 Civ. 7269, 2008 WL 4178152, at *10 n. 5 (S.D.N.Y. Sept. 8, 2008) (collecting cases); see also George v. City of Buffalo, ___ F. Supp. 2d ___, 2011 WL 2259690, at *16 (W.D.N.Y. June 3, 2011) ("In the case of representation of a non-party witness and a party, disqualification . . . occurs where . . . the attorney . . . suffers from an actual conflict based on the witness's expected testimony adverse to an attorney's client such that the attorney's duty of loyalty and zealous representation to the client and witness is thereby impaired."). Alvis Brown had no incentive to testify in a way that was adverse to Farb's interests. He was not a party to the case and thus had no need to defend himself. The original Complaint asserts that James Brown, not Alvis Brown, created a hostile work environment. (See Exh. 12 at 10). Alvis Brown's alleged participation consisted only of witnessing instances of inappropriate behavior by James Brown, and being victimized by Principal Brown's "effort[s] to cause conflict between Farb and Alvis Brown." (See id. at 6, 7, 9-10, 11). As such, he could only be expected to corroborate Farb's allegations. Plaintiffs assert that, because he represented both Alvis Brown and Farb, Liotti would not be able to

"point out that, as a Dean of Students, [Alvis] *26 Brown may have had an obligation to report to the proper School Board authorities any improprieties he observed on the part of principal James Brown." (Plaintiffs' Proposed Findings at 13). However, they fail to point out how Alvis Brown's hypothesized failure would be relevant to Farb's discrimination, infliction of emotional distress, or tortious interference claims.

This is not the kind of situation in which New York courts have found a conflict of interest based on simultaneous representation. Those cases tend to involve circumstances in which one client might assert a claim against the other client or in which recovery of one client is at the expense of recovery of another. For example, in Ferrara v. Jordache Enters. Inc., 819 N.Y.S.2d 421 (N.Y. Sup. Ct. 2006), the court disqualified an attorney from representing both the driver of a bus that was in an traffic accident and the matron on the bus. The court noted that dual driver-passenger representation is prohibited because it is likely that the passenger will interpose counterclaims against the driver, thus pitting the two clients against each other. See id. at 771. Here, however, Farb asserted no claim against Alvis Brown, nor did he against her. Indeed, there was no place for a claim against Alvis Brown in her suit, which complained only about conduct of her supervisors. (Tr. 212). Nor would Farb's recovery in her suit limit Alvis Brown's potential for recovery in his. Indeed, Farb and Alvis Brown each recovered damages against the School District. In short, it was in the mutual interest of each to support one another's claims.

Finally, plaintiffs have not identified any confidences revealed by either client that adversely affected the other. See Cardinale v. Golinello, 43 N.Y.2d 288, 295 (1977); see also Muriel Seibert Co. v. Intuit Inc., 820 N.Y.S.2d 54, 55 (App. Div. 2006) (noting that the party charging an attorney with disclosure of confidential information must identify the specific confidential information imparted to the attorney).

27   Therefore, Liotti's representation of both Farb and Alvis Brown does not *27 constitute good cause for termination.

## IV.   Liotti Has Not Demonstrated Spoliation

Liotti asserts in his papers that plaintiffs spoliated evidence when they took Liotti's case file on the Farb matter. (See Liotti's Proposed Findings at 7; Reply at 5-6). Specifically, he asserts that the "integrity" of the file was lost when it was removed by Newman without consent and later was turned over to trial counsel Ostrove and "spread throughout approximately five (5) trunk boxes of documents." (Reply at 5; see also Liotti's Proposed Findings at 7). He asks that the Court infer from such conduct that the file would have assisted him in meeting his burden of proof.[11] (Reply at 5).

> [11]   In an earlier submission, Liotti suggested that a preclusion order should be entered as a sanction for the alleged spoliation. See Letter to Magistrate Judge E. Thomas Boyle dated February 7, 2011 ("Feb. 7, 2011 Letter"), at 1, Farb v. Baldwin Union Free School Dist., No. 05-CV-0596 (Feb. 7, 2011), ECF No. 207. He did not, however, identify what was to be precluded from the hearing regarding his asserted right to attorneys' fees.

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted). To establish a spoliation claim a party must show " (1) that `the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed'; (2) that the evidence was `destroyed with a culpable state of mind'; and (3) that the destroyed evidence was `relevant' to the party's claim or defense." Centrifugal Force, Inc.

v. Softnet Comm'n, Inc., ___ F. Supp. 2d ___, 2011 WL 1792047, at *2 (May 11, 2011) (quoting Byrnie, 243 F.3d at 107-09).

Liotti has failed to establish that evidence was spoliated. Liotti complains merely that the integrity of his file was compromised. (See, e.g., Tr. 93). Although in previous submissions to the

28   *28 Court he has suggested that parts of the file may have been destroyed (see Feb. 7, 2011 Letter at 1 ("The improper withholding of a copy of my file and the damage done to its integrity, including its mutilation, dismemberment and/or destruction severely prejudice me. . . .")), he no longer seems to be asserting that claim. In any event, even if he continued to assert that parts of the file were destroyed or altered, he has not proved this allegation. Rather, it is clear that he declined the opportunity to inspect the five boxes in the possession of plaintiffs' trial counsel, Ostrove, among which his papers were apparently spread. (Tr. 93; see also Liotti's Proposed Findings at 7; Reply at 5). Moreover, Liotti has neither alleged nor shown that any putative destruction was accomplished "with a culpable state of mind." Thus, other than Liotti's conclusory assertions, there is nothing before the Court that would support a finding that plaintiffs spoliated evidence. Lastly, there is no evidence that the records in Liotti's file would be any assistance to him on the issue of termination for cause involving Ansell. Accordingly, there is no showing of prejudice.

## CONCLUSION

For the foregoing reasons, Thomas F. Liotti's Motion for Attorneys' Fees is DENIED. Liotti's request for sanctions, based on plaintiffs' opposition of his application, is also DENIED.

## SO ORDERED:

http://decisions.courts.state.ny.us/10jd/nassau/decisions/index/index_new/lally/2008may/005195-06.pdf. This state court action likely is the source of the Ansell affidavit dated January 17, 2006,

1   submitted by Liotti with his Reply papers and        discussed above. *1

casetext

# EXHIBIT "B"

 casetext

17-2758
UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

# Holcombe v. Matsiborchuk

Decided Aug 29, 2018

17-2758

08-29-2018

Fougere Holcombe, Plaintiff-Appellee, v. Vladimir Matsiborchuk, Interested Party-Appellant, US Airways Group, Inc., US Airways, Inc., (US Airways), International Association of Machinists and Aerospace Workers, Loretta Bove, Beth Holdren, Defendants.

FOR PLAINTIFF-APPELLEE: RAYMOND NARDO, Law Office of Raymond Nardo, Mineola, NY. FOR INTERESTED PARTY-APPELLANT: VLADIMIR MATSIBORCHUK, pro se, New York, NY.

FOR THE COURT: Catherine O'Hagan Wolfe, Clerk of Court

**SUMMARY ORDER RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

**At a stated term of the United States Court of Appeals for the Second Circuit**, held at the **Thurgood Marshall United States Courthouse**, **40 Foley Square**, in the City of New York, on the **29th** day of August, **two thousand eighteen. PRESENT: BARRINGTON D. PARKER, PETER W. HALL, RAYMOND J. LOHIER, JR.,** *Circuit Judges.*

## FOR PLAINTIFF-APPELLEE:

RAYMOND NARDO, Law Office of Raymond Nardo, Mineola, NY. *2

## FOR INTERESTED PARTY-APPELLANT:

VLADIMIR MATSIBORCHUK, *pro se*, New York, NY.

Appeal from an order of the United States District Court for the Eastern District of New York (Townes, J.; Orenstein, M.J.).

**UPON DUE CONSIDERATION**, **IT IS HEREBY ORDERED**, **ADJUDGED**, **AND DECREED** that the order of the district court is **AFFIRMED.**

Fougere Holcombe retained an attorney, Appellant Vladimir Matsiborchuk, to represent her in a disability discrimination lawsuit against her former employer. After six years, Holcombe retained a new attorney. Matsiborchuk moved for fees and costs, and Holcombe moved to extinguish his lien. The district court determined that Holcombe had discharged Matsiborchuk for cause and extinguished his lien. Matsiborchuk, proceeding *pro se*, appeals. We assume the parties'

familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review a district court's decisions on attorney's fees for abuse of discretion. *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009). "A court abuses its discretion when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Id.* (citation and internal quotation marks omitted).

The district court did not abuse its discretion by granting Holcombe's motion to extinguish Matsiborchuk's retaining lien and to deny Matsiborchuk's motion for attorney's fees. Under New York law, a client may discharge her attorney at any time, with or without cause. *Garcia v. Teitler*, *3 443 F.3d 202, 211 (2d Cir. 2006); Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 614 (N.Y. 1990). When a client discharges her attorney for cause, "the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement." *Id.* When the discharge is without cause, the attorney may recover fees on a quantum meruit basis. *Id.* "Poor client relations, differences of opinion, or personality conflicts do not amount to cause . . . ." *Garcia*, 443 F.3d at 212. But "impropriety or misconduct on the part of the attorney," *id.*, or the violation of a disciplinary rule is sufficient to show just cause, *Schultz v. Hughes*, 971 N.Y.S.2d 536, 538 (2d Dep't 2013); *see also Klein v. Eubank*, 663 N.E.2d 599, 601 (N.Y. 1996) (attorneys may retain liens where their representation terminated and "there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney"). Improper threats to withdraw from representation or verbal abuse of a client can constitute misconduct. *See Brooks v. Lewin*, 853 N.Y.S.2d

286, 288 (1st Dep't 2008) (finding that attorney committed misconduct by threatening to withdraw from representation if client did not sign new retainer giving attorney additional compensation); *Matter of Heller*, 607 N.Y.S.2d 305, 308 (1st Dep't 1994) (suspending attorney for 5 years for verbally abusing clients, threatening them with harsh consequences if they discharged him, and failing to return unearned fees).

Here, the district court applied the correct legal standards. Although the district court relied primarily on non-binding authority to guide its examination of whether Holcombe discharged Matsiborchuk for cause, there was no error. The district court was correct that attorney misconduct, which includes the verbal abuse of a client or improper threats to withdraw, is sufficient to extinguish a lien. *4

Further, the district court's factual findings were not clearly erroneous. Holcombe testified, and documentary evidence corroborated, that Matsiborchuk was hostile and used insults such as "stupid" or "inept." He told Holcombe to obtain a law guardian or transfer her power of attorney because she was incapable of "functioning" in the case. Further, the evidence showed that Matsiborchuk sought to control the amount of her settlement demand and improperly threatened to withdraw from representing her in an attempt to control her decisions in the case.

Matsiborchuk argues that his suggestion that Holcombe obtain a law guardian or transfer her power of attorney and his threat to withdraw from the representation were not abusive, but rather ethical and proper. As the district court observed, however, the suggestion that Holcombe obtain a law guardian was made in an effort to force Holcombe to agree to his instructions or to give her power of attorney to someone more likely to be compliant. Moreover, while some of Matsiborchuk's threats to withdraw were based on

the breakdown in communication, he also
threatened to withdraw to force Holcombe to give
him complete control over settlement.

Matsiborchuk argues that he did not interfere with
Holcombe's right to accept a specific settlement
offer and that he had merely expressed his legal
opinion on the value of her damages. Even if a
general threat to dictate a settlement demand is not
misconduct, Matsiborchuk's other violations,
particularly his abuse and improper threats to
withdraw, do constitute misconduct. *See Brooks*,
853 N.Y.S.2d at 288; *Heller*, 607 N.Y.S.2d at 308.

Matsiborchuk's arguments that the magistrate
judge and district court violated his due process
rights are meritless. The magistrate judge did not
prevent him from testifying. Matsiborchuk never
said that he intended to testify, and he responded
that he did not have any witnesses when asked by
the magistrate judge. He asserts the magistrate
judge improperly ended *5 his cross-examination
for "laughing" at Holcombe, stating he did not
actually laugh at her. The transcript shows,
however, that Matsiborchuk said "I'm laughing
because I don't understand."

Nor did the magistrate judge improperly exclude
evidence of Holcombe's relationships with her
prior attorneys. To the extent he challenges an
evidentiary ruling, this argument is meritless. The
magistrate judge did not abuse his discretion by
excluding an exhibit that Matsiborchuk referred to
as a list of attorneys, that was actually a collection
of various letters and motions to withdraw by
Holcombe's prior attorneys and a complaint
Holcombe filed against one of those attorneys. *See
United States v. Vayner*, 769 F.3d 125, 129 (2d Cir.
2014) (evidence must be authentic, and
authenticity is determined by seeing if "the item is
what the proponent claims it is." (quoting Fed. R.
Evid. 901(a))); *Cameron v. City of New York*, 598

F.3d 50, 61 (2d Cir. 2010) (reviewing evidentiary
rulings for abuse of discretion). Insofar as
Matsiborchuk argues it was error for the district
court not to address his argument that Holcombe
had a history of being a poor client, the district
court addressed the issue of Holcombe's behavior
as a client and noted that Matsiborchuk could have
moved to withdraw.

Matsiborchuk also argues that the magistrate judge
improperly acted as a corroborating witness and
inappropriately answered for Holcombe when she
was being cross-examined. The magistrate judge's
observation that Matsiborchuk's demeanor during
the hearing was "combative" and "intimidating,"
corroborating Holcombe's testimony to that effect,
was neither improper nor clearly erroneous
because other evidence supported the magistrate
judge's finding that Holcombe was credible and
Matsiborchuk was abusive. *Cf. Anderson v. City of
Bessemer City*, 470 U.S. 564, 573 (1985) (a
finding is clearly erroneous when the reviewing
court "is left with the definite and firm conviction
that a mistake has been committed" (citation and
internal quotation marks *6 omitted)). Further, the
magistrate judge did not "answer" for Holcombe;
he merely clarified whether Matsiborchuk had
referred to a certain exhibit when Holcombe did
not understand a question.

We have considered all of Matsiborchuk's
remaining arguments and find them to be without
merit. For the foregoing reasons, the order of the
district court is **AFFIRMED.**

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court



# EXHIBIT "C"

1:17-CV-34 (FJS/DEP)

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK

# Stern v. Westerman Ball Ederer Miller & Sharfstein, LLP

Decided Jul 24, 2017

1:17-CV-34 (FJS/DEP)

07-24-2017

JOSEPH STERN, SHAUL STERN, SHIMSON STERN, YOCHEVED KUSHNER, LAW OFFICE OF RICHARD B. ANCOWITZ, and LAW OFFICE OF SANFORD ROSENBLUM, Plaintiffs, v. WESTERMAN BALL EDERER MILLER & SHARFSTEIN, LLP; NITSANA DARSHAN-LEITNER & ASSOCIATES, a/k/a Nitsana Darshan-Leitner & Co.; MINTZ LEVIN, LLP; MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.; and ROBERT TOLCHIN, Defendants.

APPEARANCES LAW OFFICE OF RICHARD B. ANCOWITZ 115 Great Oaks Boulevard Albany, New York 12203 Attorneys for Plaintiffs ROSENBLUM & PARTNERS, LLP 110 Great Oaks Boulevard Western Avenue at the Northway Albany, New York 12203 Attorneys for Plaintiffs WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP 1201 RXR Plaza Uniondale, New York 11556 Attorneys for Defendant Westerman Ball Ederer Miller Zucker & Sharfstein, LLP MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C. The Chrysler Center 666 Third Avenue New York, New York 10017 Attorneys for Defendants Mintz Levin, LLP and Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. THE BERKMAN LAW OFFICE, LLC 111 Livingston Street Brooklyn, New York 11230 Attorneys for Defendant Robert Tolchin OF COUNSEL RICHARD B. ANCOWITZ, ESQ. SANFORD ROSENBLUM, ESQ. LAURA A. GILLEN, ESQ JEFFREY A. MILLER, ESQ. DOMINIC J. PICCA, ESQ. ROBERT J. TOLCHIN, ESQ.

SCULLIN, Senior Judge

## APPEARANCES

**LAW OFFICE OF RICHARD B. ANCOWITZ**

115 Great Oaks Boulevard

Albany, New York 12203

Attorneys for Plaintiffs **ROSENBLUM & PARTNERS**, **LLP**

110 Great Oaks Boulevard

Western Avenue at the Northway

Albany, New York 12203

Attorneys for Plaintiffs **WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN**, **LLP**

1201 RXR Plaza

Uniondale, New York 11556

Attorneys for Defendant Westerman Ball Ederer Miller Zucker & Sharfstein, LLP **MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO**, **P.C.**

The Chrysler Center

666 Third Avenue

New York, New York 10017

Attorneys for Defendants Mintz Levin, LLP and Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

**THE BERKMAN LAW OFFICE**, **LLC**

111 Livingston Street

Brooklyn, New York 11230

Attorneys for Defendant Robert Tolchin

## OF COUNSEL



**RICHARD B. ANCOWITZ**, **ESQ.** **SANFORD**
[2] **ROSENBLUM**, **ESQ.** *2 **LAURA A. GILLEN**,
**ESQ**

**JEFFREY A. MILLER**, **ESQ.** **DOMINIC J.**
**PICCA**, **ESQ.** **ROBERT J. TOLCHIN**, **ESQ.**
**SCULLIN**, **Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Pending before the Court is Magistrate Judge Peebles' Report and Recommendation, in which he recommended that the Court grant Plaintiffs' motion to remand, *see* Dkt. No. 12, and deny Defendant Tolchin's motion to transfer venue, *see* Dkt. No. 5, as moot, *see* Dkt. No. 37. Only Defendant Tolchin submitted objections to these recommendations. *See* Dkt. No. 38.

## II. BACKGROUND

Plaintiffs in this action seek guidance regarding entitlement to attorney's fees related to various lawyers' efforts to litigate and enforce a judgment
[3] against the Republic of Iran for *3 damages, pursuant to the Foreign Sovereign Immunities Act, ("FSIA") of 1976, 28 U.S.C. §§ 1602-1611, resulting from the death of Leah Stern in 1997 during a terrorist attack. Largely due to a recently enacted statute, Plaintiffs have now recovered more than $1,000,000 from a fund established to compensate victims of terrorist acts. *See* Justice for United States Victims of State Sponsored Terrorism Act ("VSST"), 42 U.S.C. § 10609. Under the VSST, attorneys representing victims eligible for compensation from the fund are entitled to charge a fee of up to twenty-five percent of the amount recovered. It is the recovery of this attorney's fee that forms the basis for the instant dispute.

The tragic event giving rise to this lawsuit occurred nearly 20 years ago when Leah Stern was killed in a terrorist bombing in a market in Jerusalem, Israel on July 30, 1997. In response, Plaintiffs[1] filed a wrongful death and personal

injury action against the Republic of Iran. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003). To that end, Plaintiffs retained a law firm, Westerman Ball Ederer Miller & Sharfstein, LLP ("Westerman"), which engaged Nitsana Darshan-Leitner & Associates ("Darshan-Leitner"), an Israeli law firm, to help it litigate Plaintiffs' claim. *See* Dkt. No. 12-5 at ¶ 9. In the underlying lawsuit, the Republic of Iran and the other defendants "failed to answer or enter an appearance"; and, thus, "the Court on February 13, 2002, pursuant to 28 U.S.C. § 1608(e) and Fed. R. Civ. P. 55(a)" entered default in Plaintiffs' favor. *Stern*, 271 F. Supp. 2d at 288.

> [1] Plaintiffs to the current action include several members of Leah Stern's family and their current attorneys. When used alone, the term "Plaintiffs" refers to Leah Stern's family, not their attorneys.

Despite the defendants' apparent willful default, to prevail, Plaintiffs had to "establish [their] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). Therefore, Plaintiffs submitted affidavits and evidence that compelled
[4] the court to award *4 Plaintiffs $13,000,000 in compensatory damages and $300,000,000 in punitive damages. *See Stern*, 271 F. Supp. 2d at 302. (hereinafter referred to as the "FSIA judgement")

In or around November 2003, Defendant Westerman withdrew from representation of Plaintiffs after certain conflicts of interest between Defendants Darshan-Leitner and Westerman surfaced and could not be resolved. *See* Dkt. No. 2 at ¶¶ 39-41. Thereafter, the FSIA judgment languished for a period of nearly five years. *See id.* at ¶ 45.

Then, in May 2008, Plaintiffs retained Defendant Darshan-Leitner and the law firm Jaroslawicz and Jaros, to provide legal services to enforce their unsatisfied judgment against UBS AG, a multinational bank that purportedly provided funds to Iran and Saddam Hussein. *See id.* at ¶¶

45, 46; *see also Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013). Defendant Tolchin signed the retainer agreement on behalf of Jaroslawicz and Jaros. *See* Dkt. No. 2 at ¶ 47. Ultimately, Defendants Darshan-Leitner and Tolchin's attempt to collect the debt was unsuccessful. *See id.* at ¶ 51.

According to Plaintiffs, the only activity they authorized Defendant Tolchin to complete on their behalf was to litigate the above-mentioned case against UBS AG. *See id.* at ¶ 49. Nonetheless, Plaintiffs contend that Defendant Tolchin attempted to serve the FSIA judgment on the Republic of Iran pursuant to 28 U.S.C. § 1608(e). *See id.* at ¶ 54. However, Plaintiffs assert that Defendant Tolchin did so incorrectly. *See id.*

Thereafter, on April 2, 2015, Plaintiffs retained Kreindler & Kreindler, LLP and Silverman Law Firm as their attorneys to help them collect on the FSIA judgment. *See id.* at ¶ 52. These firms then engaged the Perles Firm to assist them.[2] *See id.* at

5   ¶ 53. The Perles Firm *5 "then re-served the 2003 judgment upon the judgment-debtor Republic of Iran and related defendants in that action, given that the prior service of same by [Defendant Tolchin] had been done incorrectly." *See id.* at ¶ 54. Plaintiffs subsequently discharged Kreindler & Kreindler, LLP and Silverman Law Firm in June 2016. *See id.* at ¶ 61. Plaintiffs, then retained the Plaintiff law firms, Law Office of Richard B. Ancowitz ("Ancowitz") and Rosenblum & Partners, LLP ("Rosenblum"), to represent them. *See id.* at ¶ 57.

> [2] Kreindler & Kreindler, LLP, Silverman Law Firm, and Perles Law Firm were all named as defendants in Plaintiffs' complaint but have been dismissed from this action by stipulation. *See* Dkt. No. 19.

In the meantime, the VSST was enacted into law on December 18, 2015, "which set up a special fund designed to compensate the victims of State Sponsored (*i.e.*, Iranian) terrorism." *See id.* at ¶ 67 (citing 42 U.S.C. § 10609). On October 6, 2016,

Plaintiffs, through their newly retained counsel, applied for compensation through the VSST. *See id.* at ¶ 85. Plaintiffs have recovered more than $1,000,000 from the fund. *See* Dkt. No. 37 at 2.

As recounted above, the VSST allows attorneys to charge up to twenty-five percent of the amount recovered as a fee. Plaintiffs initiated this action in New York Supreme Court, Albany County, on December 14, 2016, to determine to whom that fee should be distributed. Generally, Plaintiffs argue that the Court should bar their previous attorneys, Defendants in this action, from receiving any fee in connection with their work. In that regard, Plaintiffs make various arguments for why Defendants should not prevail, each of which is animated in large part by New York Judiciary Law § 475, because the fundamental issue in this case is whether Defendants have a valid lien on Plaintiffs' recovery.

Defendant Tolchin removed the matter to this District on January 10, 2017. *See* Dkt. No. 1. Thereafter, on January 12, 2017, Defendant Tolchin filed a motion seeking to transfer this action to the United States District Court for the District of Colombia. *See* Dkt. No. 5. On *6 January 18, 2017, Plaintiffs moved for an order remanding the action to New York Supreme Court. *See* Dkt. No. 12.

The Court referred the motion to remand to Magistrate Judge Peebles, who also considered the motion to change venue. *See* Dkt. No. 37. Magistrate Judge Peebles recommended that the Court grant Plaintiffs' motion to remand on the ground that the parties' dispute did not present a federal question and consequently recommended that the Court deny Defendant's motion to transfer venue as moot. *See* Dkt. No. 37. Defendant Tolchin filed objections only with respect to Magistrate Judge Peebles' recommendation that this Court remand the case to state court for lack of subject matter jurisdiction. *See* Dkt. No. 38.

## III. DISCUSSION

## A. Standard of review

When a party submits a timely objection to a report and recommendation, the court will review the parts of the report and recommendation to which the party objects under a *de novo* standard of review. *See* 28 U.S.C. § 636(b)(1)(C) (stating that "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made"); *see also* Fed. R. Civ. P. 72(b)(3) (stating that "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to"). In reviewing a report and recommendation, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (C).

On the other hand, where none of the parties have filed a timely objection, a district court need only find that "there is no clear error on the face of the record" to accept a magistrate *7 judge's report and recommendation. *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985) (citation omitted); *see also Mario v. P & C Food Mkts*., *Inc*., 313 F.3d 758, 766 (2d Cir. 2002) (stating that, "[w]here parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision" (citing *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)).

## B. Plaintiffs' motion to remand

### 1. Removal was procedurally proper

Magistrate Judge Peebles initially found that Defendant Tolchin properly removed this case to federal court despite lacking Defendant Dashan-Leitner's consent because Defendant Darshan-Leitner was not properly served. *See generally* Dkt. No. 37 at 11-15. The parties do not object to Magistrate Judge Peebles' recommendation, and the Court has not identified an error in his

analysis. Therefore, the Court accepts Magistrate Judge Peebles' recommendation that removal was procedurally proper.

### 2. Federal question jurisdiction was lacking

### a. Magistrate Judge Peebles' reasoning

After laying the framework for federal question jurisdiction, Magistrate Judge Peebles first determined that Plaintiffs' "claims arise out of a dispute among the various attorneys that currently or previously served as counsel for the Stern Family." *See* Dkt. No. 37 at 17 (citation omitted). More specifically, Magistrate Judge Peebles concluded that "the attorneys disagree with respect to the apportionment of any attorney's fees for work performed pursuant to the *8 retainer agreements entered into between them and the Stern Family, and whether the Stern Family's failure to compensate their lawyers gives rise to a charging lien under New York Judiciary Law § 475." *See id*. (citation and footnote omitted). Thus, Magistrate Judge Peebles determined that Plaintiffs' "claims implicate New York State law principles of contract and charging liens and do not arise under federal law." *See id*. at 18 (footnote omitted).

Nevertheless, Magistrate Judge Peebles recognized that "[f]ederal question jurisdiction may 'also extend[, however,] to state-law claims that "turn on substantial questions of federal law."'" *See id*. (quotation omitted). In that regard, "'the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *See id*. (quoting *Grable & Sons Metal Prod*., *Inc*., 545 U.S. at 314) (other citation omitted).

Magistrate Judge Peebles' analysis with respect to whether the complaint raised a substantial federal question follows. The Court has reproduced it in

its entirety because it forms the basis for Defendant Tolchin's objections.

In this case, plaintiffs' complaint asks the court to determine the parties' rights to the distribution of the funds anticipated to be received by the Stern Family pursuant to the USVSST. Dkt. No. 2 at 16-17. To render such a determination, a court must examine the conduct of the parties with respect to obtaining the [FSIA judgement]. *Id*. at 16-17. Plaintiffs' complaint alleges that all defendants, with the exception of defendant Perles, are not entitled to a charging lien or fee because of their "misconduct and/or ethical violations[.]" *Id*. at 17-18. In addition, plaintiffs contends [sic] that, except for defendant Perles, defendants did "not obtain a 'final order' on behalf of the [Stern Family]" in light of the defendants' failure (specifically defendant Tolchin's) to properly serve the judgment upon the Republic of Iran. *Id*. at 14. Although plaintiffs' complaint does not cite legal authority for their allegation that defendant Tolchin failed to properly serve the Republic of Iran, defendants contend the provision on which plaintiffs rely for this proposition is 28 U.S.C. § 1608(e). Dkt. No. 21 at 9. Plaintiffs do not explicitly dispute defendants' contention. Dkt. No. 27 at 3. Plaintiffs do, however, maintain that the primary authority on which they rely in

9    *9

contending that defendants are not entitled to a charging lien is defendants' alleged violations of the New York Rules of Professional Conduct. *See id*. at 2-4 (accusing defendants of violating Rules 1.1, 1.16, and 7.3 of the New York Rules of Professional Conduct).

Based on my review of plaintiffs' complaint and the parties' submissions, I am inclined to agree with plaintiffs that this matter does not raise a substantial federal question. Though it is true that one of the allegations in plaintiffs' complaint involves an accusation that defendant Tolchin failed to properly serve Judge Lamberth's judgment upon the Republic of Iran, and, therefore, did not obtain a final order on behalf of the Stern Family pursuant to 28 U.S.C. § 1608(e), I agree with plaintiffs that the thrust of their complaint accuses defendants, albeit vaguely, of ethical misconduct that, in turn, breached their obligations to the Stern Family under the respective retainer agreements. For example, in their complaint, plaintiffs accuse defendant Darshan-Leitner of "improperly solicit[ing] the Stern family to sign a retainer with [defendant] WESTERMAN[.]" Dkt. No. 2 at 7. Defendants Darshan-Leitner and Westerman are also accused of abandoning the Stern Family. *Id*. at 7, 9. In addition, plaintiffs accuse all defendants of breaching their fiduciary responsibilities to the Stern Family and pursuing their own self-interests above their clients'. *Id*. at 12. These concerns, as described in plaintiffs' complaint, do not implicate substantial federal questions. Rather, they involve questions of state law that arise either under the retainer agreements entered into between defendants and the Stern Family or the code of ethics governing attorney

practice. While the parties may dispute whether the laws of New York State or District of Columbia govern, the questions of attorney liens and recovery under retainer agreements are matters of local concern over which federal courts have little or no interest.

*See id.* at 19-21. Accordingly, Magistrate Judge Peebles "recommend[ed] a finding that defendants have failed to carry their burden of establishing that the court possesses subject matter jurisdiction over plaintiffs' claims, and that the matter was therefore improperly removed to this court." *See id.* at 21. *10

#### b. Details of Defendant Tolchin's [3] objections

[3] When used alone, the term "Defendant" refers exclusively to Defendant Tolchin for the remainder of this Memorandum-Decision and Order.

Initially, Defendant contends that "[t]his fee dispute could have -- and should have -- been initiated as a motion in the underlying case in federal court in the District of Columbia." *See* Dkt. No. 38 at 7. However, Plaintiffs instead chose to sue "in New York State Supreme Court, Albany County, which has absolutely no connection to this litigation." *See id.* at 7-8. Indeed, according to Defendant, "the *only* connection between this dispute and Albany County is that plaintiffs' new counsel -- who did an infinitesimally small amount of work -- maintain their office there." *See id.* at 8.

With regard to the current litigation, Defendant states that Plaintiffs' major contention is that the Defendant law firms are not entitled to part of the forthcoming attorney's fee because

[n]o attorney's lien can result where the attorney has not obtained a "final order" on behalf of the client. No final order was obtained here, as in order to be deemed a final order, the order must be properly served upon the defendants, Islamic Republic of Iran. This was not properly done by any defendant until done by the PERLES firm in 2016.

*See id.* at 9-10 (citing Dkt. No. 2 ¶¶ 81-84 (paragraph breaks omitted)). Thus, Defendant argues that Plaintiffs' complaint "ask[s] . . . whether a judgment obtained under the FSIA is 'final' if it has not been 'properly served' on the foreign state defendant." *See id.* at 10. In that vein, Defendant asserts that "plaintiffs are relying upon 28 U.S.C. § 1608(e), which states, in pertinent part: 'A copy of any . . . default judgment *shall be sent* to the foreign state or political subdivision in the manner prescribed for service in this section.'" *See id.* (quoting 28 U.S.C. § 1608(e)). In short, the federal question in this case is the proper application and *11 interpretation of 28 U.S.C. § 1608(e), which, according to Defendant, "is a substantial federal issue that deserves -- and is entitled -- to be resolved in a federal forum." *See id.* at 11.

Agreeing with Magistrate Judge Peebles, Defendant asserts that "'federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress[.]'" *See id.* at 12 (quoting *N.Y. ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016)). Defendant contends that Magistrate Judge Peebles only identified the third factor, substantiality, as posing a problem in this case. *See id.* As to the other three factors, Defendant relies on his opposition to the motion to remand, *see* Dkt. No. 21, and Magistrate Judge Peebles' "implicit[]" finding that the proper application and interpretation of 28 U.S.C. § 1608(e) "has been

necessarily (that is, unavoidably) raised, actually disputed, and capable of resolution without undermining principles of federalism," see Dkt. No. 38 at 12-13.

As to the substantiality prong, Defendant argues that "the proper interpretation and application of § 1608(e) -- 'implicates 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum[.]'" See id. at 13 (quoting Jacobson, 824 F.3d at 316 (quoting Grable, 545 U.S. at 313)). Defendant asserts that "28 U.S.C. § 1608(e) is a significant part of the FSIA, a federal statute governing civil litigation against foreign states." See id. FSIA, according to Defendant, raises significant issues related to "international comity, sovereignty, and the conduct of foreign relations[,]" which are all federal issues. See id. Defendant contends that the "federal government undoubtedly has a serious federal interest in the uniform interpretation and application of the FSIA, solicitous of the federal policies that animate it." See id. *12

Moreover, Defendant argues that, "[e]ven if [Magistrate] Judge Peebles was correct in asserting that the state law issues in this case predominate over the federal ones, his conclusion that the federal issue is thus insubstantial was erroneous." See id. at 14 (footnote omitted). Rather, Defendant contends that "the case law makes clear that a federal issue may be held adequately 'substantial' for removal purposes even if it is plainly subordinate to state-law issues." See id.

In that regard, Defendant first describes Grable, which involved a suit under state law to quiet title. See id. Defendant states that, in Grable, the plaintiff argued that the defendant did not purchase the property from a bona fide owner. See id. The defendant then removed the case, "arguing that the plaintiffs' case turned 'on the interpretation of [a] notice statute in federal tax law.'" See id. (quoting Grable, 545 U.S. at 311). The court upheld the district court's removal jurisdiction,

"finding the federal interest in resolution of the tax questions adequately substantial." See id. (citing Grable, 545 U.S. at 312-14).

Defendant asserts that this case is similar to Grable in important respects. Defendant argues that, here, "plaintiffs purport to state a claim under state law for the extinguishment of the liens of various attorneys and to apportion the award of attorney's fees." See id. However, according to Defendant, "their argument turns 'on the interpretation of [a] notice statute in the [FSIA].'" See id. (quoting Grable, 545 U.S. at 311) (citing 28 U.S.C. § 1608(e) (requiring that a default judgment entered under the FSIA "be sent to the foreign state" so that such state will have notice of the judgment) (footnote omitted)).

Furthermore, Defendant asserts that the Second Circuit, in Jacobson, "affirmed the district court's exercise of jurisdiction, giving not a moment's thought to the predominance, vel non, of the federal issue." See id. (citing Jacobson, 824 F.3d at 310). Instead, Defendant *13 contends that "the Second Circuit analyzed only the significance of the federal interest in the resolution of questions pertaining to pertinent sections of the tax code. It did not consider the substantiality of that interest in the context of the litigation." See id. Defendant additionally cites NASDAQ OMX Grp. v. UBS Sec., 770 F.3d 1010 (2d Cir. 2014), for the proposition that a substantial federal issue need only be present in one of the putative claims. See id. (citing NASDAQ, 770 F.3d at 1020).

In addition, Defendant contends that the most important issue in this case will, in fact, be whether he properly served notice of the judgment on Iran. See id. at 16-17. In that sense, Defendant asserts that "the only specific and arguably plausible actionable allegations that the plaintiffs assert against [him] are 1) [his] alleged failure to serve the underlying judgment on Iran in accord with 28 U.S.C. § 1608(e), and 2) [his] insistence, consistent with New York law, that the plaintiffs acknowledge an attorney's lien prior to his sharing

with them his case file." *See id*. at 18 (citing Dkt. No. 2 at 11-12; *Rivkin v. A.J. Hollander & Co*., No. 95CIV.9314, 1996 WL 633217, *5 (S.D.N.Y. Nov. 1, 1996)). According to Defendant, both of these issues turn largely on his alleged failure to comply with § 1608(e). *See id*. Thus, Defendant argues that, "far from the state law issues predominating over the federal ones, the federal issue effectively amounts to the plaintiffs' entire case against [him]." *See id*.

Finally, Defendant argues that the well-pleaded complaint rule is not applied in the same fashion in an action, such as this, for declaratory judgement. *See id*. at 19. Rather, Defendant asserts that "a court attempting to determine federal jurisdiction does not start with the complaint, but must rather realign the claims and consider whether hypothetical claims brought by the party adverse to the declaratory judgment would arise under federal law." *See id*. (citing *NASDAQ*, 770 F.3d at 1018). Defendant, thus, avers that a coercive action would be stated under *14 federal law for three reasons. *See id*. First, because if he were to file a motion for fees, he would do so in the United States District Court for the District of Columbia. *See id*. Second, that any coercive action would depend on the VSST because it places a cap on attorney's fees. *See id*. at 20 (citing 42 U.S.C. § 10609). Third, that because the only non-frivolous action against Defendants in this case rests on the interpretation of 28 U.S.C. § 1608(e), he would state his claim in terms that establish compliance with the requirements of FSIA. *See id*.

### c. Analysis

Federal district courts have "original jurisdiction" over civil actions "arising under" federal law. 28 U.S.C. § 1331. District courts also have removal jurisdiction over "any civil action brought in a State court of which the district courts of the United States have original jurisdiction[.]" 28 U.S.C. § 1441(a). "'[F]ederal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law . . . .'" *N.Y.*

*ex rel. Jacobson v. Wels Fargo Nat'l Bank*, *N.A*., 824 F.3d 308, 317 (2d Cir. 2016) (quoting *Grable*, 545 U.S. at 312, 125 S. Ct. 2363). As Magistrate Judge Peebles found, and Defendant concedes, federal law did not create the instant cause of action, which, at its heart, is a dispute regarding charging liens, retainer agreements, and the rules of professional conduct.

However, in a "'special and small category'" of cases, federal-question jurisdiction will also "lie over state-law claims that implicate significant federal issues." *Id*. (quotations omitted). Nonetheless, "the Supreme Court has been sparing in recognizing state law claims fitting this criterion." *NASDAQ OMX Grp. v. UBS Sec*., 770 F.3d 1010, 1019 (2d Cir. 2014) (citation omitted).

*15

In that regard, the Supreme Court has articulated a four-factor test: "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." G*unn v. Minton*, 568 U.S. 251, 258 (2013). Accordingly, a state law claim may only serve as the basis for federal-question jurisdiction if "all four of these requirements are met . . . ." *Id*.

With respect to the first factor, "[a] state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law." *Jacobson*, 824 F.3d at 315 (quoting *Grable*, 545 U.S. at 314, 125 S. Ct. 2363). However, this first element is not present where "'all [of the plaintiff's] claims s[eek] relief under state law and none necessarily raise[s] a federal issue.'" *Id*. at 316 (quoting *Merrill Lynch*, *Pierce*, *Fenner & Smith Inc. v. Manning*, ___ U.S. ___, 136 S. Ct. 1562, 1575, 194 L. Ed. 2d 671 (2016)).

With respect to the second factor, "the 'actually disputed' factor of the test is satisfied when the federal issue is 'the only' or 'the central' point in

dispute." *Id.* (quoting *Grable*, 545 U.S. at 315, 125 S. Ct. 2363 ("the only"); *Gunn*, 133 S. Ct. at 1065 ("the central")).

With respect to the third factor, to satisfy the "'substantial' federal issue requirement, *i.e.*, to present a legal issue that implicates 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum,'" *id.* (quoting *Grable*, 545 U.S. at 313, 125 S. Ct. 2363),

> it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim "necessarily raise[s]" a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole,

16   *id.* (quoting *Gunn*, 133 S. Ct. at 1066). *16

Finally, the fourth factor, "that the exercise of federal-question jurisdiction over a state law claim not disturb any congressionally approved balance of state and federal judicial responsibilities, focuses principally on the nature of the claim, the traditional forum for such a claim, and the volume of cases that would be affected." *Id.*

In *Jacobson*, the plaintiff sought to remand an action filed under the New York False Claims Act ("NYFCA"), alleging that the defendants had filed fraudulent federal tax forms to claim state and city tax exemptions. *See id.* at 311. The Second Circuit looked to the allegations in the complaint to determine whether the claims necessarily turned on a construction of federal law. *See id.* at 317. In so doing, the Second Circuit held that, "to establish a false statement or record within the meaning of the NYFCA, Jacobson must prove at least that the trusts did not qualify under federal law." *Id.* Thus, the court reasoned that federal jurisdiction was proper because proving a violation of federal law was a necessary component of the plaintiff's right to relief. *See id.*;

*see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, ___ U.S. ___,136 S. Ct. 1562, 1570 (2016) (stating that a typical case is one in which a state-law cause of action is "'brought to enforce' a duty created by [federal law] because the claim's very success depends on giving effect to a federal requirement").

As recounted above, Plaintiffs brought this case to determine who is entitled to a forthcoming award of attorney's fees pursuant to a judgment obtained through the VSST. As Magistrate Judge Peebles and Defendant seem to agree, there is only one arguable basis for finding such jurisdiction. Namely, Defendant contends that, because Plaintiffs accuse him of failing to properly serve the FSIA judgement on the Republic of Iran pursuant to 28 U.S.C. § 1608(e), a substantial federal issue is unavoidably present. This putative federal issue applies, if it does at all, to Defendant Tolchin's contention that he has a valid charging and retaining lien. *17 Therefore, to properly analyze whether there is a federal question in this case, it is necessary to review New York law regarding attorney's liens.

Generally speaking, under New York law "there are three separate and distinct remedies which are available to a discharged attorney to recover the value of his legal services." *Butler, Fitzgerald & Potter v. Gelmin*, 235 A.D.2d 218, 218 (1st Dep't 1997). "The first remedy available to an attorney discharged without cause is . . . a plenary action in quantum meruit seeking a judgment for the reasonable value of the services, which would be enforceable against all of the client's assets." *Id.* at 218-19. A plenary cause of action accrues upon the attorney's discharge. *See id.* at 219 (citation omitted).

"The second remedy available is a charging lien against any judgment or settlement in favor of the client in an action in which the discharged attorney formerly was the attorney of record for the client." *Id.* A "charging lien does not provide for an immediately enforceable judgment against

all assets of the former client." *Id*. Instead, "[a]ll it provides to the discharged attorney is security against a *single* asset of the client, i.e., any judgment or settlement reached in favor of the former client in the action in which the discharged attorney was formerly attorney of record. The charging lien is a statutory remedy codified in Judiciary Law § 475." *Id*. Finally, "[t]he third remedy is the retaining lien, which permits the attorney to retain all of the client's papers and files until all fees are paid." *Id*.

With respect to Defendant's putative charging lien, "the procedure of Judiciary Law § 475 is designed to attach only the specific proceeds of the judgment or settlement in the action where the attorney appeared[.]" *Squitieri v. Squitieri*, 77 A.D.3d 428, 428 (1st Dep't 2010) (citation omitted). In that regard, "the attorney who appears for a party has a lien upon his or her client's . . . judgment or final order in his or her client's favor, **18** and the proceeds thereof in whatever hands *18 they may come[.]" N.Y. Judiciary Law § 475. The plain language of the statute reveals that there are two elements that a party must successfully prove to have a charging lien: (1) that the attorney appeared on behalf of the party; and (2) that the party received a judgment and proceeds in that action. *See*, *e.g.*, *Butler*, 235 A.D.2d at 219.

As recounted above, one of Plaintiffs' grounds for denying Defendant's putative charging lien is "[t]hat [D]efendants [(specifically, Defendant Tolchin)] did not obtain a 'judgment or final order' upon which such a lien could attach." *See* Dkt. No. 2 at ¶ 90. Defendant argues that this necessarily implicates the interplay between 28 U.S.C. § 1608(e) and N.Y. Judiciary Law § 475 because, on the one hand, § 1608(e) requires that a default judgement be served to be final; and, on the other, New York law makes obtaining a final judgment a prerequisite to collecting on a charging lien. At first blush, it would appear that determining whether Defendant has an enforceable lien necessarily implicates federal law, *i.e.*, either Defendant successfully served Iran and thus

obtained a final judgment and consequently a valid lien, or he unsuccessfully served Iran in which case he has nothing.

This conceptualization, however, ignores that New York Judiciary Law § 475 allows attorneys to assert a charging lien on a judgment whether or not they were the attorney who ultimately made that judgment final. *See* N.Y. Judiciary Law § 475; *see also Butler*, 235 A.D.2d at 218. It is axiomatic that the attorney seeking to recover a charging lien need not be the attorney who in fact obtained the judgement; rather, it is enough to show that the attorney worked towards that eventual end. *See Stair v. Calhoun*, 722 F. Supp. 2d 258, 267 (E.D.N.Y. 2010) (stating that, "[u]nder New York law, an attorney who is discharged is statutorily entitled to a charging lien on any monetary recoveries obtained by the former client in the proceedings in which the attorney had rendered legal services" (citing N.Y. Judiciary Law § 475); **19** *Rosewood *19 Apartments Corp. v. Perpignano*, No. 99 Civ. 4226, 2005 WL 1084396, *3 (S.D.N.Y. May 5, 2005) (stating that, to establish a charging lien under § 475, "'there must be asserted a claim which can eventuate in there being proceeds payable to, or assets recoverable by, the client as a result of the efforts of the attorney'" (quotation omitted)). Therefore, 28 U.S.C. § 1608(e) has no bearing on whether Defendant has a charging lien for services he rendered in furtherance of obtaining a final judgment.[4]

---

[4] The same is true with regard to Defendant's putative retaining lien because "[i]t is well settled that an attorney who has been discharged by his client *without cause* may invoke a retaining lien on the client's papers and files in his possession." *Andreiv v. Keller*, 563 N.Y.S.2d 88, 88 (2d Dep't 1990). Thus, a retaining lien effectively materializes automatically after an attorney has been discharged without cause. --------

Nevertheless, and importantly for the present purposes, there are several affirmative defenses upon which a party may rely to defeat a charging or retaining lien. For example, "an attorney who is discharged for cause is not entitled to a fee[.]" *Orendick v. Chiodo*, 272 A.D.2d 901, 902 (4th Dep't 2000) (citations omitted). Moreover, "[p]rior acts or inaction discovered after the substitution [of counsel] which constitute professional misconduct can serve as a basis of a fee forfeiture[.]" *De Luccia v. Vill. of Monroe*, 180 A.D.2d 897, 899 (3d Dep't 1992) (citation omitted); *see also Nassour v. Lutheran Med. Ctr.*, 78 A.D.3d 671, 671-72 (2d Dep't 2010) (stating that, "'[w]here an attorney's representation terminates upon mutual consent, and there has been no misconduct, no discharge for just cause, and no unjustified abandonment by the attorney, the attorney maintains his or her right to enforce the statutory lien'" (quoting *Lansky v. Easow*, 304 A.D.2d 533, 534, 756 N.Y.S.2d 885) (other citations omitted).

Therefore, Plaintiffs' implicit reference to § 1608(e) is relevant insofar as they argue that Defendant is not entitled to a charging or retaining lien because he was incompetent in failing to *20 properly serve the default judgment. *See* N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0, Rule 1.1 "Competence"; *see also* Dkt. No. 27 "Pl's Reply Br. Mot. to Rem.," at 3. Stated differently, the putative federal issue in this case is whether improperly effectuating service under § 1608(e) violates New York Rules of Professional Conduct.

In that regard, a court will have to consider whether Defendant Tolchin possessed the "the legal knowledge, skill, thoroughness and preparation reasonably necessary" to serve the FSIA judgment on Iran, *see* N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0, Rule 1.1(a), or that Defendant Tolchin knew or should have known "that [he] [was] not competent to handle" serving the Republic of Iran, *see* N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0, Rule 1.1(b). Thus, determining whether Defendant Tolchin's

representation was incompetent will not require the Court to conclude definitively that he did, or did not, correctly serve the FSIA judgment; rather, the Court would only consider whether, under the circumstances, his representation was reasonable and whether he possessed the skills necessary to handle the matter. This case, therefore, is unlike *Jacobson* or *Grable*, where federal question jurisdiction was predicated on the interpretation of federal law to determine whether a state cause of action was viable. *See, e.g., Jacobson*, 824 F.3d at 317 (federal tax law); *Grable*, 545 U.S. at 311 (federal tax law).

The federal issue here is only tangentially present as a basis for asserting that Defendant Tolchin acted incompetently. However, attorney competence is primarily a state issue. Therefore, the Court finds that the lone federal issue ostensibly present here cannot form the basis of federal question jurisdiction under the four-factor test the Supreme Court articulated in *Gunn* and explained in *Jacobson*. *See Gunn*, 568 U.S. at 260 (explaining that "[t]he substantiality inquiry . . . looks . . . to the importance of the issue to the federal system as a whole"); *see also Grable*, 545 U.S. at 313 (stating that "it has in fact become a *21 constant refrain . . . that federal *21 jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum" (citations omitted)).

Moreover, as Defendant notes, "a complaint seeking a declaratory judgment is to be tested, for purposes of the well-pleaded complaint rule, as if the party whose adverse action the declaratory judgment plaintiff apprehends had initiated a lawsuit against the declaratory judgment plaintiff." *Fleet Bank*, *Nat. Ass'n v. Burke*, 160 F.3d 883, 886 (2d Cir. 1998) (citing *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 248, 73 S. Ct. 236, 97 L. Ed. 291 (1952) ("Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the

threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court")) (other citation omitted). Thus, in deciding whether there is a federal question, the Court must flip the case on its head and imagine that Defendant has filed an affirmative action seeking to enforce his putative charging and retaining liens. *See id.*

Framed in this way, the only alleged federal issue arises as an element of proof in a potential affirmative defense. However, "if a complaint alleges only state law based causes of action, it cannot be removed from state court to federal court even if there is a federal defense." *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38 (2d Cir. 1997) (citation omitted). Thus, had Defendant initiated this case, it would have sounded exclusively in state law.

Defendant gives three reasons why an affirmative case would satisfy federal question jurisdiction, none of which the Court finds persuasive. First, Defendant argues that, if he were to file a motion for fees, he would do so in the United States District Court in the District of Columbia. *See* Dkt. No 38 at 19. However, that hypothetical action would come under the *22 court's ancillary rather than original jurisdiction. Second, he argues that any coercive action would depend on the VSST because it places a cap on attorney's fees. *See id.* at 20 (citing 42 U.S.C. § 10609). However, Defendant's right to part of the FSIA judgment arises, if at all, under New York law regarding attorney's liens, not the VSST. Finally, he argues that, because the only non-frivolous action against Defendants in this case rests on the interpretation of 28 U.S.C. § 1608(e), he would state his claim in terms that establish compliance with the requirements of FSIA. *See id.* However, an anticipated defense cannot serve as the basis for federal question jurisdiction.

In sum, the Court accepts Magistrate Judge Peebles' recommendation to remand this case to state court for the reasons stated herein and in

Magistrate Judge Peebles' Report and Recommendation.

### d. Attorney's fees award

Magistrate Judge Peebles recommended that the Court deny both parties' competing motions for attorney's fees pursuant to 28 U.S.C. § 1447(c). *See generally* Dkt. No. 37. The parties do not object to Magistrate Judge Peebles' recommendation, and the Court has not identified an error in his analysis. Therefore, the Court accepts Magistrate Judge Peebles' recommendation and denies the parties' motions for attorney's fees related to Defendant's improper removal. *23

## C. Defendant's motion to change venue

In light of the Court's decision to grant Plaintiffs' motion to remand this case, it accepts Magistrate Judge Peebles' recommendation to deny Defendant's motion to change venue as moot.

# IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Peebles' March 23, 2017 Report and Recommendation, *see* Dkt. No. 37, is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Plaintiffs' motion to remand this action to New York State Supreme Court, *see* Dkt. No. 12, is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' motion for an award of attorney's fees in relation to their motion to remand, *see id.*, is **DENIED**; and the Court further

**ORDERS** that Defendants' cross-motion for an award of attorney's fees in relations to its defense of Plaintiffs' motion to remand, *see* Dkt. No. 21, is **DENIED**; and the Court further

**ORDERS** that Defendants' motion to transfer venue, *see* Dkt. No. 5, is **DENIED as moot**; and the Court further *24

**ORDERS** that the Clerk of the Court shall mail a certified copy of this Memorandum-Decision and Order to the Clerk of the New York State Supreme Court, Albany County, as 28 U.S.C. § 1447(c) requires.

IT IS SO ORDERED.

Dated: July 24, 2017

Syracuse, New York

/s/

Frederick J. Scullin, Jr.

Senior United States District Judge

 casetext

# EXHIBIT "D"

**From:** Finn Law Offices <ryan@lawfinn.com>
**Date:** August 10, 2023 at 2:51:47 PM EDT
**To:** Gerard Amedio <gerardamedio@amediolaw.com>
**Subject: Re: KT v. Queensbury**


 No worries.  All cards on the table:  I will be seeking to displace you and your client and getting a good and decent settlement for the children.  Shame on you for disclosing their names publicly.  You will hear from me in due course.   I am not an angry man but you shall see how far I'll go for my true clients:  the children.  Your client KT, is a liar and a piece of absolute garbage.


Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152
Cell: 518.210.7902
Fax: 518.677.1155
Ryan@lawfinn.com
www.lawfinn.com


On Aug 10, 2023, at 2:48 PM, Gerard Amedio <gerardamedio@amediolaw.com> wrote:


 Apologies, it was inadvertently omitted.
I will submit it tomorrow and email you as well.

Sent from my iPhone

On Aug 10, 2023, at 2:13 PM, Finn Law Offices <ryan@lawfinn.com> wrote:


Please send me exhibit K as it was not in your filing.


**Ryan M. Finn, Esq.**

Finn Law Offices
P.O. Box 966
Albany, NY 12201


Ph: 518.928.1152

Fax: 518.677.1155

Ryan@LawFinn.com

http://www.LawFinn.com


<image001.png>


&ast; **Physical location:** **12 Sheridan Avenue, Albany, NY 12207**

---

**From:** Finn Law Offices <ryan@lawfinn.com>
**Date:** August 10, 2023 at 3:00:47 PM EDT
**To:** Gerard Amedio <gerardamedio@amediolaw.com>
**Subject: Re: KT v. Queensbury**


 You should also fix the public disclosure of my clients mother real name.  Just a hint.  I know you have not likely ever handled a case like this but it os 101.


Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152
Cell: 518.210.7902
Fax: 518.677.1155
Ryan@lawfinn.com
www.lawfinn.com


On Aug 10, 2023, at 2:48 PM, Gerard Amedio <gerardamedio@amediolaw.com> wrote:


 Apologies, it was inadvertently omitted.
I will submit it tomorrow and email you as well.

Sent from my iPhone

On Aug 10, 2023, at 2:13 PM, Finn Law Offices <ryan@lawfinn.com> wrote:


Please send me exhibit K as it was not in your filing.


**Ryan M. Finn, Esq.**

Finn Law Offices
P.O. Box 966
Albany, NY 12201


Ph: 518.928.1152

Fax: 518.677.1155

Ryan@LawFinn.com

http://www.LawFinn.com


<image001.png>


**\* Physical location:  12 Sheridan Avenue, Albany, NY 12207**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

**K.T.**, *individually and as parent and natural*
*guardian of her infant children John Doe and*
*Jane Doe*

v.

**Board of Education of Queensbury Union**
**Free School District, Queensbury Union**
**Free School District, Superintendent Kyle**
**Gannon**, *in his individual and official*
*capacity*, **Assistant Superintendent Amy**
**Georgeadis**, *in her individual and official*
*capacity*, **Assistant Superintendent Denise**
**Troelstra**, *in her individual and official*
*capacity*, **Kenneth Bee**, *in his individual and*
*official capacity*, **Monique Agans**, *in her*
*individual and official capacity*, and **Michael**
**Brannigan**, *in his individual and official*

-----------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF**
**ORDER TO SHOW CAUSE**

Civil Docket #: 1:22-cv-00230-TJM-CFH

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF SARTOGA    )

I, K      T      being duly sworn deposes and says as follows:

1.      I am the plaintiff in the above-captioned matter, and the parent and natural

guardian of my two minor children, who are also plaintiffs in this action.

2.      I submit this Affidavit in Support of the Order to Show Cause asking this honorable court

to relieve Attorney Ryan Finn as my representative in this action, to allow the substitution of counsel and

to prohibit Attorney Ryan Finn from obtaining any of the proceeds of this action due to his misconduct.

3.      I retained Attorney Finn to represent myself and my two children in the above-referenced

action on September 28, 2021.

1

4.      Attorney Finn filed the Notice of Claim on October 14, 2021. I was advised that the next step would be to schedule a 50-H hearing. I sent Attorney Finn an email, and text messages requesting information as to the status of the case and he did not respond for approximately two months.

5.      In December of 2021, Attorney Finn finally responded to an email wherein he indicated that the defendants did not schedule a 50-H hearing and that he wanted to delay a press release. He also indicated that email would be the best means of communication, as his paralegal monitors his inbox. *See* Email Correspondence dated November 29, 2021 through December 20, 2021 attached hereto as Exhibit A.

6.      A 50-H hearing was scheduled for January 18, 2022 at opposing counsel's office. I attempted to wait outside in order to speak with Attorney Finn prior to the commencement of the hearing but received a phone call from him indicating he would be late. Attorney Finn advised me to go into the office without him. Once Attorney Finn arrived, I was deposed. Attorney Finn did little to debrief me after I was deposed.

7.      I continued to update Attorney Finn via email on my children's health status and provided him with information for potential witnesses he had requested. I rarely received a reply to those emails.

8.      In the beginning of March 2022, I called Attorney Finn and expressed concern regarding the complaint not being filed to date. On March 10, 2022, Attorney Finn filed the complaint. Included in the filed complaint was an unredacted "synapsis" document I had drafted for him that included personal information about my children. I was advised of this information from a third-party who had accessed the complaint. I requested that Attorney Finn remove this information and according to PACER, it was removed on March 14, 2022, but re-added on March 17, 2022.

9.      Throughout March and April of 2022, I continued to email documents and other records to Attorney Finn and never received a reply. On April 12, 2022, he finally responded and advised me that

2

a Rule 16 conference had been scheduled for June 9, 2022. *See* Email Correspondence dated April 12, 17, 26, 27, 2023 attached hereto as Exhibit B.

      10.     Over the course of the following eight months, I received very little communication from Attorney Finn other than his office sending me releases to sign. I sent emails that went unanswered, and made calls that were never returned. I was never sent any discovery documents to review.

      11.     I eventually became aware of PACER and noticed that the Court had ordered a mandatory mediation, but that the deadline was missed for a mediator to be assigned. On December 8, 2022, I sent another email asking for an update on the case and to schedule a call. On the call the next day, I suggested we attempt to settle the case as I was growing increasingly wary of Attorney Finn's ability to adequately represent me.

      12.     On February 3, 2023, I received an email from Attorney Finn informing me that there was a mediation scheduled for "next Friday." Attorney Finn did not include a time or location, nor did he state that I should attend. I responded, asking those questions. He advised me that he would like me to attend but that I didn't "have to". I never received a time or location from Attorney Finn and was forced to text his fiancé for that information, which she provided. *See* Email Correspondence dated February 3, 2023 attached hereto as Exhibit C.

      13.     Mediation took place on February 10, 2023, and I had requested to be present with Attorney Finn at his office during the virtual appearance. Attorney Finn informed me that he would be attending from his home, and as such, I could not be present with him in person during the mediation. During the mediation, I was informed that the school district had submitted a mediation statement, but Attorney Finn had not submitted one on my behalf. Attorney Finn and I had a brief phone conversation right before the start of the mediation, wherein we discussed the lowest amount I would be willing to settle for. During the mediation, the defendants offered an amount far lower than what we had discussed, and Attorney Finn appeared to be upset that I would not accept the offer. Immediately after the mediation I attempted to call Attorney Finn to discuss what had occurred, but he did not answer my call.

14.     On February 23, 2023, I sent Attorney Finn another email outlining my frustration with the lack of communication regarding my case. Instead of providing me with the information I requested, he responded that I had to "find a new lawyer". When I asked for him to explain that sentiment, he responded with the following email which I find extremely offensive and unprofessional:

> "Because your expectations are ridiculous and I have way too many clients, all with important cases, and many much much more significant in terms of damages. You are lucky to have your kids. **You are lucky your children haven't been killed, killed themselves, or been raped.** I choose to focus on clients that respect me and my time and that have some sense of reality when it comes to what to expect. You do not fit that bill. Let me know where to send your file."

Attorney Finn further indicated that he would waive his fees and not require any payment for services rendered. *See* Email Correspondence dated February 23, 2023 attached hereto as Exhibit D (*emphasis added*).

15.     I had several consultations and ultimately chose to seek representation from Attorney John Hoke who wanted to speak with Attorney Finn prior to accepting me and my children as clients. I was advised by Attorney Hoke that he had attempted to contact Attorney Finn and never received a response. I emailed Attorney Finn inquiring as to why he had not responded to Attorney Hoke and never received a response. Ultimately, Attorney Hoke did not accept our case. *See* Email Correspondence dated March 20, 24, and 27, 2023 attached hereto as Exhibit E.

16.     On April 17, 2023, I sent Attorney Finn an email inquiring about the settlement conference scheduled on May 1, 2023. It took Attorney Finn nine days to respond, indicating that I could attend the settlement conference. He never informed me of the location of the conference. *See* Email Correspondence dated April 17, 2023 and April 26, 2023 attached hereto as Exhibit F.

17.     Attorney Finn did not communicate with me prior to the settlement conference. I felt very pressured during this conference to settle the case, as I had not seen any of the discovery that was provided by the defendants, and never discussed the merits, theories or likelihood of success at trial with Attorney Finn. I ultimately agreed to settle the matter, although no terms and conditions were ever mentioned during the conference other than that I would be releasing any claims related to the specific incidents alleged.

18.     On June 5, 2023, after sending two emails that went unanswered, I sent a third inquiring as to the status of the settlement paperwork. Ten days later, Attorney Finn finally responded with a proposed release which included language that was not explained to me, and had the wrong settlement amount. I requested to speak with Attorney Finn regarding concerns I had with the release and he would not arrange a meeting to discuss it with me. *See* Email Correspondence dated June 5, 2023, June 15, 2023 attached hereto as Exhibit G.

19.     On June 24, 2023, I emailed the school district (a defendant in this matter) requesting a CSE meeting for my son, as he may have to return there. I received a text message from Attorney Finn that day stating: "Why are you emailing the school? Like really, what the hell is wrong with you." Attorney Finn continued: "You need to find another lawyer. I'm absolutely done, and I'll take my third anyway." *See* June 24, 2023 text message attached hereto as Exhibit H.

20.     On June 29, 2023, I received an email from Attorney Finn informing me that a conference was scheduled for the next day to discuss finalizing the settlement. At the conference, Attorney Finn had me sign the infant compromise order, but did not explain it to me. During the conference, it was indicated to me that I could never sue the school district again. This concerned me, as my children may have to attend a school within that district, and I did not want to be

5

prohibited from any potential remedies if there were any issues in the future. I sent Attorney Finn a copy of the transcript from the settlement conference in May, outlining the terms I had agreed to. I did not receive a response.

21.     On July 12, 2023, I sent Attorney Finn a text message asking for a phone conversation to discuss the status of the settlement. The following day, I received a text message from Attorney Finn threatening to remove me as guardian for my children's case because I was "not listening to counsel". He further stated that he would no longer speak with me and he would seek to "displace" me. I informed him that he was fired and to not contact me again. *See* Text Messages dated July 13, 2023 attached hereto as Exhibit I.

22.     Attorney Finn has continued to contact me and has not informed me that his prior agreement to waive all fees was "withdrawn." *See* Exhibit I. On July 19, 2023, he continued to contact me, and informed me again that he would be asserting a lien on any settlement of this matter. *See* Email Correspondence dated July 19, 2023 attached hereto as Exhibit J.

23.     I recently became aware that Attorney Finn made a public comment on Facebook related to this case wherein he disclosed several confidential, and extremely private details involving my claims against the school district. Specifically, he outlined specific details regarding the nature of the sexual harassment and abuse suffered by my minor child in a public Facebook comment. Attorney Finn made this comment in response to someone commenting that "lawyers" were "trying to get rich any way they can". *See* Facebook Post attached hereto as Exhibit K. To add insult to injury, Attorney Finn continued to interact with the post, even responding to another poster's request for representation and providing his phone number. Exhibit K.

24.     I have met with and retained Attorney Gerard Amedio to represent me in this matter.

6

25.    Throughout the course of his representation, I have felt abandoned, ill-prepared, pressured, and threatened by Attorney Finn.  Attorney Finn is clearly unable to practice in a professional manner.  He is volatile and prone to angry outbursts, as outlined in his correspondence with me, and his inability to control himself in a public Facebook post wherein he discloses personal, private, confidential details about my minor children.

26.    I terminated his representation for cause due to his misconduct and unprofessionalism as outlined above.

WHEREFORE, I respectfully request this Court grant the Order to Show Cause in it's entirety, relieve Attorney Finn and substitute Attorney Amedio as counsel, and prohibit Attorney Finn from receiving proceeds, if any, from the culmination of this suit, together with such other and further relief as to the Court may deem just and equitable.

Dated: August _/O_, 2023

K     T

Sworn before me this _/O_
of August, 2023

Notary Public    GERARD V. AMEDIO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02AM6089055
Qualified in Saratoga County
Commission Expires March 17, 20_2_

7

# EXHIBIT "A"





## Update
1 message

**K████ T████ <████████████████>**
To: Finn Law Offices <ryan@lawfinn.com>

Mon, Nov 29, 2021 at 8:06 PM

Hi Ryan, I was wondering what the status of the hearing is. K█████

Hi Ryan, I'm wondering if you're seeing my text messages. It's nothing personal. I think my school experience has me tainted in thinking people don't respond for a bad reason. I don't think negatively of you of course but I hate being left in the dark because then I worry something isn't going well. With that being said and keeping an open mind that there is many reasons why you might not be able to respond in a timely manner, is your work load too much right now? I'd consider bringing on a second attorney if you needed to. I know you have done a lot of work already and I appreciate and value your experience and drive here so I want to still work with you but please let me know ypur thoughts. Is there something that might work better for you? Like maybe scheduling a weekly update text from you or something just so I don't go crazy lol. And then I'm also not bugging you when you probably have a lot on your plate that is more urgent. Please let me know.

**Ryan Finn** <+15182107902@unknown.email>                                                   Mon, Dec 20, 2021 at 5:40 PM
To: K█████████

I can handle the case it is simply that they haven't done something as simple as scheduling the 50-h.  I do not want to do a press release before the 50-h because they can use it to impeach you and ask you questions.  I didn't mean to ignore. Definitely email is better because my paralegal gets those.   Ryan@lawfinn.com

Taylor@lawfinn.com

<k█████████                                                                                    Mon, Dec 20, 2021 at 5:42 PM
To: Ryan Finn <5182107902@unknown.email>

Okay. I'll start emailing instead. That is helpful thank you. Please don't think I think your incompetent at all. I've dealt with these people so much I understand what walls you may be hitting. I'll send an email now so I start on the right track here because I do have a further question about the time frame.

# EXHIBIT "B"

*3*



## Parent
1 message

K███████ T████████                                                    Tue, Apr 12, 2022 at 11:05 AM
To: Finn Law Offices <ryan@lawfinn.com>

Hi Ryan, I sent you an email a couple of weeks ago. Did you get it? I was thinking maybe we could setup a monthly check in type thing so I don't bug you too much and so I stay in the loop. I'm sure this is a long process. I also attached a screenshot and video of last night's school board meeting. This mom has a 6th grade son that was recently physically harmed/bullied at Queensbury Middle School and they initially responded very poorly. ████████ and ████████ would be in the same grade if still there. Not sure if this has any baring on the case but I thought I'd share a small clip of her testimony and screenshot of when she reached out to me so you have her name. The top two virtual people you see in the video are board members and the woman on the right of the mom is Denise Troelstra. They are definitely uncomfortable and you see Amy Molloy write something down with a concerned look. I'm sure they don't like this public complaint with the pending suit. https://drive.google.com/█████████████████████████████

Talk soon, K██████ T█████

4



## Pacer
3 messages



K████ T████ ████████ ████████
To: Finn Law Offices <ryan@lawfinn.com>                              Mon, Apr 17, 2023 at 5:12 PM

Hi Ryan, I noticed on Pacer there is a settlement conference in two weeks. I'd certainly like to get this over with for both of us if possible. Is this something I attend? Could you please let me know? Hope you're doing well. K████ T████

Finn Law Offices <ryan@lawfinn.com>                                 Wed, Apr 26, 2023 at 10:15 AM
To: K████ T████ <████████████████



K████

Yes, it would be preferred if you attend the settlement conference.  If you cannot make it we can talk ahead of time about parameters but the Judge prefers clients in attendance.

Please let me know.

Kind regards,

Ryan

## Ryan M. Finn, Esq.

Finn Law Offices
P.O. Box 966
Albany, NY 12201

[Quoted text hidden]

K████ T████ ████████ ████████
To: Finn Law Offices <ryan@lawfinn.com>                             Thu, Apr 27, 2023 at 11:09 PM

Hi Ryan. I'll be there. I have 1:30 written down. If you could let me know where to go, that would be helpful. Thanks,
K████
[Quoted text hidden]

# EXHIBIT "C"



## Question
1 me   age

**Finn        ffi**   <ryan@lawfinn.com>                                    Fri, Feb 3, 2023 at 5:58 PM
To: K█████ T████ ████████████████████ >

Your in  tinct i  correct  Plea  e do not   end

We are scheduled for mediation next Friday.  Let's see if we can settle the case and allow you and your family to move
forward.

Ryan M. Finn, Esq.
Finn Law Offices
PO  Box 966
Albany, NY 12201
Ph: 518.928.1152

Fax  518 677 1155
Ryan@LawFinn.com
www.LawFinn.com

On Jan 29, 2023, at 7:44 PM, K████████████████████ > wrote:

Quoted text h dden]



**Question**

1 me   age

**Finn        ffi        <ryan@lawfinn.com>**                                        Fri, Feb 3, 2023 at 6:14 PM
To: K████ T██ █████████████████

I would prefer you attend ye     But you don't have to


Ryan M  Finn  E  q
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph  518 928 1152

Fax: 518.677.1155
Ryan@LawFinn.com
www LawFinn com




On Feb 3, 2023, at 6:05 PM, K████ ███████████████> wrote:


[Quoted text h dden]



## Question

1 me   age

  >
To: Finn Law Offices <ryan@lawfinn.com>

Fri, Feb 3, 2023 at 6:16 PM

What time and where next Friday?
Quoted text h dden]

# EXHIBIT "D"





## Please Reply

9 messages

K█████ T█████ ████████████           Thu, Feb 23, 2023 at 7:35 PM
To: Finn Law Offices <ryan@lawfinn.com>

Hi Ryan, I am really struggling with the lack of communication here. After mediation I called you right away and left a voice mail asking what the next steps are so I dont bother you too much. That was two weeks ago, no response. Then I noticed Queensbury filed a judgement and had to pay for it to read it on Pacer because you never informed me. I sent you a text Monday asking if we could talk about it. It's Thursday-havnt heard from you at all. I've tried to be patient and give you the benefit if the doubt that something came up, but this may effect my case so it's worrisome for me. Remember, I've never sued anyone before. I know nothing about how this process works. I have no clue what happens next. I've asked when their discovery is due to us and I havnt gotten an answer from you about that either. I never saw the mediation statement you submitted and have no clue if you're trying to negotiate things behind the scenes or not. It's been over a year since the notice of claim was filed and I havnt gotten a single record the district is obligated to give me. And to my knowledge, not a single discovery document. I know I'm not paying you by the hour currently so that probably makes a difference on how much communication I get, but as I'm sure you can tell I've done my part. I've organized all the files and documented everything very thoroughly. I've converted all the audio files for you and reorganized the folders at your request. I took days off from work for the 50h hearing and the mediation. I've signed all the releases and mailed everything you requested. I'm willing to do whatever it takes, but I feel lost in the shuffle here. Can you send me the stipulation timeline which I'm thinking would have the discovery and trial date on it. If you tell me what to expect next or when new things come up-i won't have to keep inquiring. Please reply-even if you have something going on, just to tell me when I can expect to hear from you. Thank you, K█████ T█

---

**Finn Law Offices** <ryan@lawfinn.com>           Thu, Feb 23, 2023 at 8:38 PM
To: K█████ T█████ ████████████

I think it's time for you to find a new lawyer

Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152

Fax: 518.677.1155
Ryan@LawFinn.com
www.LawFinn.com

On Feb 23, 2023, at 7:35 PM, K█████ T█████ <████████████> wrote:

[Quoted text hidden]

---

K█████ T█████ ████████████           Thu, Feb 23, 2023 at 8:44 PM
To: Finn Law Offices <ryan@lawfinn.com>

Can you explain please. I'm very confused.
[Quoted text hidden]

**Finn Law Offices** <ryan@lawfinn.com>                                         Thu, Feb 23, 2023 at 8:48 PM
To: K████ T████  <████████@gmail.com>

Because your expectations are ridiculous and I have way too many clients, all with important cases, and many much much more significant in terms of damages.  You are lucky to have your kids.  You are lucky your children haven't been killed, killed themselves, or been raped.

I choose to focus on clients that respect me and my time and that have some sense of reality when it comes to what to expect.

You do not fit that bill.  Let me know where to send your file.


Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152

Fax: 518.677.1155
Ryan@LawFinn.com
www.LawFinn.com




On Feb 23, 2023, at 8:45 PM, K████ T████ ████████████████████ wrote:


[Quoted text hidden]


**K████ T████** ████████████████████                                           Thu, Feb 23, 2023 at 9:10 PM
To: Finn Law Offices <ryan@lawfinn.com>

I'm sorry you feel that way and I'm sorry if I did have unreasonable expectations...but I've been asking for you to outline reasonable expectations for me because I don't know what to expect. The judgement says to reply within 14 days and it's been 9 so I felt it was reasonable to be worried why I hadn't heard from you. I wish things didn't have to go this way but it's clear you don't want to help us. How do you get paid if I can find a new attorney?
[Quoted text hidden]

**Finn Law Offices** <ryan@lawfinn.com>                                         Thu, Feb 23, 2023 at 9:11 PM
To: K████ T████ ████████████████████

I'll waive all fees.  No payment needed.  Good luck


Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152

Fax: 518.677.1155
Ryan@LawFinn.com
www.LawFinn.com

# EXHIBIT "E"





## Update

1 message

**K████ T████████████████**
To: Finn Law Offices <ryan@lawfinn.com>

Mon, Mar 13, 2023 at 8:17 PM

Hi Ryan, I met with attorney John Hoke today. I wasnt sure what to say exactly why I needed a new attorney, so I left it pretty general that you and I were not on the same page. I think that sparked him wanting to speak with you, so he plans to contact you-if he hasn't already, so I thought I'd give you a heads up. I'm speaking with another attorney Wednesday. Because nothing is definite of course, if you need anything from me discovery wise, please let me know. I appreciated the phone call Friday. Thanks a lot, K█████

10



## Queensbury case

1 message

**John Hoke** <JHoke@smithhoke.com>                                    Mon, Mar 20, 2023 at 2:08 PM
To: █████ T████████████████████

Ms. T████

I have left a message with Mr. Finn looking to discuss the matter with him.  As soon as I hear back, I will advise you of my firm's position with respect to representation.  I apologize for the delay.

### John J. Hoke | Attorney at Law

SH — SMITH HOKE, PLLC —
       Attorneys at Law

16 Wade Rd. | Latham | NY | 12110

Mailing Address:

P.O. Box 128 | Slingerlands | N.Y. | 12159

| p | 518.489.5600 ext. 1 | f | 518.641.1286

| e | jhoke@smithhoke.com

### CONFIDENTIALITY NOTICE

THE INFORMATION CONTAINED IN THIS CORRESPONDENCE IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED ABOVE. IF YOU ARE NEITHER THE INTENDED RECIPIENT NOR AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THE INFORMATION CONTAINED HEREIN IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS CORRESPONDENCE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE TO ARRANGE FOR THE RETURN OF THE ORIGINAL DOCUMENTS TO THE LAW OFFICES OF SMITH HOKE, PLLC.

### IRS CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

[Quoted text hidden]



## Message
1 message

K▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮                                          Fri, Mar 24, 2023 at 11:08 PM
To: Finn Law Offices <ryan@lawfinn.com>

Hi Ryan, attorney Hoak said he tried calling you, but hasn't heard back yet. Did you get a chance to connect yet? Please let me know. Thanks, K▮▮▮



## Queensbury case

1 message

**John Hoke** <JHoke@smithhoke.com>                                                    Mon, Mar 27, 2023 at 4:18 PM
To: K█████ T█████████████████

Ms. T██████

I apologize for the delay in responding to you.  I had hoped to have an opportunity to discuss the matter with Ryan Finn since he indicated to you that he was looking to transition the matter, however, I have not received a response. Notwithstanding the lack of communication from Mr. Finn, my firm has spent a considerable amount of time reviewing the pleadings and contemplating whether we believe we can put your children in a better position than they are in with Mr. Finn's representation and have determined that at this juncture, we would not be successful in adding value to the case. This is based upon the present procedural posture of the matter and the real possibility that our ability to obtain relevant evidence might be precluded by the scheduling order.  I agree with you that the video, and audio, of the bus rides would be critical in helping you substantiate that the conduct transcended normal inappropriate behavior on the bus, that the school was aware of that conduct and deliberately indifferent to what was transpiring on the bus.

As a result, we will be unable to assist you in this matter.  I would urge you to continue working with Mr. Finn to the extent you are unable to locate other competent counsel.  I believe that Mr. Finn is certainly competent to handle your matter.  I appreciate the opportunity to assist you and wish you the best of luck.

[Quoted text hidden]

# EXHIBIT "F"

4



## Pacer

3 messages

K███ T███ ███████                                             Mon, Apr 17, 2023 at 5:12 PM
To: Finn Law Offices <ryan@lawfinn.com>

Hi Ryan, I noticed on Pacer there is a settlement conference in two weeks. I'd certainly like to get this over with for both of us if possible. Is this something I attend? Could you please let me know? Hope you're doing well. K███ T███

**Finn Law Offices** <ryan@lawfinn.com>                        Wed, Apr 26, 2023 at 10:15 AM
To: K███ T███ ███████

K███████

Yes, it would be preferred if you attend the settlement conference.  If you cannot make it we can talk ahead of time about parameters but the Judge prefers clients in attendance.

Please let me know.

Kind regards,

Ryan

### Ryan M. Finn, Esq.

Finn Law Offices
P.O. Box 966
Albany, NY 12201

[Quoted text hidden]

K███ T███ ███████                                             Thu, Apr 27, 2023 at 11:09 PM
To: Finn Law Offices <ryan@lawfinn.com>

Hi Ryan. I'll be there. I have 1:30 written down. If you could let me know where to go, that would be helpful. Thanks,
K███████
[Quoted text hidden]

**EXHIBIT "G"**

14



---

## Settlement

3 messages

---

**K████ T█████**                                                        Mon, Jun 5, 2023 at 9:23 AM
To: Finn Law Offices <ryan@lawfinn.com>

Ryan, it's been over a month since the verbal settlement with Judge Hummel. I've sent you two emails and have gotten no response. I want this to be over and I know you do too, so why I havnt I heard anything from you? If the school is the hold up, then please say so. Just give me something here. What is the timeline here to be done? K████ T████

---

**Finn Law Offices** <ryan@lawfinn.com>                                  Thu, Jun 15, 2023 at 12:20 PM
To: K█████ T█████████████████████████████

I received the proposed release (attached) which I needed to prepare our infant settlement order. I will have a draft of the motion (which is fairly straight-forward next week. We are almost there

## Ryan M. Finn, Esq.

Finn Law Offices
P.O. Box 966
Albany, NY 12201

[Quoted text hidden]

---

**K████ T██████████████████**                                           Thu, Jun 15, 2023 at 12:47 PM
To: Finn Law Offices <ryan@lawfinn.com>

Thanks. That is more money that verbally agreed upon. How did that happen? Also how does the stipulation work regarding my job where I reserve the rights to that? I don't see it mentioned. K█████
[Quoted text hidden]

# EXHIBIT "H"





**Ryan Finn** ⌄

Saturday, June 24

Why are you emailing the school.  Like really, what the hell is wrong with you

3:42 PM

I told
You I was preparing the paperwork.

You need to find another lawyer.  I'm absolutely done, and I'll take my third anyway

3:43 PM

I apologize.
 I was livid.  But we both want to get this done so I can't have you undermining me and my efforts.  Let's salvage this and move forward

4:04 PM

Wednesday, July 12

I need to know what's going on...if anything. I feel like a phone conversation would be much easier than the emails back and forth, but I've asked several times in those emails what my options are, and I don't believe you

# EXHIBIT "I"

12:23 PM   answered.

Thursday, July 13

I assume you contacted the court directly
again?  That is completely inappropriate
12:15 PM

I must tell you;  my next move is to have you
removed as guardian of your children's case.
You are not listening to counsel and are
erratic.
12:31 PM

You won't talk to me about me any further
about the release so what choice did I have
Ryan? I've just asked what my options are.
And the other tome I contacted the court
was to get a copy of the transcript. I don't
see how I have done anything wrong.
12:40 PM

I will no longer speak to you.  We will let the
judge decide.  I want nothing to do with you.
12:41 PM

I still represent your children and I will seek
to displace you.
12:42 PM

You're fired Ryan and please don't contact
me again.
12:43 PM

Please be advised that I retain a charging
lien of 1/3 recovery for any payments you
receive.  I've notified the court and opposing
counsel of your decision.
12:55 PM

And my agreement to waive any costs or
any disbursements previously made are
withdrawn.  I will seek it all
12:56 PM

Stop harassing me. I asked you not to
contact me anymore.
12:57 PM

    

# EXHIBIT "J"

 **Finn Law Offices** 1:47 PM 

to me ⌄

Not trying to harass you, but just making clear, whether you do, or don't find new counsel, I am asserting a lien of 1/3 of the recovery pursuant to our retainer agreement.  Please be advised that, if you and your children are not Medicaid or Medicare recipients, there is no lien.  Private health insurers are prevented from asserting them.  I'd be agreeable to working with you to just get this done.  Just need to keep it professional, on both ends.

Ryan M. Finn, Esq.
Finn Law Offices
P.O. Box 966
Albany, NY 12201
Ph: 518.928.1152
Cell: 518.210.7902
Fax: 518.677.1155
Ryan@lawfinn.com
www.lawfinn.com

# EXHIBIT "K"

 **facebook**                                                                    Log In



### Moving Saratoga Forward
March 10, 2022 · 🌐

[Queensbury Union Free School District](#) is facing a $5M federal lawsuit due to its failure to protect two students from bullying, harassment and discrimination by other students.

According to the filing, the plaintiffs children were threatened with rape and told to engage in sexual activity with their siblings.

Attorney for the victims, Ryan Finn stated; "it is about time that these School Districts start paying attention and take bullying and harassment seriously."

[The Post-Star](#)

### Moving Saratoga Forward
Personal blog                                               💬 Send message

👍😮🥰 153                          120 comments   368 shares

👍 Like                              💬 Comment

                                          Most relevant ▾

✏️ Author
**Moving Saratoga Forward**
Moving Saratoga Forward is Saratoga County's MOST trusted source for news
1y                                        👍😂 3

▸ View 2 previous replies

✏️ Author
**Moving Saratoga Forward**
Tammy Keller it definitely doesn't mean labor union

# facebook

Log In



Lawyers trying to get rich any way they can. Disgusting for sure.

1y

😲😂 4

Wait. You think the parents suing the school and their lawyers are just looking for a payday? Or am I misunderstanding you?

1y

👍 7

you're are not misunderstanding him

1y

😢

if my interest in obtaining justice and holding people accountable disgusts you then I suppose we just view the world very differently. We also seek removal of the Superintendent and school officials involved; seek to prevent further abuse of other children and parents in the District; and, seek to prevent use of non-disclosure agreements aimed at hiding and obscuring the truth. Let's be clear: my client, a fifth grade child, was encouraged to "suck her brother's penis" and then also threatened that she and her mother would be raped if she didn't do so. This happened after months of daily abuse and numerous complaints about this specific bus and the harassers involved who have engaged in this behavior without any recourse. Enough is enough. Maybe I should have demanded 10 million after the School lied and covered up the entire incident, not to mention neglecting to take action whatsoever to protect the children, in general, in the Queensbury District, and this bus in particular. Sorry pal, not going to accept School officials passing the buck any more.

1y

👍❤️😲 29

Ryan Finn can you PLEASE help me pursue legal action against my son's private school? I'm literally begging you. I've exhausted all resources I can find for months.

1y

# facebook

Log In



I certainly can take a look.
518.928.1152

1y